## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

PAUL F. JANNUZZO,

       Plaintiff,

   v.

GLOCK, INC.; CONSULTINVEST, INC.; ROBERT T. CORE; and JOHN F. RENZULLI;

       Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

### COMPLAINT

**"He's [Jannuzzo] still full of false bravado. . . .  His children will only know him as a convict.  [Judge] Kell will bury him if he doesn't cooperate."**

**— Defendant Robert Core**



## <u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION ..................................................................1

II.    PARTIES............................................................................................3

III.    JURISDICTION AND VENUE ........................................................9

IV.    BACKGROUND INFORMATION ..................................................12

    Glock, Sr.'s Control Over Glock, Inc. and the Larger Glock Group...................12

    Glock, Sr.'s Illegal Activities Exposed .........................................14

V.    DEFENDANTS' SCHEME TO INDICT AND CONVICT JANNUZZO ......17

COUNT I – 42 U.S.C. § 1983 – Malicious Prosecution ................................48

COUNT II – 42 U.S.C. § 1983 – Due Process................................................49

COUNT III – 42 U.S.C. § 1983 – Conspiracy for Violation of Civil Rights.............50

COUNT IV – State Law Claim for Malicious Arrest, Imprisonment, and Prosecution ........................................................53

COUNT V – Violation of O.C.G.A. § 16-14-4(a).........................................53

COUNT VI – Violation of O.C.G.A. § 16-14-4(b) .......................................60

COUNT VII – Violations of O.C.G.A. § 16-14-4(c)....................................61

COUNT VIII – Punitive Damages .................................................................62

PRAYER FOR RELIEF..................................................................................63

Plaintiff Paul F. Jannuzzo, by and through counsel, brings this action against the above-named Defendants, and alleges the following:

## I.    NATURE OF THE ACTION

1.    This case stems from the efforts of a private employer, Glock, Inc.,[1] to criminally prosecute its former employee, Plaintiff Paul F. Jannuzzo, as part of a multi-year campaign of private vindictiveness against a number of individuals formerly affiliated with Gaston Glock Sr. ("Glock Sr."); Glock, Inc.; Consultinvest, Inc.; and other Glock-affiliated entities (collectively "Glock"). Glock used its wealth, power, and influence to fund and advance the criminal prosecution of several individuals that it wanted to see locked away.

2.    Over a number of years, Defendants Glock, Inc. and Consultinvest, Inc., through their private legal counsel Defendants Robert Core and John Renzulli (who acted at Glock Sr.'s direction), crafted a criminal case against several Georgia citizens formerly associated with Glock.  When Glock was unable to gain traction with federal officials, it presented the case to the Cobb County District Attorney's office—where it found willing participants.

---

[1]    The cover page image is the cover of a trial preparation binder used by Defendant Assistant District Attorney John Butters in the case of *State v. Jannuzzo.*

3.    Assistant district attorney John Butters joined forces with Glock to "investigate" and press forward with a case against Mr. Jannuzzo that was not supported by probable cause. In turn, Butters, Core, and Renzulli collectively directed Detective Ramon Keith Harrison and the investigation conducted by the Smyrna police department.  Butters and Det. Harrison were able to provide the imprimatur of support of the State of Georgia for investigatory and prosecutorial steps Glock would have been unable to take on its own as a private citizen.  In short, Defendants improperly used the State's criminal justice system to advance a private retributive interest.

4.    Defendant Core, with input from Defendant Renzulli, and Butters' approval, largely took the lead and crafted Glock's criminal case.  For example, Mr. Core:  interviewed witnesses on his own; instructed Det. Harrison whom to subpoena and what to ask for; decided what documents to produce and when; and determined the order of the prosecution's witnesses and the contents of their testimony.    Mr. Core  did  everything  short  of  actually  presenting  the prosecution's case at trial.

5.    The sole motivating factor for Defendants Core and Renzulli was to obtain a conviction for their clients Glock, Sr., and Defendants Glock, Inc. and Consultinvest, Inc.   Unrestrained by any of the duties and obligations that

2

traditionally constrain police officers and prosecuting officials, but with the ability to bring the full power of the State of Georgia to bear through the involvement of Butters and their influence over Harrison, Defendants were able to wield the power of State investigating and prosecuting officials without any of the associated protections that normally accompany the use of such power.

6.     Defendants Core and Renzulli were not sworn police officers or ministers of justice.  They were not even attorneys licensed to practice law in Georgia.  These Defendants tampered with witnesses and evidence, withheld exculpatory evidence, and advocated positions that were clearly and directly contrary to established law.

7.     The result was years of legal proceedings, arrest, imprisonment and associated injuries to Mr. Jannuzzo founded on a prosecution that was never supported by probable cause before his conviction was finally and conclusively reversed by the Georgia Court of Appeals.

II.    **PARTIES**

8.     Plaintiff Paul F. Jannuzzo is a citizen of the State of Georgia.  He is a lawyer and a former prosecutor for the state of New Jersey.  He was long-time general counsel to Glock, Inc.  He is 59 years old.

9.     Plaintiff has standing to bring these claims, because, as described more fully herein, he is a person who has sustained injury to his person and property by reason of Defendants' conduct.  Plaintiff sustained injury in the form of unjust arrest and imprisonment, malicious prosecution, and damage to his person and property, as well as to his professional livelihood and reputation. Defendants' acts of racketeering have been directed at him; he was and is the intended victim.

10.     Plaintiff suffered significant personal and financial harm and losses. These injuries were caused by Defendants' conduct.  Plaintiff was arrested on February 7, 2008, and initially incarcerated in Cobb County for two weeks in February 2008.  He was subsequently continuously incarcerated from December 2009 through July 17, 2013.  After his trial, Mr. Jannuzzo spent several weeks at the Georgia Diagnostic and Classification State Prison in Jackson, Georgia which also houses Georgia's "death row."  In December 2012, Jannuzzo was transferred to Autry State Prison near Pelham, Georgia where he was held until his release, eight days after the Court of Appeals' reversal of his convictions.

11.     Because Defendants are directly responsible for losses suffered by Plaintiff, each is liable to Plaintiff for treble the amount of Plaintiff's losses, and attorneys' fees, as permitted by law.

4

12.     Plaintiff was the target of Defendants' racketeering scheme. The original and ongoing purpose of the scheme was to inflict harm on Plaintiff individually. His injuries (as detailed herein) are a direct result of that scheme and Defendants' conduct.

13.     Defendant Glock, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

14.     Defendant Consultinvest, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Smyrna, Georgia.

15.     For at least a portion of the relevant time, Butters maintained a part-time private practice while also serving as an assistant district attorney. Butters sometimes used a private email address and not his official Cobb County email address in communications regarding the criminal case against Plaintiff.

16.     Defendant Robert Core is a citizen of the State of Virginia and is also a lawyer. On information and belief, Core is not and has never been licensed to practice in Georgia.

17.     Defendant John Renzulli is a citizen of the State of New York and is also a lawyer. On information and belief, Renzulli is not and has never been

5

licensed to practice in Georgia.  At all relevant times, Renzulli was also CEO of Defendant Consultinvest, Inc.

18.    Each of the Defendants named herein is a "person" as defined by 18 U.S.C. § 1961(3), because each is an "entity capable of holding a legal or beneficial interest in property."

19.    Defendants also conspired with certain other non-party actors to engage in the improper activities detailed herein.

20.    Gaston Glock, Sr. is a citizen of the Republic of Austria.

21.    At all times material hereto, Glock Sr. exercised ultimate control and authority over Glock Inc. and Consultinvest, such that those entities no longer had a separate mind, will, or corporate existence of their own. The corporate entities within the Glock structure, including Glock Inc. and Consultinvest, were mere instrumentalities used by Glock Sr. to further his own interests. In substance, Defendants Glock, Inc. and Consultinvest were mere alter egos of Glock Sr., such that it is fair to impute the actions of Glock Sr. to Glock Inc. and Consultinvest and vice versa.

22.    John Butters is a citizen of the State of Georgia and at all relevant times was a Cobb County assistant district attorney acting under color of state law.[2]

23.    Patrick Head was Cobb County District Attorney until his retirement on December 31, 2012.  District Attorney Head was at all relevant times acting under color of state law.

24.    Christopher Timmons is a former assistant district attorney for Cobb County.  Mr. Timmons was at all relevant times with the Cobb County District Attorney's Office and, acting under color of state law, assisted in the prosecution of Mr. Jannuzzo as described *infra*.  Mr. Timmons departed when Vic Reynolds became Cobb County's new district attorney in January 2013, and he is now with the DeKalb County district attorney's office in Decatur, Georgia.

25.    Defendants and their conspirators (Glock Sr., Butters, Head, and Timmons) also used and directed other non-party actors to engage in the improper activities detailed herein.

---

[2]    Mr. Butters returned to private practice after the events detailed herein. Butters is currently a defendant in a civil RICO suit, under investigation by the Fulton County District Attorney's Office, and disqualified from representation of a client for his role in the client's illegal video recording of a consensual sexual encounter.

26.    James Deichert is a citizen of the State of Georgia and is a lawyer for Glock, Sr., Glock, Inc., and Consultinvest, Inc.

27.    Carlos Guevara is the current general counsel of Glock, Inc.

28.    Ramon Keith Harrison is a former police officer and Detective for the city of Smyrna, Georgia.  Det. Harrison was at all relevant times with the Smyrna Police Department and, acting under color of state law, served as the lead investigating officer for the State in the case against Mr. Jannuzzo.[3]

29.    Robert Wellon is a resident of the State of Georgia and is an attorney practicing in Atlanta, Georgia.

30.    The named Defendants, together with Glock Sr., D.A. Head and A.D.A. Timmons, conspired to engage in the improper activities detailed herein. Those individuals and the other non-party Actors identified above together form an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").  The Enterprise consisted of Defendants, and non-party actors Glock Sr., Mr. Deichert, Det. Harrison, Mr. Butters, District Attorney Head, Mr. Timmons, Mr. Wellon, Mr. Guevara, the Cobb County District Attorney's Office, and the Smyrna Police

---

[3]    As used herein, the term "State Actors" refers to Butters, Head, Timmons, and Harrison.

Department.  The Enterprise furnished a vehicle for the commission of a pattern of racketeering activity.

31.    The Enterprise had: a common purpose; an ongoing structure or organization supported by personnel or associates with continuing functions or duties, including lawyers operating under the pretended cloak of "attorney-client privilege"; relationships among those associated with the Enterprise; a common source(s) of financing their efforts; and longevity sufficient to permit those members to pursue the Enterprise's purpose.

32.    A hierarchy existed in which Glock Sr. was the leader, while Defendants and members of the Enterprise (many of them attorneys answering to Glock Sr.) controlled and combined to operate and manage the Enterprise's affairs and achieve its ends.

33.    The Enterprise is distinct from the pattern of racketeering activity in which Defendants have engaged.  Moreover, the Enterprise is distinct from any one Defendant.

## III.    JURISDICTION AND VENUE

34.    This Court has subject matter jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1331 (federal question), because Plaintiff's claims

arise pursuant to 42 U.S.C. § 1983 (conspiracy in deprivation of constitutional civil rights).

35.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under state law, because the claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

36.     Defendants Glock, Inc. and Consultinvest, Inc. are subject to the personal jurisdiction of this Court because they are organized under the laws of the State of Georgia; maintain their principal place of business in the State of Georgia, specifically Cobb County; and committed the wrongs described herein in Cobb County and the State of Georgia.

37.     Defendants Core and Renzulli have regularly done and solicited business in the State of Georgia, engaged in other persistent courses of conduct in the State of Georgia, and derived substantial revenues from goods used or consumed, or services rendered, within the State of Georgia.

38.     Defendants Core and Renzulli are subject to the personal jurisdiction of this Court pursuant to O.C.G.A. §§ 9-10-91(1) to (3), because they:

      a.     transacted business within the State of Georgia;

      b.     committed tortious acts and omissions within the State of Georgia; and

      c.     committed tortious injuries within the State of Georgia by acts and omissions outside of the State of Georgia.

39.    Defendants may be served pursuant to Rule 4 of the Federal Rules of Civil Procedure, O.C.G.A. § 9-11-4, and 18 U.S.C. § 1965(d).

40.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because (a) Glock, Inc. and Consultinvest, Inc. reside and maintain their principal places of business within the Northern District of Georgia.

41.    Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district; Defendants pursued the malicious prosecution of Plaintiff under color of state law in conspiracy with State Actors located in this district and using the courts of Cobb County within this judicial district; and, a substantial part of the property that is the subject of the action is situated in this district.

42.    Venue is also proper in this district pursuant to 18 U.S.C. §§ 1956(i), 1965(a).

## IV.    BACKGROUND INFORMATION

### Glock, Sr.'s Control Over Glock, Inc. and the Larger Glock Group

43.    Glock is one of the world's best known and most profitable arms companies.

44.    Glock supplies weaponry to military and law enforcement agencies in at least 48 countries, and to civilians in more than 100 countries. Glock pistols are popular choices for law enforcement officers, self-defense, and concealed carry.

45.    With an approximate 65% market share, Glock dominates the United States gun market. Throughout its history, the overwhelming bulk of Glock's revenues have come from the United States.

46.    Glock's annual revenues have been estimated at $400 million, with more than a million of its guns sold in the United States in a single year.

47.    In 1985, Glock Sr., with the assistance of local lawyer Peter Manown incorporated Glock, Inc. in Smyrna, Georgia to sell pistols manufactured in Austria.

48.    Glock Inc.'s success in penetrating the United States' market, combined with an estimated profit margin per pistol of 68% made Glock, Inc. a cash cow and extraordinary wealth-generating machine.

49.     Behind the scenes of Glock, Inc.'s astonishing success, however, all was not well. Glock, Sr., with assistance from his close associate Charles Ewert and from Manown, had initiated a sequence of sham corporate acts that would repeatedly and falsely manipulate the stated ownership of Glock, Inc.

50.     These corporate machinations, which began almost as soon as Glock, Inc. had been formed, were just the beginning stages of what would eventually become a much broader scheme by Glock, Sr. to siphon, divert, and hide monies and assets away.

51.     The history of corporate acts reflecting the purported ownership of Glock, Inc. over time is a study in disrespect for corporate formalities and the corporate form.  It includes backdated documents, bogus agreements, phantom capital increases, and gratuitous share transfers.

52.     Glock, Sr. and his associates carried out a methodical, deliberate pattern and practice of conducting sham transactions over a period of decades. Proceeds of this scheme were treated as the personal funds of Glock Sr. and his associates.

53.     The end game of all of this was Glock Sr.'s appropriation of the benefits of Glock's financial success for himself.  Glock Sr. ruled the "Glock Group" as an absolute monarch.  He personally directed and controlled the

13

numerous entities that comprised "his" commercial empire. Glock Sr. treated these entities as alter egos and mere instrumentalities for the accomplishment of his own purposes.

### Glock, Sr.'s Illegal Activities Exposed

54.     Mr. Jannuzzo served as general counsel of Glock, Inc. for many years.

55.     In February 2003, Mr. Jannuzzo had a personal falling out with Glock Sr. stemming at least in part from Glock Sr.'s interest in Jannuzzo's wife, Monika, who was also a Glock employee. Jannuzzo went to Glock Sr.'s home to meet with him and inform him of his resignation. Jannuzzo informed Glock Sr. that there was substantial evidence of illegal activities within the Glock Group. Monika also resigned from Glock, Inc. at the same time.

56.     After Monika and Jannuzzo resigned, Glock Sr. called Monika several times and asked her to come to his home to talk. Monika finally agreed to meet Glock Sr. in a public place, and they arranged to meet at the Atlanta airport before Glock Sr. flew back to Austria. Glock Sr. told Monika that she would always be welcome back at Glock and that she would be welcome to come to Austria, live close to him, and take their friendship "to the next level." He offered to provide Monika with housing in Vienna, a car, and all the money she

14

needed.  Glock Sr. ended the conversation by telling Monika that, if she did not accept his invitation, Jannuzzo would be "finished."[4]

57.    At roughly the same time as Jannuzzo's resignation, a team of investigators led by James R. Harper III, a former Assistant U.S. Attorney hired by Glock to deal with the ramifications of a falling out between Glock Sr. and Ewert, had uncovered evidence that implicated Glock Sr. in his own illegal activities.

58.    Jannuzzo had known Harper before Harper's work for Glock.  As Glock, Inc.'s general counsel, Mr. Jannuzzo was responsible for dealing with Harper and his team regarding their billing.   Mr. Jannuzzo reviewed and approved the Harper team's bills.

---

[4]    Indeed, a November 2, 2010, letter to Glock Sr. from his bodyguard and assistant George Taylor demonstrates the lengths to which Glock Sr. was willing to go:

> Jannuzzo has been sitting in jail because I tracked Monika down, and then tracked him through 4 countries and set up the process for him to be arrested with FBI input. Regardless, I've been shut down on discovering who is going to see PJ and who is still supporting him. All of this is vital information for you to know and could help the legal battle. Manown still regularly receives visitors from German money people and visits Germany. . . . Considering the fact that PM embezzled your money, I know you would feel it's important to see who he is meeting with and what money he is moving. . . .

59.    In March 2003, it became clear to Harper that Glock Sr. was implicated in illegal activities and that he did not intend to bring Glock into legal compliance.  Harper notified Glock Sr. of his intent to cease actively pursuing his investigation in late March 2003.

60.    Glock Sr. orchestrated a scheme to maliciously accuse and prosecute Jannuzzo to punish him for his relationship with Monika.  Glock Sr. further orchestrated to maliciously accuse and prosecute Jannuzzo, Harper, and others who were potentially privy to information uncovered by Harper regarding Glock Sr.'s illegal activities because those individuals were problematic to his illicit conduct.

61.    In addition to his own personal animosity against Jannuzzo, Glock Sr. needed to discredit him because Jannuzzo reviewed and approved Harper and his team's billings.  Jannuzzo was therefore an obvious obstacle to Glock's criminal prosecution of Harper and his team, which would ultimately be founded largely on allegations of over-billing.[5]

---

[5]    Indeed, in the indictment that would follow of Harper and two members of his team (Jeffrey Pombert and Jerry Chapman), Jannuzzo is frequently referenced as a "separately indicted co-conspirator."

62.     To accomplish his ends, Glock Sr. employed his own personal lawyers, New York lawyer Defendant Renzulli and Atlanta lawyer James Deichert, as well as Virginia lawyer Defendant Robert Core.

## V.     DEFENDANTS' SCHEME TO INDICT AND CONVICT JANNUZZO

63.     Glock's full-court-press campaign against Jannuzzo began in October 2003, when Manown made a confession to Defendant Renzulli[6] and to Glock Sr. that he had misappropriated funds from Glock entities.

64.     Glock Sr. and Renzulli immediately seized upon this as an opportunity to extract revenge on Jannuzzo, Harper, and Harper's team.  As Manown testified at Jannuzzo's trial, Glock Sr. was "hell bent for leather" to get Jannuzzo.   Glock Sr. and Renzulli hired Deichert to institute criminal proceedings against Jannuzzo and Harper's team.

65.     Deichert and Renzulli initially contacted the FBI.  Manown accepted a federal plea bargain with a prison sentence of twenty-two months.

66.     The following year, dissatisfied with the federal efforts, Glock Sr. and Renzulli also directed Deichert to file a criminal complaint with the City of

---

[6]     Shortly after Jannuzzo resigned, Glock Sr. made Renzulli CEO of Consultinvest.

Smyrna, Georgia.    Deichert did so in June 2007 alleging fraud, theft, and extortion.[7]

67.    On July 23, 2007 Deichert wrote a letter to the Smyrna Police Department recommending the prosecution of Manown, Jannuzzo, Harper, and Jerry Chapman (a member of Harper's team).

68.    The complaint was assigned to Det. Harrison.

69.    In late 2007 or early 2008, Glock Sr., Glock, Inc., and/or Consultinvest hired Defendant Core, another attorney, to manage, supervise, and control Det. Harrison in the pursuit of the false arrest and prosecution of Jannuzzo.  As discussed below, however, Glock, Inc. had actual knowledge that the conversion offense for which Jannuzzo was being investigated — and on which his entire prosecution hinged — was time-barred under Georgia's four-year statute of limitations for felonies.

70.    Core is a former FBI agent, who purports to be a specialist in the investigation and disposition of financial crimes.  He is not barred in Georgia nor was he during the relevant time period.

---

[7]    Tellingly, the police report identifies the victim as "Gaston Glock DBA Glock, Inc./Consultinvest, Inc."

71.    Det. Harrison revered Core as "a retired FBI agent" and "a lawyer," and relied on Core for guidance in conducting the investigation and for the provision of information.  Harrison did not see Core as an interested advocate for his own client's interests.  In fact, at Jannuzzo's criminal trial Det. Harrison expressly disagreed with the assertion by defense counsel that Core was "representing his client" and stated that he considered Core to "go beyond that."[8]

72.    Glock became dissatisfied with the progress in the federal criminal case in part because, upon information and belief, the FBI refused to share with it the content of its interview of Manown.

73.    By contrast, in Smyrna and Cobb County, Defendants had a friend in Butters and an investigating officer whom they could manipulate and control.

74.    Defendants were able to recruit the Cobb County District Attorney's Office to get Manown's case transferred to it from the U.S. Attorney.  In a highly unusual move, Cobb County D.A. Patrick Head obtained a transfer of the case.

---

[8]    In another example, Harrison specifically invited Core's "tutelage" in preparation for a hearing in Jannuzzo's case telling Core that:  "This by far is the most complex case I've ever been involved with."

19

75.    After the case transfer, Manown negotiated a plea bargain with D.A. Head. Instead of the federal sentence of twenty two months, Manown's plea deal was sweetened to mere probation.

76.    By this time, it had been over four years since Jannuzzo had left Glock's employment (in February 2003) and nearly four years since Glock indisputably knew about Manown's improprieties, which purportedly implicated Jannuzzo.  Further, Glock, Inc., based on its official corporate records, had *actual* knowledge at the time Jannuzzo left his employment that the gun had been loaned to him for use as an exhibit in litigation.  No later than March 2003, Mr. Jannuzzo told Kevin Connor (an officer of Glock, Inc.) that he still had the gun.  As a result, efforts to prosecute Jannuzzo under Georgia's four year statute of limitations for felonies plainly should have been barred.[9]

77.    On October 17, 2007, Glock Sr. (through Glock, Inc. and/or Consultinvest, Inc.) convinced the district attorney's office to allow Renzulli to take a proffer from Manown.  That proffer would serve as the foundation of Glock's efforts to prosecute Jannuzzo.

---

[9]    The State of Georgia had the burden to prove beyond a reasonable doubt that the offenses for which Mr. Jannuzzo was tried occurred during the applicable statute of limitations or that an exception that would toll the running of the statute applied.

78.    At the Manown proffer, Mr. Timmons of the district attorney's office essentially turned the proceedings over to be conducted by Defendant Renzulli, despite the fact that Renzulli was not barred in Georgia nor had he been appointed as a special prosecutor or assistant district attorney.  Core was also present at the proffer.  Timmons explained why his office was taking, what he recognized as, the "unusual step" of allowing a private attorney from New York to ask the questions during the proffer:

> [W]e, the State of Georgia, are getting this case pretty late in the game.  We've got a short time frame that we have to operate.  Accordingly, we have taken an unusual step of allowing Mr. John Renzulli, who is an attorney from New York, and I believe you know Mr. Renzulli, of asking the questions.
>
> The reason why we are doing that is that Mr. Renzulli has a ton of knowledge about this case, and I frankly don't have time to get up to speed enough in order to ask you the educated questions that I need to be able to ask you.  So do you understand that Mr. Renzulli is going to be asking the questions?

79.    As long-time counsel for Glock, and then-CEO of Consultinvest, Defendant Renzulli was already well-known to Manown.  Manown confirmed that the two "go back a long while."  Indeed, when Manown made his October 2003 confession, it was to Renzulli. Further, Renzulli was identified as a witness in Glock's criminal complaint against Manown, Jannuzzo, Harper, and Chapman in Smyrna.

21

80.    Throughout the proffer, Renzulli advocated for his clients, Glock, Inc., Consultinvest, and Glock Sr. by inappropriately inserting himself into the proceedings and attempting to influence Manown's testimony.    Renzulli repeatedly argued with Manown, questioned his recollection on various points, and steered his testimony in particular directions.

81.    There was ample testimony from Manown that should have called his credibility into question.  His testimony at the proffer suggested that he was under duress at the relevant times; may not have had an accurate perception or recall of events due to a compromised mental state; and had been susceptible to pressure from Renzulli:

Renzulli:  Did we calculate that it was over, had to be over a half a million bucks in interest that was syphoned off?

Manown:    I'm sure that wasn't the case.  I don't—maybe we calculated that, John.  But you've got to remember, I was, I wasn't thinking clearly.  I was, without knowing it, clinically depressed when I started this thing with you.

I asked myself if this, the way I calculated it over the nine years or whatever the time period was—I think it was eight or nine years—the figures were that, were thrown around would mean that I was making, from this, a half a million dollars a year.

I've never made, I never made anything close to that in my life, everything, including this.  So I don't know if some of those figures were, you know, if you kind of walked me into it and I said yes.  I don't know.  I would have told you I killed my mother at that time. I was trying to get everything off my chest.

82.    Renzulli steered Manown's testimony away from any implication that his clients had done anything wrong, and argued with Manown for even suggesting it:

> Manown:  I'll tell you why and then, John, I know you can relate to this.  I'll say it as concisely as I can.  Glock [Sr.] is not Snow White.  He's got a lot of skeletons.  He's done, in my mind, a lot of things that are much worse that what Jannuzzo and I did.  He makes roughly two hundred thousand dollars a day, he personally.  He spends money on mistresses, on houses, on sex, on cars.  He bribes people.  He's just a bad guy. . . .
>
> Renzulli:  Well, Peter, I want to make something clear here.  Okay.
>
> Manown:  And I know that you represent the guy.
>
> Renzulli:  No, I want to make something clear to you.
>
> Manown:  Okay.
>
> Renzulli:  No, I don't think he's a bad guy.  And even if he was a bad guy, where I grew up, that doesn't mean you can steal money from this guy.
>
> . . .
>
> Manown:  And John, I take what you said.  I know that that's the case, but I want to get—
>
> Renzulli:  I take offense—
>
> Manown:  —it off of my chest too.
>
> Renzulli:  I take offense to, you know, you use this as, this as a defense—as an offense, Peter
>
> Manown:  That's not—I'm not here—

Renzulli:  The problem is, is you just said on the record, that Mr. Glock [Sr.] is a bad guy, he is an illegal guy, he bribes people and all that.

Manown:  Well, I know that.  I did some of them for him, John.

83.    Manown's testimony implicated Glock Sr. in illegal activities. Manown also stated that Glock Sr. told him that he (Glock Sr.) had detectives tailing Jannuzzo, and was tapping his phones and monitoring his emails around the time that Jannuzzo left Glock, Inc.  No efforts were made by Mr. Timmons to explore these accusations.  What is more, Renzulli attempted to affirmatively steer Manown's testimony away from any implications of wrongdoing by Glock Sr.  Upon information and belief, no one involved in the investigation or prosecution of the case against Jannuzzo made any attempt to follow up or further explore this aspect of Manown's allegations.

84.    At other times, Renzulli tried to force Manown into implicating Jannuzzo in some of Manown's own activities.

85.    Manown's testimony would have raised concerns with an independent prosecutor or police officer and warranted further investigation. Instead, as an attorney hired by and paid for by Glock, Renzulli's interest — indeed, his duty — was to represent and zealously advocate for Glock's interests.

86.    Because Timmons began the proceeding by acknowledging that he was unprepared and lacked information, he was obviously not in a position to control those proceedings or credibly evaluate Manown's testimony.

87.    Timmons would later use an outline prepared by Renzulli for his presentation to the grand jury.  Timmons also admitted that he had not seen the supporting evidence before presenting the case to the grand jury.

88.    After Manown's proffer and plea, Defendants Core and Renzulli used the negotiations concerning his restitution to coerce Manown into building a case against Jannuzzo.

89.    For example, Renzulli prepared a restitution summary for Manown which Defendants used to pressure Manown to tie Jannuzzo to his activities.

90.    Core and Renzulli advocated for restitution in an amount that would make him "a credible witness against Jannuzzo."[10]

91.    Even as they acknowledged that Manown was "willing to lie under oath" and a "pathological liar," Defendants persisted in using Manown to craft a case against Jannuzzo.  Renzulli and Core pressed for charges against Jannuzzo based on what they could get from Manown — not what the documents or other

_____

[10]    As Core explained to Butters:  "Manown needs to be responsible for his part of the restitution regarding this conduct, because if he isn't, his testimony against Jannuzzo would not survive cross examination."

25

corroborating evidence showed.  In several instances, based solely on Manown's testimony, Renzulli and Core advocated for charges that were otherwise uncorroborated.[11]

92.     Upon information and belief, Defendants Core and Renzulli assisted in actually drafting the indictment of Jannuzzo.

93.     When it became clear that an initial indictment against Jannuzzo suffered from a fatal statute of limitations problem, Core and Renzulli pressed a re-indictment and lobbied for its contents.[12]

94.     In a memo to Butters, Core advocated for keeping a theft by conversion charge that was clearly unrelated to the other allegations in the indictment:[13]

---

[11]     For example, in a February 26, 2008 email to Harrison, Butters, and Renzulli, Core stated:  "I feel that this conduct forms a strong basis for charges against Jannuzzo. Manown's testimony is obviously necessary to make them stick."

[12]     In a May 19, 2009 email that pre-dates the second indictment of Jannuzzo, Core told Butters:  "I am at your service to help you put pen to paper to get this [Harper] indictment written.  Please let me know when it's convenient and I'll be right down.  I am going to work soon on the Jannuzzo indictment to develop a defense to the statute of limitations motions sure to come."

[13]     As detailed *infra*, the theft by conversion charge related to a pistol that was checked out to Jannuzzo by Glock, Inc. for his use as an exhibit in products liability litigation in his role as general counsel.  Glock alleged that Jannuzzo converted this pistol by failing to return it when he left Glock.  By contrast,

> This predicate act is not as clearly connected to the overall racketeering activity as the other predicate acts, but should nevertheless be viewed within the overall context of Jannuzzo's activities. We recommend that Count One remain intact and that theft by conversion of the pistol remain a predicate act, given the circumstances. With the requirement that only two predicate acts need be proved by the State, there is no real harm in presenting evidence to the jury that the pistol was a predicate act and permitting the jury to determine whether is [sic] qualifies as such.

95. Further, Defendants purposefully obscured the actual alleged victim of the conversion (Glock, Inc.) by asserting that the victim was (a) "Gaston Glock DBA Glock, Inc./Consultinvest, Inc." in the police report and (b) the "Glock Group" in the 2009 indictment. Because Glock, Inc. had actual knowledge of the whereabouts of the gun at the time that Jannuzzo left his employment, the statute of limitations had clearly expired at the time Jannuzzo was first indicted in May 2008 and reindicted in June 2009.

96. Core also advocated for adding an obstruction of justice predicate act to the indictment, claiming that Jannuzzo (a) had lied[14] to Harrison in an interview in which Jannuzzo voluntarily agreed to participate and (b) had placed

---

the other acts charged hinged on Manown's testimony about a purported scheme between himself and Jannuzzo to misappropriate funds.

[14] The supposed "lies" were largely regarding Jannuzzo's statements that he could not adequately recall certain persons or transactions.

a "threatening" phone call and email to Manown.   Core claimed that this extended the running of the statute of limitations to January 2008, when the interview was conducted by Harrison.

97.    Core's memo on this point was intentionally misleading.  It made no mention of the fact that only *felony* obstruction of justice may serve as a predicate act under Georgia's RICO statute.[15]   And, per Georgia's obstruction of justice statute, only "offering or doing violence" to certain law enforcement officials or legally authorized persons constitutes felony obstruction of justice.[16]   Core intentionally obfuscated the issue by claiming that Jannuzzo "lied" to Harrison and "threatened" Manown.

98.    In Core's May 28, 2009 cover email to Butters, forwarding his statute of limitations analysis, he informed Butters that: "The best item to beat the statute on the RICO count is Jannuzzo's interview with Keith [Harrison]. He's pretty much stuck there."

99.    Butters accepted these recommendations and did not make an objective evaluation of the proposed changes.  Instead of accepting that the case against Jannuzzo was fatally flawed on statute of limitations grounds,

---

[15]   O.C.G.A. § 16-4-3(9).

[16]   O.C.G.A. § 16-10-24.

Defendants intentionally pressed forward with a second indictment on legally unsupportable grounds.

100.    Thus, on June 11, 2009, Glock obtained the indictment under which Jannuzzo would ultimately be prosecuted.  The indictment charged two counts: (1) theft by conversion; and (2) conspiracy to violate RICO.  Count One alleged that, at some time "between the 12th day of February, 1999, and the 26th day of August, 2007, the exact date being unknown to the Grand Jurors at this time," Jannuzzo "did convert to his own use a LaFrance Specialties .45 caliber semi-automatic custom pistol being the property of Glock, Inc."  The indictment charged that Jannuzzo was given temporary custody of the pistol by Glock, Inc. in 1999 and then did not return it when he left Glock's employment in February 2003.  Count One alleged an exception to the statute of limitations pursuant to O.C.G.A. § 17-3-2(2) because the crime was unknown to the State until 2007.

101.    Count Two of the indictment alleged that Jannuzzo conspired and endeavored with Manown to violate RICO through a pattern of racketeering activity.  The same gun conversion charge of Count One was also charged as a predicate act for the RICO count.

102.    As Defendants were well aware, the indictment was not supported by probable cause.

29

103.   With an indictment in hand, Glock—through Core and Renzulli—guided the investigation of the case and preparation for trial.

104.   As detailed above, Det. Harrison revered Core and was unable to view him as an interested advocate for the alleged victim.

105.   Similarly, Butters abdicated his responsibilities and outsourced prosecutorial functions to Core.  At a pre-trial hearing on Mr. Jannuzzo's motion to exclude Core from the prosecutors' table at trial, Butters told the court that Core was necessary for an orderly presentation of the evidence because "Mr. Core had been hired by the victim and done extensive investigation of the matter from the standpoint of the victim's records and books and is the liaison with the victim."   Butters did not seek a similar exception to the sequestration rule for Det. Harrison, the State's lead investigating officer.

106.   Butters' reliance on a private special prosecutor violated Uniform Superior Court Rule 42.1:  "Private special prosecutors retained by the family or relatives of one named as a victim in an indictment or accusation may not participate in the prosecution of a criminal case. Special assistant district attorneys appointed by the district attorney including attorneys from personnel of public agencies may prosecute criminal cases."

107.    Because neither Core nor Renzulli are licensed to practice law in Georgia, neither would have been eligible for appointment as special assistant district attorneys.  Their participation violated Rule 42.1.[17]

108.    In fact, Butters, Harrison, Core and Renzulli had such a singularity of interest that they falsely asserted that communications amongst their group were attorney-client privileged.  Core instructed Butters to tell a GBI financial expert witness who was preparing to meet with Jannuzzo's trial counsel:

- My Participation: He should not mention me or volunteer my existence. If asked about me he should just state that I am Glock counsel and have been working with you. No more than that.

- He should not divulge any communications with me, you, or Keith. That is work product and attorney client privileged.

- Any Discussions of Ours: He should not answer any questions about any discussions between or among us. That is work product and attorney client privileged.

109.     In fact, during Mr. Jannuzzo's trial, counsel issued a subpoena to Core seeking his billing statements for the Jannuzzo case, emails with Butters

---

[17] *See* O.C.G.A. § 15-18-21(b) ("Any assistant district attorney, deputy district attorney, or any other attorney at law employed by the district attorney shall be a member of the State Bar of Georgia, admitted to practice before the appellate courts of this state, shall serve at the pleasure of the district attorney, and shall have such authority, powers, and duties as may be assigned by the district attorney.").

and the District Attorney's Office, and his notes and analyses shared with the District Attorney's Office. Core moved to quash the subpoena on the grounds that the material was protected by the attorney-client privilege and work product privileges. Jannuzzo did not receive the documents.

110. The entire case against Jannuzzo and evidentiary presentation was of Glock's making. Core created detailed spreadsheets scripting out each witness, the testimony he or she would provide, and supporting documents that were the roadmap for trial.

111. Core added or removed witnesses and elements of their testimony and documents for evidence. He crafted the case and filtered information to the prosecution and to the defense in the manner that suited Glock's interest.

112. Core provided guidance on all manner of trial strategy, witness preparation, and document production.

113. Core and Renzulli were in charge of the State's document productions to the defense. Core would simply inform Butters and Harrison when he or Renzulli intended to add or withhold documents from productions.

114. At times, Core would come up with records from "Glock's files" or that he had supposedly just located and place them in the productions. There

32

was no independent check on the source, origin, reliability, or authenticity of these documents by Butters or Harrison.

115.   Moreover, an employee at Glock, Inc.'s facility in Smyrna actually compiled and produced the prosecution's document productions.  Again, there was no check by Butters or Harrison over this process because it was occurring outside of their physical control and through an employee of Glock, Inc. ,operating under Core and Renzulli's control.

116.   Glock Sr., Glock, Inc., and/or Consultinvest paid over $40,000 to have the entire case "digitized" in a database for the prosecution.  Core and Butters together determined that this fact did not need to be disclosed to the defense.

117.   With respect to witnesses within Glock's influence or control, Core regularly primed witnesses for contact with Det. Harrison or even interviewed them on his own.  In doing so Core had no qualms about bringing Glock's influence to bear on these witnesses.

118.   For example, in one email Core reported:

Gents, I think Emmanuel is really comfortable with this whole thing now. He completely understands the case, to include those acts he previously did not know about. I am no longer concerned, but I would still like to downplay the "witness" label.  Almost all of his

personal income is now derived from Glock, therefore he will always come when directed.

119.    Core interviewed key witnesses on his own.  For example, Core flew to Grand Cayman, at Glock's expense, to interview David Roberts, the prosecution's first witness.  No one from the district attorney's office or any investigating officers attended this interview.  Core simply informed Butters and Harrison that he was going and then reported back the information of his choosing.

120.    With respect to witnesses outside of Glock's influence, Core would identify subjects for Det. Harrison to interview or subpoena, and would draft subpoena language or witness interview questions for Harrison to use.

121.    Renzulli himself was a witness at Jannuzzo's plea in bar.  During that testimony, Renzulli committed perjury concerning a matter affecting his credibility.  Because a witness's credibility is always relevant, the fact that Renzulli testified falsely called into question all of his testimony.  Further, because the judge relied on Renzulli's testimony in allowing the case against Jannuzzo to proceed after the plea in bar, Renzulli's perjury directly influenced the continuation of those improper proceedings.

34

122.    Core urged Butters to reclassify a financial expert from the GBI as a fact witness to avoid certain disclosure obligations. In prepping that witness for a meeting with Jannuzzo's trial counsel, Core instructed Butters:

- Expert Witness:  I don't know what's customary when the State calls someone like Robert in Georgia. Since Robert will only be stating facts and presenting spread sheets of actual bank records, I don't think he needs to be considered an expert for discovery or testimony purposes. He is more of a fact witness. . . .

- The Spread Sheets: We may want to consider whether to leave the Bates numbers on the sheets if we give [Jannuzzo] an early production. We should give him a final production with the numbers only when statutorily required to. The Bates numbers, if followed, give up much of our strategy and seriously streamline his workload. The documents may change after an early production, because we could, and probably will, find errors on them as we use them prior to or during trial. They should be considered fluid documents up to the time of Robert's testimony. They are not evidence, they are Robert's construction of the direct evidence and they are his work product. Robert should tell Citronberg [Jannuzzo's counsel] that. If you rethink the expert issue, it could be that we won't have to turn these over at all. I don't object to Robert showing them to [Citronberg] at the meeting, but I question whether we ever need to turn them over.

123.    Defendants also undertook to suppress exculpatory evidence and influence and manipulate the testimony of a key witness on the gun charge, Mr. Kevin Connor, who replaced Jannuzzo as general counsel of Glock, Inc.

124.   On February 1, 2010, Mr. Connor forwarded his unsigned draft affidavit to Renzulli.   The draft affidavit contained significant exculpatory evidence on the gun conversion charge.   The following day Core forwarded the affidavit to Butters and Harrison.   Core noted that Connor is a "very weak sister" who is "financially struggling" and is "easily manipulated by fellow attorneys who may refer business to him."   Core requested of Butters and Harrison:

> John Renzulli asks that you deal with this discretely, because he doesn't want Connor to stop talking to him. . . .
>
> I'm afraid that Connor is going to be manipulated into signing something that will make him into a better defense witness than a prosecution witness. He is going to send John a final draft of what he intends to sign. John has counseled him on signing something he is not sure of. Hopefully, Connor will do the right thing and delete the troublesome passages.

125.   Det. Harrison interviewed Connor almost immediately thereafter, on February 5, 2010.   Notes from the interview make very clear that Connor informed Harrison that, shortly after Jannuzzo left Glock, Inc.'s employment, Jannuzzo called Connor and told him that he [Jannuzzo] had the pistol—which the indictment charges Jannuzzo with stealing—and even gave Connor the gun's serial number.   Connor then gave the gun's serial number, together with others that Jannuzzo gave him, to his superior Robert Glock, who is Glock Sr.'s son.

36

126.   Connor's testimony, at the very least, conclusively demonstrated that Defendant Glock, Inc., had *actual* knowledge, as of late February or early March 2003, that Jannuzzo had possession of the gun after his employment had ended.  This is well outside of the statute of limitations for either offense charged in the June 2009 indictment.  Moreover, both charges expressly relied on an exception to the statute of limitations because of Glock's purported lack of knowledge of the conversion offense.

127.   Rather than seeking to explore this exculpatory testimony, which demonstrated that probable cause was lacking, at a minimum for the statute of limitations element of the gun offense, Defendants sought to bury it and to discredit Connor.

128.   Just a few days after his interview with Det. Harrison, Connor completed an affidavit that differed from the one he had originally forwarded to Renzulli.  In one important respect, the signed affidavit deleted a paragraph that Core and Renzulli had specifically identified as "troublesome" in the unsigned draft.  As Core noted in a cover email sending the affidavit to Harrison:  "The unsigned affidavit had much more ridiculous statements on it. It was before your interview of him.  The signed affidavit came after your interview of him. I guess you educated him a bit. You should charge him tuition."

129.   In addition to influencing and manipulating Connor's testimony, Defendants sought to discredit Connor and were dismissive of the testimony he did provide.  Defendants immediately focused on establishing that Connor did not actually have authority to personally authorize the transfer of the gun to Jannuzzo and that no ATF Form 4473 for transfer of the gun had been completed.

130.   Upon information and belief, no one investigating Jannuzzo's alleged crimes or acting for the prosecution made any attempt to contact Robert Glock or Glock Sr. about Connor's testimony.   After Jannuzzo's trial ended, defense counsel received an affidavit from Robert Glock that did, in fact, corroborate Connor's testimony.  According to Robert Glock's affidavit, Connor gave him a list of guns that Jannuzzo identified as still being in his possession. Connor told Robert Glock that Jannuzzo wished to return the loaned weapons to Glock, Inc.  Robert Glock gave the list to his father, Glock Sr., and told him that Jannuzzo wanted to return the loaned weapons.  Glock Sr. instructed Robert Glock that he would take care of the request and that Robert should not take any further action.

131.  Defendants could have explored the facts and evidence from witnesses such as Connor and Robert Glock who (a) were present and involved at the time that Jannuzzo left his employment and (b) actually spoke with

Jannuzzo about the gun.  Instead, the prosecution at trial relied on business records and the testimony of witnesses not actually involved to show that Glock loaned the pistol to Mr. Jannuzzo and there was no ATF Form 4473 documenting any transfer.

132.   In one version of Core's witness presentation spreadsheet, there is no mention of Connor or Robert Glock—witnesses who actually had firsthand knowledge at the time the conversion offense was alleged to have occurred. Instead, the designated testimony on that charge was to come from Glock, Inc.'s then-current general counsel–Carlos Guevara—and Renzulli.  Guevara and Renzulli were designated to testify that Jannuzzo later denied having the gun and that if he had purchased it "he would have had to pay for it and complete a [ATF Form] 4473."[18]  Further testimony on the conversion charge was also designated for Harrison. Core's notes on this anticipated testimony state:

> PJ claimed he offered to give the gun back. He used it in a hearing in Dallas in 2003.  He told Renzulli he had the gun and others. Renzulli doesn't lie, he'll remember.

---

[18]  The spreadsheet identifies the supporting documentation for this as "company record"; however, it later indicates that the "record" is actually a purported telephone call and email to Renzulli.  Obviously, neither of these is a business record.

This is yet another demonstration that there was no independent evaluation of the merits of any case against Jannuzzo. Core and Renzulli provided not just legal strategy and assistance, but the entire substance of the case as well.

133. As Harper's trial approached, Core also considered how to manipulate the production of information from Connor to release information that was helpful to Glock's position, while holding back other documents that could be used to impeach Connor in Jannuzzo's case:

> Why don't we include his statement in discovery production on Monday, because it helps us. There is no exculpatory info on Harper in it. Let's just leave the personnel jacket and gun transfers out of it for now. They are potential impeachment material of him in the Jannuzzo gun matter.

134. Core, Butters, and Renzulli were always aware of the statute of limitations problems in the case against Jannuzzo. In one communication after review of an appeal by Harper, Core advised Butters:

> I just looked at this again. It attacks Harper's indictment as being "imperfect. It does not give "adequate notice" of how alleged thefts related to "overbilling" occurred. It attacks the over-65 SOL provision and tries to impute knowledge of the victim to knowledge of the government. It does not address "multiplicity" which I thought it would.
>
> There is no similar issue in the Jannuzzo indictment other than the potential of imputing the victim's knowledge to that of the government. The courts have rejected that notion time and again. The complaint to Smyrna was in 2007, Jannuzzo was indicted in

2008. Glock could not have known of Jannuzzo's crimes before late October 2003 and he was indicted in June 2008. He was caught committing the separate crime of possession of the stolen gun in 2007 and no one knew it was stolen until then; he lied to Keith in 2008; and he ran in 2009. His charged offenses have continued from 1995 to almost the present.

Citronberg [Jannuzzo's trial counsel] is desperate.

135.    In another instance, Core was able to suddenly produce "evidence" regarding Glock, Inc.'s purported knowledge:

> I know we aren't visiting this issue Wednesday, but I thought you'd like to have this. It's not *in production* but it is notification to all Glock, Inc. employees to not have any further contact with Jannuzzo and [Monika] Bereczky and to report them if seen on the premises. Jannuzzo wants to put victim (and therefore State) knowledge in February 2003 when he resigned, this puts knowledge of Jannuzzo crimes squarely on October 30, 2003 when Manown confessed. What's more, after Jannuzzo left Glock, he never came back to the premises. Carlos can testify to that. Therefore, he converted the gun on or before February 2003 and not more than four years after the last RICO act which PJ tries to place in February 2003.

136.    Core and Renzulli made regular trips to Atlanta to work with Butters and Harrison. Core regularly worked out of the Cobb County district attorney's office.[19]

---

[19]    Indeed, when Jannuzzo's counsel sought to serve a subpoena on Core, on one such occasion the staff seemed readily familiar with Core and paged him over the office intercom system as if he worked there.

137.    Glock requested and paid for transcripts for the prosecution.  Butters publicly used binders bearing the Glock insignia as shown on the cover page of this Complaint.   The cover page image is the cover of a trial preparation binder used by Defendant Assistant District Attorney John Butters in the case of *State v. Jannuzzo*.

138.    Defendants made repeated efforts to connect Jannuzzo to Harper and vice versa.   Jannuzzo is referenced throughout Harper's indictment as a "separately indicted co-conspirator."

139.    Defendants also explored the possibility of trying to get Jannuzzo to "cooperate against Harper."[20]    Butters permitted Core to edit a letter to Jannuzzo's defense counsel regarding a potential plea deal.  The letter purported to come from Butters, on the letterhead of the district attorney's office.   Core explained his ideas as follows:

> I suggest tacking on restitution and lengthy supervised parole just to ramp up the pain for now, the restitution can be backed off of later so that Citronberg can show his client that he did him some good. Restitution is not an issue with us unless a large cache of Glock money is uncovered. However, I do suggest that any deal be accompanied by a very long probationary or parole period so that Jannuzzo can be revoked if he chooses to double cross us. If he can, he will.

---

[20]  Det. Harrison even went so far as to tell Core:  "We discussed the possibility of charges against Monika.  What do you think about that."

140.    When it became obvious that Jannuzzo had no intention of pleading out, Core stated to Harrison:

> He's [Jannuzzo] still full of false bravado. . . .  His children will only know him as a convict.  [Judge] Kell will bury him if he doesn't cooperate.

141.    Following Core's roadmap, the case proceeded to trial.  Jannuzzo was convicted on both counts.  Jannuzzo appealed.

142.    On July 9, 2013, the Georgia Court of Appeals reversed Jannuzzo's convictions on both counts, finding that the charges were clearly time-barred and that the State failed to carry its burden to prove that Mr. Jannuzzo was indicted on either count within the applicable statutes of limitations.

143.    With respect to the theft by conversion charge, the court cited Mr. Connor's testimony as well as Glock's own business records reflecting that the gun was loaned out to Mr. Jannuzzo:

> In compliance with federal regulation, Glock kept written records of the whereabouts of every gun it owned and loaned, and the records showed that Glock knew the pistol remained in Jannuzzo's possession when he left Glock's employment in February 2003. Moreover, a couple of weeks after Jannuzzo left employment, Glock's general counsel received a call from Jannuzzo confirming that he still had the pistol. Construing the four-year limitation period in favor of repose, and construing the tolling provision narrowly and in favor of Jannuzzo, we find no evidence that could support a finding by the jury that Glock's actual knowledge of the theft by conversion occurred any later than February or March of 2003 – more than six years prior to the June 12, 2009 indictment.

43

144.    With respect to the RICO charge, the Court noted that without the obstruction of justice allegations that had been struck by the trial court, the last in time alleged predicate act was the conversion of the pistol.  The Court found that the conversion predicate act was not within the statute of limitations for the same reason it was time-barred as a separately charged offense.  The Court further noted confusion as to whether the indictment intended to allege an exception to the statute of limitations for other predicate acts or only for the pistol conversion predicate act.  Ultimately, the court concluded that even if the State intended to allege that the exception in O.C.G.A. § 17-3-2 (2) tolled the limitation period, with respect to other predicate offenses occurring during Jannuzzo's employment with Glock, Inc., because the State lacked knowledge of the offenses, the State failed to prove this exception.  Accordingly, the Court of Appeals reversed Jannuzzo's convictions on both counts.

145.    While Jannuzzo's appeal was pending, Cobb County elected a new district attorney, Vic Reynolds, who took office in January 2013.

146.    On the day that the Court of Appeals issued its opinion, Mr. Reynolds' office immediately confirmed by email to defense counsel that he would not file a motion for reconsideration and would move to nol-prosse.  In a statement to the press, Reynolds noted that the Court of Appeals had been

44

"adamant" in pointing out that the case had a statute of limitations issue and that it would not be appropriate, proper, legal, or ethical for it to go forward.

147.   Mr. Reynolds' office agreed to submit a joint filing to the Court of Appeals to notify the court of this intent in order to expedite the remittitur and Mr. Jannuzzo's release from prison.

148.   On Thursday, July 11, 2013, Cobb County's Criminal Appeals Clerk confirmed that the court had received the expedited Remittitur from the Georgia Court of Appeals reversing Mr. Jannuzzo's convictions.   The clerk prepared a Remittitur for Judge Kell, the trial judge, to sign for Mr. Jannuzzo's immediate release.

149.   Judge Kell's staff attorney informed Jannuzzo's counsel that Judge Kell would sign the remittitur but that Mr. Jannuzzo would remain incarcerated pursuant to a contempt order that he entered while Mr. Jannuzzo was incarcerated in connection with Mr. Jannuzzo's 2002 divorce from Carin Dixon.[21] The staff attorney further informed counsel that he could contact Judge Kell's clerk, who would be back in the office on Monday (July 15, 2013), to schedule a time to appear.

---

[21]   In fact, Judge Kell filed the contempt order while the jury was deliberating in Mr. Jannuzzo's criminal case.

150.   Later that day Jannuzzo's counsel contacted the Cobb County clerk to inquire whether Judge Kell had signed the remittitur.  He was informed that it had not been received in the clerk's office.

151.   Jannuzzo's counsel contacted Judge Kell's office again and expressed concerns about Jannuzzo's safety and about the possibility that something could happen to Jannuzzo while he was forced to remain in Autry State Prison on a reversed conviction.

152.   The following morning, Cobb County officials arrived at Autry State Prison without warning to the officials there, to Mr. Jannuzzo, or to his counsel, to transport Jannuzzo back to Cobb County.  On information and belief, the Cobb County officials informed Autry officials that Jannuzzo was needed in Cobb County for an emergency hearing before Judge Kell.

153.   Jannuzzo's counsel was not notified of any such emergency hearing.

154.   Throughout the day on Friday, July 12, Jannuzzo's counsel continued to inquire of the clerk's office whether the remittitur had been signed. The clerk's office informed him that it had not been received.

155.   On Sunday, July 14, 2013, Jannuzzo's counsel notified the Cobb County court of his intent to file an emergency motion for Mr. Jannuzzo's immediate release from incarceration.

46

156.   The remittitur was filed with the clerk's office the next day.  It was dated Thursday, July 11, 2013.  Judge Kell then indicated that he would recuse himself from Jannuzzo's case.  It was reassigned to Judge Flournoy.

157.   The district attorney's office filed the *nolle prosequi* on July 15, 2013, which stated that the Court of Appeals reversed Jannuzzo's convictions based upon the statute of limitations and, further, that "[t]here is no criminal act which remains to be prosecuted."

158.   Also on Monday, July 15, 2013, Jannuzzo's counsel filed the motion for immediate release.  The motion noted that Mr. Jannuzzo lacked the ability to pay the purge amount required by Judge Kell's contempt order because he had been incarcerated with no source of income for the previous 43 months and that continuing to hold him on the contempt order was not constitutionally permissible.

159.   Judge Flournoy scheduled an emergency hearing for Wednesday, July 17, 2013.

160.   Ms. Dixon's attorney, Robert Wellon, opposed the motion and argued that Jannuzzo should remain in custody.  Mr. Wellon confirmed that he was assisted in his efforts to oppose Jannuzzo's release by a Washington-D.C.-based attorney.  On information and belief, that attorney was Mr. Core.

161.    At the emergency hearing on July 17, 2013, Judge Flournoy determined that it would be unconstitutional to hold Jannuzzo in custody and stated that it would violate his oath of office to continue to hold Mr. Jannuzzo for failure to pay a debt.

162.    Judge Flournoy ordered Jannuzzo's immediate release. Mr. Jannuzzo was finally released from incarceration late in the day on July 17, 2013.

163.    Only after his release from jail, through public records requests did Jannuzzo learn about Defendants' machinations and scheme.

## COUNT I – 42 U.S.C. § 1983 – Malicious Prosecution

164.    Plaintiff incorporates paragraphs 1 through 163 as if fully set forth herein.

165.    Defendants deprived Plaintiff of his constitutional rights under the Fourth Amendment to be free from unreasonable seizures and malicious prosecutions.

166.    Defendants Core, Renzulli, Glock, Inc. and Consultinvest, Inc. assumed a public function and/or operated in joint action with state actors such that they were at all relevant times acting under color of state law.

167.    Defendants caused a criminal prosecution to be instituted and continued against Plaintiff with malice and without probable cause.

168.    The criminal prosecution terminated in favor of Plaintiff.

169.    As a direct and proximate result, Plaintiff suffered damages including, without limitation, personal injury, incarceration, pain, outrage, public humiliation, shame and anxiety, loss of time from work, and injury to his peace, happiness, and feelings, damage to his reputation and professional livelihood, lost earning capacity, and attorneys' fees paid to defend against the underlying criminal prosecution and investigation of this case.

## COUNT II – 42 U.S.C. § 1983 – Due Process

170.    Plaintiff incorporates paragraphs 1 through 163 as if fully set forth herein.

171.    Defendants deprived Plaintiff of his constitutional due process rights.

172.    Butters failed to retain control and management over the investigation and prosecution of Plaintiff, instead allowing Defendant Core, a private attorney compensated by a private corporation (Glock, Inc.) on behalf of a private individual (Glock Sr.), to exercise control and management over the investigation and prosecution.

49

173.    Defendants Core and Renzulli, acting on behalf of Defendants Glock, Inc. and Consultinvest, Inc. exercised control and management over the investigation and prosecution of Plaintiff.

174.    In doing so, Defendants engaged in conduct prejudicial to Plaintiff and acted in disregard of Plaintiff's rights.

175.    As a direct and proximate result, Plaintiff suffered damages including, without limitation, personal injury, incarceration, pain, outrage, public humiliation, shame and anxiety, loss of time from work, and injury to his peace, happiness, and feelings, damage to his reputation and professional livelihood, lost earning capacity, and attorneys' fees paid to defend against the underlying criminal prosecution and investigation of this case.

**COUNT III – 42 U.S.C. § 1983 – Conspiracy for Violation of Civil Rights**

176.    Plaintiff incorporates paragraphs 1 through 163 as if fully set forth herein.

177.    A common understanding existed between the Defendants and Butters, Head, Timmons, and Harrison to form an unlawful conspiracy to deprive Plaintiff of his constitutional rights under color of state law.

178.    Beginning on or around June 21, 2007 and continuing through on or about July 17, 2013, in Cobb County, Georgia, Defendants formed a common

50

understanding with Head, Timmons, and Det. Harrison to take certain unlawful and improper actions to target Plaintiff and deprive him of his rights under the United States Constitution.

179.   Defendants, acting in concert together with the other actors, entered into a conspiracy to commit unlawful acts and by unlawful means to inflict injury upon Plaintiff.   Defendants and the other actors committed overt acts resulting in damage to Plaintiff with the purpose of injuring him.

180.   The object of this conspiracy was to violate the constitutional rights of Plaintiff to be secure in his person, house, papers, and effects, against unreasonable searches and seizures; to violate the right of the people that no Warrants shall issue, but upon probable cause; to violate Plaintiff's right to due process of law under the Fourteenth Amendment; to violate his right to be tried upon evidence that is unmanipulated; and to violate his right to be tried using witnesses that are uninfluenced by improper means.

181.   Defendants controlled, directed, intertwined, and intermingled themselves with actors who were clothed with state authority to investigate and prosecute crimes. This control and intertwined relationship was such that, although some of the Defendants are private individuals or entities, the acts of

51

those acting under color of state law were fairly chargeable to the Defendants as if they were agent and principal.

182.    Although several Defendants were ostensibly private actors themselves, they were at all relevant times engaged in state action or in conduct that is fairly attributable to the State (and vice versa) in that: (1) the deprivation of Plaintiff's civil rights depended upon a common understanding and conspiracy with those acting under color of state law and was executed through procedures or authority of the State or by a person for whom the State is responsible such that the above-named Defendants can fairly be said to have deprived Plaintiff of his constitutional rights under color of state law.

183.    Defendants caused a criminal prosecution to be instituted and continued against Plaintiff with malice and without probable cause.

184.    The criminal prosecution terminated in favor of Plaintiff.

185.    As a direct and proximate result, Plaintiff suffered damages including, without limitation, personal injury, incarceration, pain, outrage, public humiliation, shame and anxiety, loss of time from work, and injury to his peace, happiness, and feelings, damage to his reputation and professional livelihood, lost earning capacity, and attorneys' fees paid to defend against the underlying criminal prosecution and investigation of this case.

## COUNT IV – State Law Claim for Malicious Arrest, Imprisonment, and Prosecution

186.   Plaintiff incorporates paragraphs 1 through 163 as if fully set forth herein.

187.   With malice, but without probable cause, the Defendants caused a criminal prosecution to be instituted or continued against Plaintiff.

188.   The criminal prosecution terminated in favor of Plaintiff.

189.   As a direct and proximate result, Plaintiff suffered damages including, without limitation, personal injury, incarceration, pain, outrage, public humiliation, shame and anxiety, loss of time from work, and injury to his peace, happiness, and feelings, damage to his reputation and professional livelihood, lost earning capacity, and attorneys' fees paid to defend against the underlying criminal prosecution and investigation of this case.

## COUNT V – Violation of O.C.G.A. § 16-14-4(a)

190.   Plaintiff incorporates paragraphs 1 through 163 as if fully set forth herein.

191.   Each Defendant acted in concert with the other Defendants to engage in an ongoing pattern of racketeering activity as defined by O.C.G.A. § 16-14-3(8).

192.  The Georgia pattern of racketeering activity engaged in by Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within four years after the commission of a prior act of racketeering activity.  Such acts are detailed *supra* and include:

- In October 2007 and continuing through at least March 2008, Defendants Core and Renzulli improperly influenced and attempted to influence the testimony of Peter Manown at his proffer and thereafter in negotiating his restitution;

- In May 2008 and early June 2009, both Core and Renzulli willfully provided legal advice to Butters that contained knowingly false statements and statements contrary to established law in order to obtain an indictment of Jannuzzo;

- On or about June 16, 2009, Renzulli committed perjury at the plea in bar;

- In February 2010, Renzulli improperly influenced Mr. Connor to alter affidavit testimony and withhold exculpatory statements;

- In February 2010, despite Connors' exculpatory statements regarding a call from Mr. Jannuzzo about the pistol, Butters, Core, and Renzulli willfully failed to contact Robert Glock regarding this exculpatory evidence and thereby prevented such evidence from being available to the jury; and

54

- Defendants used the manipulated evidence and witness testimony at Mr. Jannuzzo's criminal trial, which took place from late February 2012 through part of March 2012.

193.    These acts were related, as described herein, because: (1) the same or similar purpose was to maliciously prosecute, arrest, and imprison Plaintiff; (2) the same or similar participants were Glock Sr., Defendants, and the other actors identified herein; (3) the same victim was Plaintiff; and (4) the same or similar methods of commission were the use of evidence and witness tampering, withholding of exculpatory evidence, influencing of witnesses, and perjury.

194.    The acts referenced herein were continuous, both because a series of related acts was committed, which extended over a substantial period of time, and because there is a threat of continuity given that Defendants employed predicate acts and patterns of racketeering against other victims, including Harper and Pombert.

195.    The members of the Enterprise, as defined in paragraph 30 *supra*, were acting within the scope of their employment for, and as the agents of, Defendants.

196.    The Georgia RICO pattern of racketeering activity engaged in by the Enterprise and Defendants consists of more than two acts of racketeering activity

that were ongoing, coordinated, and bent towards a common modus operandi and objective.

197.   It was part of the conspiracy that some of the Enterprise, aided and abetted by each other and the other actors, would knowingly and willfully falsify documents.

198.   It was further part of the conspiracy that some of the co-conspirators, aided and abetted by each other, would make false, fictitious, or fraudulent statements or representations about Jannuzzo's activities.

199.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors:  would (a) communicate to witnesses threats of injury or damage to the person, property, or employment of the witnesses, or would offer or deliver a benefit, reward, or consideration to such witnesses, with intent to deter the witnesses from testifying freely, fully, and truthfully before the grand jury and in the criminal proceedings pending against Plaintiff in the Cobb County Superior Court, and (b) knowingly use intimidation, physical force, or threats and misleading conduct toward another person with intent to influence, delay, or prevent the testimony of persons before the grand jury and in the criminal proceedings pending against Plaintiff in the Cobb County Superior Court.

200.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would tamper with evidence with the intent: (a) to prevent the apprehension of Glock Sr. or other Glock affiliates for criminal conduct; (b) to cause the wrongful apprehension of Plaintiff; (c) to obstruct the prosecution of Glock Sr. or any Glock affiliate; and (d) to obstruct the defense of Plaintiff by knowingly destroying, altering, concealing, or disguising physical evidence or making, devising, preparing, or planting false evidence.

201.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would plot to discredit, punish, falsely arrest, and falsely imprison Plaintiff.

202.   It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would:  (a) review and selectively extract documents from the books and records of Glock Sr., Defendants Glock, Inc. and Consultinvest, Inc. as well as from the records of Manown and Plaintiff; (b) meet with and supply false, misleading, and incomplete information to the State Actors; (c) withhold or destroy exculpatory evidence in order to prejudice the criminal defense of Plaintiff; (d) commit perjury; (e) seize records of Plaintiff and others; (f) tamper with witnesses;

57

(g) tamper with evidence and knowingly withhold exculpatory evidence; and/or

(h) falsely swear in affidavits signed in support of warrants for the seizure of records.

203.    It was further part of the conspiracy that some of the Enterprise, aided and abetted by each other and the State Actors, would maliciously prosecute Plaintiff in violation of his Fourth Amendment and Fourteenth Amendment rights.

204.    Defendants, through the Enterprise, engaged in a pattern of racketeering activity, to wit: (a) tampering with evidence with the intent of causing the wrongful apprehension of Plaintiff and obstructing his defense, a crime under O.C.G.A. § 16-10-94(a) and predicate act under Georgia's RICO law, by knowingly destroying, altering, concealing and/or disguising physical evidence and/or making, devising, preparing or planting false evidence; (b) threatening or causing physical or economic harm to another person or attempting to cause physical or economic harm to another person with the intent to hinder, delay, prevent or dissuade any person from: (i) attending or testifying in an official proceeding; (ii) reporting in good faith to law enforcement the commission of an offense under the laws of this state; and/or (iii) causing a criminal prosecution to be sought or instituted or assisting in such prosecution or

58

proceeding, all of which are crimes under O.C.G.A. § 16-10-32(b) and predicate acts under Georgia's RICO law; (c) using intimidation, physical force, threats, corrupt means or misleading conduct with intent to influence, delay, or prevent the testimony of any person in an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(A) and predicate act under Georgia's RICO law; (d) using intimidation, physical force, threats, corrupt means or misleading conduct with intent to cause or induce any person to withhold testimony or a record, document, or other object from an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(B)(i) and predicate act under Georgia's RICO law; (e) using intimidation, physical force, threats, corrupt means or misleading conduct with intent to cause or induce any person to alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding, a crime under O.C.G.A. § 16-10-93(b)(1)(B)(ii) and predicate act under Georgia's RICO law; and (f) committing perjury in sworn testimony during the criminal proceedings against Mr. Jannuzzo, a crime under O.C.G.A. § 16-10-70 and predicate act under Georgia's RICO law.

205. It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or

indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.  O.C.G.A. § 16-14-4(a).

206.    Defendants acquired and maintained an interest and control over an enterprise and/or property through a pattern of racketeering activity.

207.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in his person, property, professional livelihood, reputation, and mental well-being and business by reason of Defendants' violations of O.C.G.A. § 16-14-4(a).

208.    The injuries suffered by Plaintiff were caused by Defendants' violations of O.C.G.A. § 16-14-4(a).

209.    Plaintiff is entitled to recover threefold the damages he has sustained and his costs of suit, including reasonable attorneys' fees.

## COUNT VI – Violation of O.C.G.A. § 16-14-4(b)

210.    Plaintiff incorporates paragraphs 1 through 163 and 190 through 209 as if fully set forth herein.

211.    It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, an enterprise through a pattern of racketeering activity.  O.C.G.A. § 16-14-4(b).

212.    The above-named Defendants were employed by or associated with an enterprise and did conduct or participate in, directly or indirectly, an enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b).

213.    As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in his person, property, professional livelihood, reputation, and mental well-being and business by reason of Defendants' violations of O.C.G.A. § 16-14-4(a).

214.    The injuries suffered by Plaintiff were caused by Defendants' violations of O.C.G.A. § 16-14-4(b).

215.    Plaintiff is entitled to recover threefold the damages he has sustained and his costs of suit, including reasonable attorneys' fees.

### COUNT VII – Violations of O.C.G.A. § 16-14-4(c)

216.    Plaintiff incorporates paragraphs 1 through 163 and 190 through 209 as if fully set forth herein.

217.    Defendants have endeavored to violate O.C.G.A. § 16-14-4(a), in violation of O.C.G.A. § 16-14-4(c).

218.    Defendants have also conspired with each other to violate O.C.G.A. § 16-14-4(a), in violation of O.C.G.A. § 16-14-4(c).

219.   Defendants have committed overt acts, which are also acts of racketeering activity, in furtherance of the conspiracy. These overt acts include witness and evidence tampering, falsification of evidence, influencing witnesses, and threatening of witnesses.

220.   As a direct and proximate result of Defendants' violation of O.C.G.A. § 16-14-4(c), Plaintiff suffered injury and is entitled to recover threefold the damages he has sustained and his costs of suit, including reasonable attorneys' fees.

## COUNT VIII – Punitive Damages

221.   Plaintiff incorporates paragraphs 1 through 220 as if fully set forth herein.

222.   The foregoing acts of Defendants were intentional, malicious, vexatious, and in direct disregard of Plaintiff's rights. Defendants' actions were actively undertaken with the specific intent to cause harm to Plaintiff.

223.   Defendants' actions show willful misconduct, fraud, wantonness, oppression, and an entire want of care that raises the presumption of conscious indifference to consequences, and specific intent to cause harm, entitling Plaintiff to receive punitive damages sufficient to deter, penalize, or punish Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands and prays for judgment and other relief as follows:

1. Judgment for damages, in an amount to be determined at trial, pursuant to 42 U.S.C. § 1983;

2. Reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

3. Judgment in an amount equal to three times the actual damages sustained by Plaintiff, pursuant to O.C.G.A. § 16-14-6(c);

4. Punitive damages in an amount to be determined by the finder of fact, pursuant to O.C.G.A. 16-14-6(c);

5. Attorneys' fees in the trial and appellate courts in connection with the criminal prosecution of Plaintiff, and costs of investigation and litigation reasonably incurred in connection with the criminal prosecution and this action, pursuant to O.C.G.A. § 16-14-6(c);

6. Trial by jury; and

7. Such other relief as the Court deems just and proper.

Respectfully submitted this 8th day of July 2015.

/s/ John Da Grosa Smith
John Da Grosa Smith
Georgia Bar No. 660946
jdsmith@smithlit.com

63

Kristina M. Jones
Georgia Bar No. 435145
kjones@smithlit.com

Smith LLC
1320 Ellsworth Industrial Blvd.
Suite A1000
Atlanta, GA 30318
Tel: (404) 605-9680
Fax: (404) 935-5226

*Counsel for Plaintiff Paul F. Jannuzzo*