# Exhibit 2

# Part 8 of 19

# Pages 817-941

IN THE SUPERIOR COURT OF COBB COUNTY

STATE OF GEORGIA

STATE OF GEORGIA,                    )
                                     )
        Plaintiff,                   ) CRIMINAL FILE
                                     ) NO. 09-9-2603
        vs.                          )
                                     ) DAY 5
PAUL F. JANNUZZO,                    ) VOLUME 6
                                     ) FEBRUARY 27, 2012
        Defendant.                   ) PAGES 817 TO 1066

JURY TRIAL OF PAUL JANNUZZO

FEBRUARY 27, 2012

THE HONORABLE C. LATAIN KELL, SR., PRESIDING

Cobb County Superior Court
Marietta, Georgia

APPEARANCES OF COUNSEL:

On Behalf of the Plaintiff:     John Butters
                                Assistant District Attorney

On Behalf of the Defendant:     Robert Citronberg, Esq.
                                John DaGrosa Smith, Esq.

Kathleen J. Sherwood, RPR, CCR, B-2039
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia   30090
(770)528-1872

817

VOLUME 6

FEBRUARY 27, 2012

|  | PAGE/VOL |
|---|---|
| HEIDI HEIN | |
| Direct Examination by Mr. Butters | 835 v6 |
| Cross-Examination by Mr. Smith | 845 v6 |
| VICKI BERENS | |
| Direct Examination by Mr. Butters | 899 v6 |
| Cross-Examination by Mr. Smith | 944 v6 |
| DAVID KREGLOSKI | |
| Direct Examination by Mr. Butters | 963 v6 |
| Cross-Examination by Mr. Smith | 966 v6 |
| VIRGIL ROBERT BYERLY | |
| Direct Examination by Mr. Butters | 969 v6 |
| Cross-Examination by Mr. Smith | 972 v6 |
| DAVID COLLIER | |
| Direct Examination by Mr. Butters | 987 v6 |
| Cross-Examination by Mr. Smith | 993 v6 |
| DAVID KOLIOS | |
| Direct Examination by Mr. Butters | 995 v6 |
| Cross-Examination by Mr. Smith | 1002 v6 |
| Redirect Examination by Mr. Butters | 1021 v6 |
| DIANE PITCHER | |
| Direct Examination by Mr. Butters | 1024 v6 |
| Cross-Examination by Mr. Smith | 1028 v6 |

MICHAEL T. NATIONS

Direct Examination by Mr. Butters

Cross-Examination by Mr. Smith                          1040 v6

KATIE RIESTER, APD                                      1050 v6

Cross-Examination by Mr. Butters
                                                        1056 v6

STATE'S EXHIBITS

| Exhibit | Description | Marked | Admitted |
|---------|-------------|--------|----------|
| 1 | (Previously marked) | | 944 v6 |
| 2 | 3/7/97 Letter to Jannuzzo from Marshall | 905 v6 | 908 v6 |
| 40 | Copy of Glock check 43935 | 901 v6 | 902 v6 |
| 42 | Copy of Glock check 44550 | 902 v6 | 903 v6 |
| 55 | 10/1/95 Summit National Bank statement | 837 v6 | 839 v6 |
| 56 | 11/1/95 Summit National Bank statement | 837 v6 | 839 v6 |
| 59 | 2/14/97 Summit National Bank statement | 837 v6 | 839 v6 |
| 61 | Summit Bank records | 840 v6 | 841 v6 |
| 62 | Summit Bank records | 840 v6 | 841 v6 |
| 63 | Bank record | 841 v6 | 845 v6 |
| 73 | Bank record | 841 v6 | 845 v6 |
| 74 | Bank record | 841 v6 | 845 v6 |
| 75 | Bank record | 841 v6 | 845 v6 |
| 76 | Bank record | 841 v6 | 845 v6 |
| 78 | Bank record | 841 v6 | 845 v6 |
| 80 | Check Request | 909 v6 | 911 v6 |

819

| 81 | Copy of Glock check 45694 | 903 v6 | 904 v6 |
| 82 | Credit Enhancement | 913 v6 | 999 v6 |
| 89 | 6-25-98 Wire transfer | 1021 v6 | 1023 v6 |
| 188 | First Union Loan Guarantee | 913 v6 | 989 v6 |
| 189 | Security agreement | 987 v6 | 990 v6 |
| 219 | Control agreement | 987 v6 | 991 v6 |
| 220 | Tri-party agreement | 987 v6 | 992 v6 |
| 221 | First Union document | 987 v6 | |
| 278 | 7-6-01 letter to Jannuzzo from Nations | 1041 v6 | 1042 v6 |
| 293 | Series of e-mails from law firm | 1044 v6 | 1047 v6 |
| 500 | Series of photos of cabinets | 965 v6 | 965 v6 |

DEFENDANT'S EXHIBITS

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 4 | Series of documents | 849 v6 | 852 v6 |
| 5 | Series of documents | 857 v6 | 858 v6 |
| 6 | Series of documents | 880 v6 | 881 v6 |
| 7 | Legal document about investment | 979 v6 | |
| 8 | UCC Financing Statement | 1014 v6 | |
| 9 | Memo 2002 | 1016 v6 | 1018 v6 |

(ITEMS WHICH MAY HAVE BEEN TENDERED OR ADMITTED INTO EVIDENCE RELATING TO THIS HEARING HAVE BEEN RETAINED BY THE OFFICE OF SUPERIOR COURT CLERK PURSUANT TO THE POLICY OF JAY STEPHENSON, CLERK, COBB SUPERIOR COURT, AND ARE THEREFORE NOT ATTACHED TO THIS TRANSCRIPT. YOU MUST CONTACT HIS OFFICE DIRECTLY TO OBTAIN THE OFFICIAL CERTIFIED COPIES OF ANY EXHIBITS.)

P R O C E E D I N G S

(February 27, 2012, at 9:30 a.m. in open court with all parties present.)

THE COURT: Call the case back to order. And let me just study a couple things. First of all, so the record is clear, because I had requested that -- Mr. Citronberg had contacted me last night. I don't know how much we put on the record on Friday, but Mr. Citronberg wasn't feeling well on Friday and I wanted to make certain that he could go forward today.

During that conversation, he indicated to me that his doctor had advised him to take some time off and recuperate from his particular condition, and I think he negotiated with his doctor and -- at any rate so that he would stay out today.

He indicated to me, Mr. Smith, that, obviously, he had spoken with you and also with Mr. Jannuzzo about that fact that he would not be able to appear today and that you believed that, at least with respect to most the matters that the State might cover, or most of the witnesses that the State might cover, that we could probably go forward with the exception specifically of Detective Harrison.

Am I at least somewhere in the ballpark of where we are?

821

MR. SMITH:  That's how I understand the conversation from last night, Your Honor, yes, sir.

THE COURT:  Yes, sir.  And Mr. Jannuzzo, let me ask you specifically:  Are you satisfied with going forward today without Mr. Citronberg's participation with those witnesses other than Detective Harrison?

MR. JANNUZZO:  Yes, Your Honor.  May I inquire what we'll tell the jury?  I don't want them to think we fired Bob or anything.

THE COURT:  No.  No.  Well I'm going to tell them a couple of things, quite frankly, because my second point that I wanted to tell everyone is I am very much under the weather today.

I have been up all night last night and I am not feeling well, and I'm going to try to push on today and see if we can get as much done as we can get done.  And as I have told the bailiffs, if I get up and depart the bench at some point in time without announcing it, they will take the jurors directly into the juror room and we'll have a short break at that time.

MR. BUTTERS:  Your Honor, as you can tell by the sound of my voice, I have got the same problem.

THE COURT:  Oh, my goodness.

MR. BUTTERS:  I think what's going on is we are -- I literally think we are passing a virus around through the

documents that everybody is handling. That's best I can figure out.

THE COURT: I told Ms. Smith to keep the hand sanitizer in a prominent spot today. That would be my advice to everyone, at least with respect to things I touch, because -- but I am at least feeling like we can get some things accomplished this morning and we are going to do this.

Let me tell you a couple other things that I have been thinking about. I believe that I am also going to tell the jurors that -- not today, obviously, because I think we are just going to finish what we can today and then stop, which I don't think will be a late day for us.

I think it will probably be somewhere early unless I'm miscalculating, but at any rate I think we can finish on time today. Tomorrow, unfortunately, I need to wrap up at 4:45. I have an appointment at 5:00 that I can't change, and I regret that.

But I think I'm going to tell them that Wednesday, Thursday, and Friday they need to at least be prepared to be able to stay later in the evening.

And when I say later, I'm thinking like 8:00, and we will feed them some dinner at some point in time and go on with the presentation of evidence, so I wanted to give you all a heads up that that's my thought process right now

and we'll just kind of see where we are at the end of the day today, but at least they can be making some plans to do that so we'll try to do that.

And as I told you at the outset of the case, it is never my preference to do that, but I think given where we are in this trial -- I know we have at least one juror, if I'm remembering correctly, who said he had an issue if we went beyond Friday, and I don't want to create an issue where we don't have to, so that's certainly going to be my goal is to get us finished by the day we told them we would finish by.

Those are all the preliminary matters that I needed to get out of the way. What else does the State have that we need to go over?

MR. BUTTERS: Nothing, Your Honor. The State's ready.

THE COURT: I received the updated witness list this morning that was sent out from the State, and I recognize most of the names on there at least from what you had told us on Friday. So, Mr. Smith?

MR. SMITH: Yes, sir. Your Honor, as the Court is aware, last Friday began with the defense advising Court that we were no closer to being ready than we were the night before because we had not received the list that Mr. Butters thought he sent.

The Court will also recall that at the end of Friday the Court had admonished counsel, or at least recommended to counsel that we try and restore some civility and professionalism and be cognizant of that.

On Friday, we received a handwritten list from Mr. Butters with expected witnesses.

At 6:25 -- 6:44 this morning we received a new list. That list contained, among others, John Renzulli. John Renzulli, as the Court is aware, is outside counsel for Glock and has been involved in this matter from the outset for years. That name was not present on the list that Mr. Butters provided to us on Friday.

It is -- it's strange credulity that Mr. Butters didn't know that he was going to call -- the State was going to call Mr. Renzulli who has been in this matter for roughly five-plus years until 6:44 this morning.

And with all due respect, Your Honor, this has been a pattern for the defense, and it's not about trying to make life more difficult for the Court or simply stand on a soap box with Mr. Butters. It's about trying to prepare a reasonable and adequate defense for the very serious charges that have been leveled against Mr. Jannuzzo.

And when we get names in the morning, regardless of the fact that that person has been in and around the case, regardless of the fact that we obviously know that name

825

and it's not new, the preparation that we directed was directed towards the witnesses that Mr. Butters represented he would call.

And unless he didn't realize till 6:44 this morning that a lawyer from New York was going to be flying in town, it seems to me, Your Honor, that that is improper.

And we would ask, at a minimum, that Mr. Butters be admonished for now the second day in a row of advising us at the last minute about who a witness is in this case.

Making -- previously made a representation to the Court that he would provide something that he did not, and, at a minimum, ensure that Mr. Renzulli does not go on today, because we learned about it at 6:44 in the morning that he was going to call this man and at a minimum make sure Mr. Renzulli doesn't testify until tomorrow.

THE COURT:  Thank you.

Mr. Butters.

MR. BUTTERS:  The State is not going to call John Renzulli today, and the State is not going to call John Renzulli.

The State was going to call John Renzulli to then authenticate that e-mail for that purpose only, and I'm sorry that the defense counsel got all bent out of shape over that, but the State is not going to call him, so that issue doesn't even need to get anybody upset.

826

THE COURT: Thank you, Mr. Butters. We will take Mr. Renzulli, which is number seven on the updated list, we will take his name off.

MR. SMITH: The second issue, Your Honor, this morning the defense filed a motion to compel that we submitted a copy to the Court just this morning to Ms. Smith for a subpoena that was issued to Mr. Robert Core, whom I don't see in the courtroom at this time.

Last week that had a response date of Friday. Mr. Core has not addressed that subpoena with the defense. It was a properly issued subpoena that I personally served on him.

He did not come and talk to me about it. I have actually seen him in the hotel this weekend walking around. He's never mentioned it, and to my knowledge, sir, there has not been a motion to quash filed.

So therefore, Mr. Core, attorney, has just simply failed and ignored a subpoena, so at this point we'd ask that he be compelled to produce all the documents that are on the subpoena.

THE COURT: Do you have a copy of the subpoena? It's not attached to the motion that I have. I just wanted to look at it, because that's one subpoena I haven't seen yet.

MR. SMITH: Yes, sir.

THE COURT: Thank you, sir.

MR. SMITH: We did not have a Xerox machine, Your Honor, but I represent that I wrote in the date for Friday on the subpoena, but that is an accurate reflection of the documents that were requested.

THE COURT: Yes, sir. I'm sorry, for this past Friday, the 24th?

MR. SMITH: It was -- it had a due date of this past Friday. Correct, sir.

THE COURT: Thank you, sir. Can I keep this copy?

MR. SMITH: Yes, Your Honor, you may keep this copy.

It would be the defense position that Mr. Core be compelled to produce the documents, and because he failed to file a timely motion to quash he's, therefore, waived any objections to the subpoena, which we believe is consistent with the statute and consistent with Georgia law that he simply produce the documents.

THE COURT: What I think I'll do is I anticipate at some point Mr. Core will be available for us today, and if he's not then I will have to do something else, but I certainly will take this matter up with him, because I think at least some portion of the documents are due to be produced unless he's got some defense as to why they can't be produced.

MR. BUTTERS: Your Honor, if you just give me an idea

828

of when you would like him here, I will make arrangements to have him up here.

THE COURT: Sure. Let's try to get him over here, say, around 10:00 and I will try to take it up at whatever break we have so that the defense can have some idea of what we're talking about prior to the lunch break.

Thank you.

MR. SMITH: That's all I have, Your Honor.

THE COURT: Okay. And don't let me forget that, gentlemen. I know you won't, but remind me of that. I'm making notes of things so I won't forget, but today I'm not at my best.

MR. SMITH: Yes, sir. And just one last point. I noted in Mr. Butters' exhibit list of potential exhibits today one of the exhibits is a police report from the Atlanta Police Department that contains content consistent with what we've already had agreements to exclude. It's in that document.

And, of course, the contents of that document would just be rote hearsay and wouldn't be admissible, but it's in the book and I'm not sure why it's there, but it caused me to at least be concerned.

THE COURT: I'm sure that's one of the things that you'll use, if you need to, to refresh the witness's recollection, but we have already discussed what the

parameters are of that, so just make sure that when that witness comes to the witness stand they have been advised, and if you need a moment to advise them of what the Court's ruling is, we'll take that.

MR. BUTTERS: Your Honor, along those lines, I think what I'd like to do with respect to that witness, and maybe the safest thing, because we've had so much going on, we've had so many side conferences about this --

THE COURT: Yeah.

MR. BUTTERS: -- that when I get to that witness, if we could just excuse the jury --

THE COURT: Sure.

MR. BUTTERS: -- and kind of go over the ground rules with the witness with everybody present, then I don't have to worry about whether I said the right thing or the wrong thing and we can go from there.

THE COURT: I think that makes sense out of an abundance of caution. I will be happy to go over that with the witness when -- outside the presence of the jury when that time comes.

What's that officer's name?

MR. BUTTERS: It's Ahearn-Riester, I think it is. She's gotten married since then.

THE COURT: All right. Well, we will take that up with her, then, when she comes to the witness stand.

MR. SMITH:  I suspect that would be true for any document that Mr. Butters would seek to use of any witness that might have a reference to that.  I assume it's only going to be Officer Ahearn.

MR. BUTTERS:  Oh, yeah.  If we're not going to go into it, we will cover documents in testimony.  I just want to do it in front of everybody so --

THE COURT:  Absolutely.  I think that makes sense.  All right.

Thank you, gentlemen.  Is everyone here?

All right.  Great.  We will -- unless there's anything else, we will -- let's go ahead and bring in the jurors.

Who is your first witness this morning?

MR. BUTTERS:  Vicki Berens.

THE COURT:  Thank you.

I have a few things to tell them and then we will start.

(The jury enters the courtroom at 9:25 with all parties present.)

THE COURT:  Good morning, ladies and gentlemen.  I hope everyone had a wonderful weekend.  Certainly hope you got to get outside yesterday.  It was so nice outside.

I'll tell you a couple of preliminary things this morning before we get directly into our testimony for

today.

As you may be able to tell from my voice, I am not feeling well today. I am a little bit under the weather, but we're going to push forward and see if we can get some things done today that we need to get done so that we can stay on track, so I will just warn if at some point I get up and bolt from the bench, don't be overly concerned.

The bailiffs will just take you back to the jury room for a minute, we'll take a break, and I'll come out when I am feeling a little bit better, but hopefully that won't happen. I'm feeling better this morning than I was about 3:00 this morning, so anyway we will do what we can.

Along that same vein, Mr. Citronberg, who you have seen previously sitting at defense counsel table, is also under the weather today and is not going to be here, but we have discussed it and he is fine with going forward in his absence with some of the witnesses that we have scheduled for today, so everybody is pushing forward.

And I think Mr. Butters is a little under the weather as well, so I'm afraid you may want to stay away from this area over here. Just stay where you are in your jury box over there, and we've all agreed to keep our hand sanitizer handy and pass the documents back and forth only after we've scrubbed our hands with it. So at any rate, we will see what we can get done and how everyone is

832

feeling.

1 have assessed -- and this is my assessment, but I try to prepare and I think it's my job to be prepared for worst-case scenarios in terms of just about everything that has to do with a trial or anything else in Court, so I'm trying to figure out how -- if we get behind this week, how we will make up the time.

And trying to take into consideration some of the considerations that you folks have said that you have and also trying to keep us on schedule to finish Friday, as I told you that we would, what 1 would ask, not today and not tomorrow, but if it looks like we are getting behind I would ask you folks to try to be putting together a plan by which we could stay late on Wednesday, Thursday, and Friday evenings if we have to. And by late, I would mean as late as maybe 8:00.

And what we would do is feed you dinner. Very exciting, a free dinner from the county. It's not something you get very often, but won't be too much, I can promise you, but certainly something to sustain, but we would give you a little dinner break at some point in the early evening and then go on for another couple of hours after that, so that's at least what I am thinking about, so 1 wanted you all to be able to plan for that ahead of time.

Again, as I told you the very first day of trial, I greatly appreciate the extraordinary efforts that you have to go through to be available for these trials, and we all, all, appreciate that very, very much, so thank you for that.

We are, I think, ready to get started this morning, and so with that I will ask the State to call its next witness.

MR. BUTTERS: Your Honor, the State's next witness will be Vicki -- excuse me. I'm sorry. It's Heidi Hein. Good thing --

THE COURT: Heidi Hein.

If you will get Ms. Hein for me, please.

While Miss Hein is getting to the witness stand, can counsel approach the bench for me for just one second?

Ms. Hein, if you would, just make your way past the bailiff over there and come all the way to this seat. I've got to have a sidebar with counsel for just a moment.

MR. SMITH: I won't get sick, Judge, will I?

THE COURT: I wouldn't get too close.

(A bench conference was held off the record from 9:30 to 9:34 a.m.)

THE COURT: Sorry about that, ma'am. That took longer than I thought it was going to.

If you would, please place your left hand on the

Bible and raise your right hand.  Thank you.

HEIDI HEIN,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT:  You can be seated.  Just make sure to pull the chair up close enough to the mic so we can hear you.  Right there.  You don't even have to be that close.

MR. BUTTERS:  I'll be with you in just a second.

THE WITNESS:  Okay.  Thank you.

MR. SMITH:  On the sequestration, Your Honor, I did get an exception for Mr. McGovern to remain present, but invoke the rule of sequestration for anyone else.

THE COURT:  All right.  Folks, anyone else -- anyone who has been called as a witness in this case at this time, if you would please step outside, with the exception of -- I think I also told Mr. Core that he can stay and I said Mr. McGovern could stay during the expert witness's testimony, I believe, but not during the other witnesses.

MR. BUTTERS:  It's fine with Mr. McGovern to be here for this witness.

THE COURT:  You don't mind.  All right.  If there's anybody else, they need to step outside.

All right.  Thanks very much.  You may proceed.

DIRECT EXAMINATION

BY MR. BUTTERS:

835

Q    Ma'am, my name is John Butters.  We have not met, have we?

A    No, we have not.

Q    And you will have to excuse me.  I'm sounding a little like a fog horn this morning.  It's not intentional.

Would you please state your name for the record?

A    Heidi Hein.

Q    Okay.  Ma'am, are you currently employed?

A    Yes.

Q    Where do you work?

A    East West Bank.

Q    Did you ever work at Summit Bank?

A    Yes.

Q    Could you tell us kind of your history at Summit Bank and how you got to East West Bank and just kind of fill us in?

A    Okay.  I was hired by Summit Bank about 14 years ago and it remained Summit Bank until the board of directors and the president decided to take up an offer from United Commercial Bank to sell Summit.

Q    Okay.

A    It remained in United Commercial Bank's hands for about three years.  United Commercial Bank was one of the banks that failed and was acquired by East West Bank.

Q    So what did you do at Summit Bank?

A    I was the branch manager of what was then called

private banking. It was just a particularly customer-friendly department of the bank, and I had several people working for me at the time.

Q What is your current position with East West Bank?

A I am a business development officer and a vice president.

Q Okay. Are you familiar with the record-keeping system of Summit Bank when it was in existence?

A Yes.

Q I'm going to show you some exhibits and see if you can just tell us a little bit about them.

MR. BUTTERS: If I can just take a few minutes. I'd like to just give a -- pull a handful together rather than --

THE COURT: That would be fine.

MR. BUTTERS: -- run around the courtroom.

THE COURT: Yes, sir.

(State's Exhibit Numbers 55, 56, and 59 was marked.)

Q (By Mr. Butters) I'm going to hand you Exhibits 55, 56, and 59.

Do you need to see them, John?

MR. SMITH: Just to start with, then I think I'll be able to tell.

MR. BUTTERS: Don't touch it.

MR. SMITH: I'm the only one standing.

Are these in your list?

Q    (By Mr. Butters)  I'm going to hand you Exhibits 55, 56, and 59, and then I'll let you -- ask you if you can identify them.

Let me spread them out, that way maybe it's less likely that you'll need to touch them, because I just -- I don't want you to hate me for the rest of the week and get sick.

So can you tell us what -- let's take Exhibit 55. Just generally -- tell us what each one of those are just in the general nature of things, whether they are bank statements or what.

A    It looks like the bank statements for commercial money market account.

Q    Okay.

MR. BUTTERS:  And if I could approach, Your Honor.

THE COURT:  Yes, sir.

Q    (By Mr. Butters)  These are -- appear to be bank statements for -- would those be bank statements for an entity Unipatent since that address appears to be on there?

A    That seems to be the holder of that account, yes.

Q    Okay.  Would these documents be documents that Summit Bank would have made in the ordinary course of its business?

A    Yes.

Q    Would it have been the ordinary course of business of

838

Summit Bank to make these documents?

A     Yes.

Q     And would the transactions reflected on those documents, would they be put on those documents at or about the time that those transactions occurred?

A     Yes.  Mm-hmm.

Q     And is that -- was that a common practice with respect to bank accounts at the bank, that they would make -- the records were maintained like this -- these records?

A     They are normal bank statements.

MR. BUTTERS:  Okay.  Your Honor, we move to tender into evidence Exhibits 55, 56, and 59.

THE COURT:  Any objection to those?

MR. SMITH:  No, sir.

THE COURT:  They are admitted.

THE WITNESS:  May I make a comment?

Q     (By Mr. Butters)  Sure.

A     These statements were rendered prior to my employment with Summit.

Q     Okay.  But to your knowledge, in looking at them, they look like records that would be maintained in the ordinary course of the business of Summit Bank?

A     Yes.  And the business names are not familiar to me.

Q     Okay.

I'm going to hand you a couple more exhibits, 61 and

62.

(State's Exhibit Number 61 and 62 were marked.)

MR. SMITH:  Just one moment, Your Honor.

THE COURT:  Yes, sir.

Q    (By Mr. Butters)  I'm going to hand you Exhibit 61 and 62 and ask you:  Do those appear to be Summit Bank records if you know?

A    Yes.

Q    Would those be records that Summit Bank would have maintained in the ordinary course of its business?

A    Yes.

Q    And would it be the ordinary course of business of Summit Bank to maintain such records?  I know that sounds like double-talk but --

A    Well, banks are required keep records for seven years.

Q    Okay.  And would the transactions on those documents be -- have occurred at about the time reflected on the documents?  Was that part of the ordinary course of business, to put transactions on documents at or about the time they occurred?

A    Yes.  Those are wire transfers.

Q    Okay.  Wire transfers.

MR. BUTTERS:  Your Honor, the State moves to tender into evidence Exhibit 61 and 62.

840

THE COURT: Any objection?

MR. SMITH: No, sir.

THE COURT: They are admitted.

(State's Exhibit Numbers 63, 73, 74, 75, 76, and 78 were marked.)

Q   (By Mr. Butters)  Ma'am, I'm going to hand you documents 63, 74, 75, 76 and 78.

MR. BUTTERS: Can I just check here, Your Honor?  I want to see if I --

THE COURT: Sure.

MR. BUTTERS: Counsel, I'm going to hand you Exhibit 73.  I'm going to also use Exhibit 73.  Sorry.  I didn't see it.

Q   (By Mr. Butters)  Ms. Hein, I'm going to hand you documents 63, 74, 75, 78 and 76.  Would you take a look at those documents and tell the Court whether those appear to be --

A   Can I touch them?

Q   -- records of Summit Bank.

I'd be glad to spread them out if you'd like.

THE COURT: At your own risk.

MR. BUTTERS: Yes, I was going to say.

THE WITNESS: Too late now.

Q   (By Mr. Butters)  Got a lot of witnesses that say I didn't tell you to touch them so --

A    63 seems to be fine, or it seems to be that it --

Q    A business record of the bank?

A    -- a business record of the bank, yes.

So does 74.

Q    Okay.

A    Both records.

75 is a business record.

Q    Okay.

A    76 is a receipt of a deposit.

Q    Would that be a business record of the bank?

A    Yes.

Q    Okay.

A    And 78 also seems like the Summit National Bank statements.  It shows a debit to the account and two deposit tickets.

Q    Okay.  And let me hand you one other final one and that would be State's Exhibit 73 and ask you:  Does that look like a business record of Summit Bank?

A    Yes, it does.

Q    Okay.  Now, with respect to that most recent handful of documents that you've gone through --

A    Mm-hmm.

Q    -- are all of those documents that the Summit Bank would maintain in the ordinary course of its business?

A    Correct.

Q     And it would be part of its ordinary course of business to maintain such documents; correct?

A     Absolutely.

Q     Okay.  And the transactions reflected on those documents would have occurred at or about the time shown on the documents?

A     Yeah.

Q     Okay.

MR. BUTTERS:  Your Honor, we move to tender into evidence State's Exhibits -- and let me read them off just so the record is clear.  We move to tender into evidence State's Exhibit 73, 78, 76, 75, 74, and 63.

THE COURT:  Any objection to those?

MR. SMITH:  Your Honor, this is just a recurring issue.  I mean, the witness is seeking to lay a foundation for a business record which -- it's been going on since last week where the witnesses are handed documents that have handwriting on them.

Mr. Butters understands that the witness obviously can't authenticate as a business record a printed statement that has handwriting on it.

So I have to keep objecting and ask that it be stricken, so perhaps, you know, going forward if we are going to present a witness with something believed to be a business record it would contain that.  Specifically, in

this instance, it's Exhibit 78 contains handwriting, and it's Bates number 001429.

MR. BUTTERS:  If I could just take a look at it.

THE COURT:  Certainly.

MR. SMITH:  Dead smack in the middle of the page in bold.

THE COURT:  Okay.

Q   (By Mr. Butters)  Do you recognize the handwriting on the middle of page 78?

A   No, I do not.

Q   Would that handwriting -- do you think that handwriting would have been put on there by the bank, or do you know?

MR. SMITH:  Objection.  Calls for speculation.

MR. BUTTERS:  I do not --

THE COURT:  Overruled.

THE WITNESS:  -- know.

MR. BUTTERS:  Okay.

THE COURT:  She doesn't know.

MR. BUTTERS:  Your Honor, I'll just let the State rule -- I mean, I'll let Your Honor rule with respect to that, but otherwise it's --

THE COURT:  Other than that -- that's the only objection that I hear, so I will allow that document to be redacted, that is, to remove the handwriting, but the

844

remainder of the document can come into evidence.

MR. BUTTERS:  Okay.

THE COURT:  And with respect to other documents, they're okay.

MR. SMITH:  Okay, sir.

MR. BUTTERS:  Your Honor, that's all I have of this witness.

THE COURT:  Is there cross-examination for this witness?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Yes, sir.

MR. SMITH:  Your Honor, in order to expedite things and keep everyone on the same page, we created binders of all the exhibits we're going to use.

If I could hand a copy to Mr. Butters so he can follow along.  I also have one for the Court.

THE COURT:  Thank you.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.  Give that to Ms. Smith for me, please.  Thank you, sir.

CROSS-EXAMINATION

BY MR. SMITH:

Q   Morning.

A   Good morning.

Q   You're healthy today?

845

A    Yes.  I woke up.

Q    I'm healthy, too.

I'm going to end up showing you a series of documents similar to Mr. Butters, and we can be able to go through the process in which they were kept at the bank.

A    Okay.

Q    Prior to that, I just wanted to cover a few points with you.  Again, what was your title at Summit National Bank?

A    I was branch manager of private banking and vice president.

Q    Okay.  I want to talk a little bit about the way in which accounts are titled.  When a account has a title of a corporation, what does that mean, when an account is titled with a corporation name?

A    It has to coincide with the registration at the Georgia State; state of Georgia, excuse me.

Q    And what does that mean that it coincides with the registration with the State of Georgia?

A    That it's a valid title together with the tax ID number for the company.

Q    Why is that important?

A    To identify that it's a legitimate business.

Q    And when a account is titled in the name of a corporation that matches the tax ID and matches the registration of the State of Georgia, who is the actual owner

of the -- of that account?  Who is the --

A    The corporation.

Q    The corporation is the titleholder?

A    Yes.

Q    Okay.  So if a -- so if a corporation was formed by a person and two other people and the corporation then opened an account, do the funds in that account belong to the people that started the corporation or do they belong to the corporation itself?

A    They belong to the corporation itself.

Q    And how does the bank determine whether or not the person or people that opened the account are authorized to do it?

A    It should say so in the articles of incorporation.

Q    And does the bank require when an account is opened in the name of a company, either a corporation or a limited liability company, that documents, organizational documents, be provided to show that the person has authority to act on behalf of the entity?

A    Yes.

Q    If there is signature authority on that account, does that change who the owner of the account is?

A    Rephrase, please.

Q    Sure.  If there's signature authority, if multiple people have signature authority --

847

A    Right.

Q    -- on an account that's titled in the name of a limited liability company, does that change who owns the funds in the account?

A    No.  The limited liability company owns the funds, and normally the signatories are members of the LLP -- LLC.

Q    Okay.  And if a signatory wasn't a member but had authorization, that doesn't change the ownership of the funds in the account; correct?

A    No.

Q    That just means that that person was authorized to conduct transactions on the account and was given that authority consistent with the organizational documents for that company.

A    Correct.

Q    Okay.  If an account -- and what is the tax ID number?  You mentioned the tax ID.  I think you mentioned the tax ID number.  What is that?

A    Well, it is a number that is issued by the Internal Revenue Service for this company to conduct business and pay their taxes to that particular account at the IRS.

Q    So if an account had a title, for example, of Mansell Holdings, LLC, the titleholder of that account would be Mansell Holdings, LLC; correct?

A    Correct.

Q   And the property that's contained in the account, or the money contained in the account in particular, would belong to Mansell Holdings, LLC; correct?

A   Correct.

Q   And it would be the bank's position that an individual doesn't lay claim and can't lay claim to that money because it belongs to the limited liability company who is the titleholder of the account; correct?

A   Mm-hmm.  Yes.

Q   Okay.

A   Sorry.

(Defendant's Exhibit Number 4 was marked.)

Q   (By Mr. Smith)  I want to show you -- I'm going to mark collectively -- Ms. Smith, do you know the defense exhibit we're up to?  Is it 3 or 4?

THE COURT CLERK:  4.

MR. SMITH:  Mr. Butters, do you have an objection if I mark a series of documents in one of your books collectively as D4?

MR. BUTTERS:  Which book?

MR. SMITH:  It would be in the book entitled "Mansell Holdings."

MR. BUTTERS:  No, that's fine.  So the whole book is D4?

MR. SMITH:  Yes, sir, if you don't have any

objection.

MR. BUTTERS:  No.  No.

MR. SMITH:  If that's all right with the Court, I'll mark as D4 collectively, Your Honor.  If I may approach the witness.

THE COURT:  Yes, sir.

Q    (By Mr. Smith)  I'm healthy.

A    Thank you.

Q    Yes, ma'am.  If you could just take a moment and take your time and look through the stack of documents that's been marked as Defense Exhibit 4.

Once you've had a chance to review them thoroughly, if you would just let me know.

Have you had a chance to take a look at those documents?

A    Mm-hmm.  Yes, I have.

Q    Are they generally familiar to you as documents that relate to Summit Bank?

A    Yes.

Q    Okay.  Well, I'd like to go through them document by document.  I'm going to refer to the Bates number, which is the six-digit number in the bottom right-hand corner that begins with a J.

The document -- the first set that you have there, 291 and 292 --

A    Mm-hmm.

Q    -- do you recognize what those documents are?

A    They are -- each one of them -- excuse me.  It shows the front page of two checks that have been written out of Mansell Holdings' account, and it shows the endorsement on the second page.

Q    How can you tell that those checks were written from Summit National Bank?

A    Well, the checks themselves say the Summit National Bank and the account number is something that relates to the Summit Bank's account holder sequences.

Q    Did Summit National Bank maintain images of checks that were written by account holders on its accounts?

A    Yes.

Q    Why did it do that?

A    Well, we are required to keep documents for seven years.

Q    Okay.  And is there anything unusual looking about the front of the checks on 291 and the back of the checks on 292?

A    They were written, as far as I can see, that they were transfers to other accounts, and they show two signatures.

Q    Okay.  Were these types of images, images of checks, something that the Summit National Bank would keep in the regular course of its business?

A    Yes.

Q    In fact, it had to keep it -- because of the regulations, they had to keep it for seven years; right?

A    Correct.

MR. SMITH:  Your Honor, I would seek to enter at least the first part of the -- what's been marked as Exhibit 4, pages to 291 and 292, into the evidence.

THE COURT:  Since it's marked collectively, do you mind if we go through the whole thing --

MR. SMITH:  Sure.

THE COURT:  -- and then deal with it as a group?

MR. BUTTERS:  Your Honor, if it will speed things up, I have reviewed the whole exhibit.  I have no objection to it.

THE COURT:  All right.  Then the exhibit will be admitted, and you can ask the witness what you need to ask her about the other pages.

MR. SMITH:  Great.  Thank you.

Q    (By Mr. Smith)  What does -- the checks exhibit -- the first two pages of Exhibit 4, 291 and 292, that's a check that's written out of Mansell Holdings, LLC; is that right?

A    That's correct.

Q    So that's property of Mansell Holdings, LLC, that was contained in an account, and there's a check that's drawn on the account that has cash belonging to Mansell Holdings, LLC;

is that correct?

A    That's correct.

Q    Okay.  And the -- for the first check, the first image on page 291, there's the "to" line and it says Eaglesmith Partners, Inc.  Do you see that there?

A    Yes, I do.

Q    Okay.  Would that be -- is that a -- would that be separate entity?  Is that a corporation; do you know?

A    It is a separate entity.

Q    Are you familiar with that name:  Eaglesmith Partners, Inc.?

A    Yes, I am.

Q    How are you familiar with it?

A    It was an account that was established when I was hired by Summit.

Q    Who established that account?

A    Mr. Manown.

Q    Okay.  So the property in Eaglesmith Partners, Inc., who did that cash belong to?

A    Eaglesmith Partners, Inc.

Q    And then there would be a bank document that would give an individual, a human being, authority to act on behalf of Eaglesmith Partners, Inc.?

A    Yes.

Q    So when a check was written from Eaglesmith Partners,

Inc., it wasn't the individual who was writing a check.  It was an individual who was authorized, or should have been authorized, to write a check on behalf of the corporation; correct?

A    Correct.

Q    Okay.  And the second check on the front page, it says "Pay to the order of I.B." -- as in "boy" -- "Group"; do you see that there?

A    Yes, I do.

Q    Are you familiar with that entity?

A    No, I'm not.

Q    Okay.  The top left-hand corner of the check, does it indicate what account -- or what the titleholder of the account that the check is drawn on?

A    Mansell Holdings, LLC.

Q    Okay.  If you look at pages 293 and 294, please.  And I'm going to go in order of the original stack.  Yes, ma'am.  Take your time.

A    Yeah.

Q    Okay.  That's an account statement; correct?

A    Correct.

Q    And that's an account statement for an -- what's the account number for that account statement?

A    The account number for that statement is 01006071.

Q    Okay.  And who is the titleholder of that account?

A    Mansell Holdings, LLC.

Q    And the property that's in that account belongs to Mansell Holdings, LLC?

A    That is correct.

Q    If you look at check 287, please.

A    Yes.

Q    You see there's a check there that's -- can you tell who that's made payable to?

A    Eaglesmith Partners, Inc.

Q    Okay.  And that's the same entity that you had testified earlier that you were familiar with?

A    Yes.

Q    And that was an entity that had an account at Summit?

A    That is correct.

Q    That was opened by Mr. Manown?

A    Yes.  According to the other exhibit that you're showing me, it was required -- it was required that Peter Manown as well as Paul Jannuzzo were jointly signing on those accounts.

Q    Okay.  Let's go to that account while you're talking about it.  That's document 284; is that right?

A    That is correct.

Q    And at the top right-hand corner --

A    285.

Q    I'm sorry, and 85.  The top right-hand corner of that

document, what's the title of the document?

A    Summit Bank Limited Liability Company Account Resolution.

Q    Could you please describe what that is, an account resolution?

A    An account resolution shows who -- who has access to the account; who can write checks or transact business.

Q    And from this document, the Limited Liability Company Account Resolution, who is the titleholder of the account?

A    Mansell Holdings, LLC.

Q    And the cash in the account belongs to Mansell Holdings, Inc.?

A    Correct.

Q    Who is entitled to act on behalf of Mansell Holdings, LLC, based on this document?

A    Mr. Paul Jannuzzo and Peter S. Manown.

Q    How can you tell that?

A    It is indicated by their names on various lines of the resolution, as well as their signatures.

Q    I don't have any other specific questions on this stack but I'm going to give you a second stack.

A    Okay.

MR. SMITH:  And I'm going to mark this collectively, Mr. Butters, if you don't have an objection, Exhibit 5, sir.  And it's the one that says, "Eaglesmith Partners

records to authenticate."

I'll mark this stack, with the Court's permission, collectively as Defense Exhibit 5.

THE COURT: Yes, sir.

(Defendant's Exhibit Number 5 was marked.)

MR. SMITH: May I approach the witness, Your Honor?

THE COURT: You may.

Q    (By Mr. Smith)  If you would kindly just take a moment and review each of those documents.  When you have done so, just let me know that you have reviewed them.

MR. BUTTERS: Your Honor, if it will speed things up, I have looked at them.  The State has no objection.

THE COURT: Do you want to admit them at this time?

MR. SMITH: I would like the witness to just go through and familiarize herself and then we can go ahead and give the defense, if that's okay.

THE COURT: That's okay with me.

MR. SMITH: While the witness is reviewing them, I would just note that Bates number 61962 contains handwriting on the statement, and we would, of course, stipulate that that should be redacted prior to submission to the jury.

MR. BUTTERS: What tab?

MR. SMITH: That's tab 16, Mr. Butters.

THE COURT: Yes, sir.

MR. SMITH:  The center on the bottom right.

Also, on tab 7, Your Honor, there is handwriting.

Q    (By Mr. Smith)  Have you had a chance to look at those documents?

A    Yes.

Q    Okay.  And other than the handwriting that was contained on that statement in tab -- large tab 7, your document 61947, and the handwriting contained on a statement that has Bates number 61962, are those all documents that you would -- are familiar with?

A    Yes, they are.

Q    Those are all documents that Summit National Bank would keep in the ordinary course of business?

A    Yes, they are.

MR. SMITH:  Okay.  Based on Mr. Butters' stipulation, Your Honor, we would seek to move Exhibit 5 into evidence.

MR. BUTTERS:  No objection.

THE COURT:  It's admitted with the stipulation of redaction.

MR. SMITH:  Stipulation of redaction of Exhibit 7 and 16.

THE COURT:  Yes sir.

Q    (By Mr. Smith)  If you would look at the account statement, please, with the Bates number 1643.  It's the first one, ma'am.

A    Yes.

Q    Could you tell me what that account statement means to you?  Who is titleholder of that account?

A    Eaglesmith Partners, Inc., II.

Q    What does that mean:  Eaglesmith Partners, Inc., II; do you know?

A    I presume there was originally an Eaglesmith I.  I'm not sure.  This was actually prior to my employment.

Q    Okay.  Based on -- just based on the review of the statement, who would be the holder of the account?

A    Eaglesmith Partners, Inc.

Q    And whose cash would be contained in the account?

A    Eaglesmith Partners, Inc.

Q    If you turn to page 1647 --

A    Mm-hmm.

Q    -- that's a deposit ticket; correct?

A    Correct.

Q    And that's a deposit ticket.  And am I correct that the name written next to the typed word "Name" is "Eaglesmith Partners, Inc., II"?

A    Correct.

Q    And am I also correct that the -- that deposit ticket would be a deposit into an account maintained and owned by Eaglesmith Partners, Inc., II?

A    That is correct.

Q    And then when the money -- if the money gets deposited into the account, that is then cash that belongs to the titleholder, Eaglesmith Partners, Inc., II; correct?

A    Correct.

Q    If you could look at what's been marked with Bates number 1645, please.

A    Yes.

Q    And at the top of that page, there's a check there. Can you tell from the check what account that is drawn on?

A    Eaglesmith Partners, Inc., II.

Q    And the Eaglesmith Partners, Inc. -- Roman Numeral II; correct.

A    Yes.

Q    Okay.  And that is -- that is actually printed on the top of the check, is it not?

A    Yes.

Q    And if that check was issued and then negotiated, that would be taking money out of Eaglesmith Partners, Inc., II's account, and the money would be going wherever it's directed on the check; is that right?

A    That is correct.

Q    Are you familiar with Madison Capital Partners?

A    I'm not.

Q    Okay.

A    But in your exhibit I saw a letter, a copy of a

letter.

Q    Okay.  Well, let's look at page two of the document that you wrote on, 1646, which is the back of the check.

A    Okay.  Yeah.

Q    And does the back of the check contain an endorsement, that top check?

A    Madison Partners Capital, I presume, yeah.

Q    It's a little -- the words are a little blurred out there, but you can see the "tal" right?

A    Correct.

Q    All right.  And what does that mean when it's endorsed -- when the check is endorsed "Madison Capital Partners"?

A    It is endorsed that -- it shows that it went into that account from Madison Capital Partners.

Q    Do you recognize that as an account number at Summit National Bank?

A    I do not, actually.

Q    Okay.  Do you know if that number is consistent with an account at Summit National Bank or inconsistent with an account?

A    Since we have changed banks about three times, I cannot ascertain that this is a Summit account number.

Q    Understood.  When the back of the check is endorsed "Madison Capital Partners" or in this case "Madison and" "tal"

"Partners" -- we assume the first three letters are "Capital" --

A   Right.

Q   -- is that being endorsed by the company itself or by an individual?

A   It merely indicates that it's going to go into that account, because below the company's name it also says "for deposit only" with that account number.

Q   Understood.

A   I don't know who the individual was that might have endorsed it.

Q   If we could go to document 2122.

MR. BUTTERS:  What page?

MR. SMITH:  I'm sorry, Your Honor.  That's tab 8.  We both have tabs and I think the witness has numbers.

THE COURT:  Yes, sir.

Q   (By Mr. Smith)  It's a 2122 at the top right-hand corner.

A   2122?

Q   Yes, ma'am.  It's entitled "telefax," "Madison Capital Partners, LLC."

THE COURT:  Looks like this.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Yes, ma'am.

THE WITNESS:  Yes, I have it.

Q    (By Mr. Smith)  Okay.  Does this document -- do you know who Karen Westbrook is?

A    Yeah.  She was my predecessor.

Q    Okay.  And did she have the same title that you did at Summit Bank before you joined?

A    I believe so, yes.

Q    Okay.  And if you look at the content of that fax, telefax, do you see the words there that -- to the effect that there's a transfer effective a certain date, April 30, 1997 --

A    Yeah.

Q    -- i.e., tomorrow --

A    Mm-hmm.

Q    -- 1.8 million from Eaglesmith Partners, Inc., II, account and there's a number there --

A    Yeah.

Q    -- to Eaglesmith Partners, Inc., account.  There is another number there.  Do you see that?

A    Yes, I do.

Q    And from your experience as branch manager and in working at the bank, does that mean that money is being transferred from an account that's owned by Eaglesmith Partners, Inc., II to an account that's owned by Eaglesmith Partners, Inc.?

A    Yes.

Q    And the cash that's in Eaglesmith Partners, Inc., II

863

belongs to Eaglesmith Partners, Inc., II; correct?

A   Yes.

Q   And when the transfer, then, goes through and the money moves to the account entitled "Eaglesmith Partners, Inc.," that money belongs to Eaglesmith Partners, Inc.; correct?

A   Yes.

Q   Okay.  Are you familiar with an account -- or a company known as Consultinvest?

A   I have heard that name, yes.

Q   Do you know how you have heard that name?

A   It was one of the accounts that was held under Peter S. Manown.

Q   Okay.  And do you see here in this telefax it says, "Also, I need you to close the Consultinvest account."  And it has a number there, 0012842.  Do you see that?

A   Yes, I do.

Q   And that means that there's an account that has the title "Consultinvest" being closed.  Is that functionally the same?

A   That is correct, yes.

Q   And in order for the gentleman in the bottom right-hand corner, Mr. Peter Manown, to have given that instruction, he would need to be authorized to act on behalf of Consultinvest; correct?

864

A    That's correct.

Q    If we could go to -- it's tab 13, and it's a telefax and it has the number 002125 on the top right, and it's dated June 12th, '97, and it's a document that looks similar to the other telefax that we were just speaking about, 2125.

A    I see it.

Q    Yes, ma'am.  And that's the same Karen Westbrook that we just talked about from the previous telefax?

A    Yes, it is.

Q    Okay.  And looking down at the substance of the communication, do you recognize Mr. Manown's signature at the bottom right?

A    It looks like his signature, yes.

Q    Okay.  And were you familiar with his signature through your work at Summit National Bank?

A    Yes, I am.

Q    You're not getting sick, are you?

A    No.

Q    You see in the substance there it says that "I would like to come by the bank tomorrow morning and obtain $5,875 in cash from Eaglesmith Partners, Inc.," and there's an account number that ends in 5719.  Do you see that there?

A    Yes, I do.

Q    And to make sure I understand it, what would be happening there is that Mr. Manown would have authority to act

on behalf of this entity called Eaglesmith Partners, Inc., and would have permission to withdraw and be authorized to withdraw money from that account; is that right?

A    That is correct.

Q    And if he wasn't authorized, the bank wouldn't let him do it; right?

A    That is correct.

Q    That's the purpose of having to fill out all those documents and making sure that people who are authorized or are on the ledgers and lists, because if you weren't authorized, you couldn't do it.

A    Right.

Q    Okay.  In addition, you see there's also a request for a cashier's check in the amount $220,000 payable to Charles Schwab & Company from the funds in Eaglesmith Partners, Inc., II.  Do you see that there?

A    Yes.

Q    And that's for account number 5727; right?

A    That's correct.

Q    Okay.  And it would be the same analysis that we just did for the other account, that Mr. Manown would have needed to have authority to act on behalf of Eaglesmith Partners, Inc., II, to have a check issued from that account; correct?

A    Correct.

Q    And the money that was in that account belonged to

Eaglesmith Partners, Inc., II; right?

A    Correct.

Q    And from the bank's perspective, Mr. Manown could write the payee as anyone he wants as long as he has authority to act on behalf of Eaglesmith Partners, Inc., II?

A    That's correct.

Q    Okay.  If you go to tab 3844.

THE COURT:  Mr. Smith, before we proceed, I have a request from one of the jurors that we have a break, so can we do that at this point?

MR. SMITH:  Absolutely.  And I'll just make the Court aware we have one small stack of documents that are not in our binders.  I don't know that we can make duplicates, but I'll give it to Mr. Butters over the break so he can see everything that we're --

THE COURT:  We'll take a break, ladies and gentlemen, for ten minutes.

Ma'am, if you want to step down from the witness stand, you are welcome to do that as well.  Thank you.

(The jury exits the courtroom at 10:23 a.m.)

(Recess taken from 10:23 to 10:37 a.m.)

(Defendant and all parties present.)

THE COURT:  You can bring the jurors back in.

(The jury enters the courtroom at 10:37 a.m. with all parties present.)

THE COURT: There's a judge I know, he gives his jurors a little red card at the beginning of the trial if they need an emergency break, and they hold it up and get his attention.

It's not a bad system, actually, but certainly if anyone needs a break, you get the bailiff's attention and they will tell me. Thank you, folks.

Mr. Smith, you may continue.

MR. SMITH: Thank you.

Q    (By Mr. Smith) Miss, if you would turn to what's for Your Honor, Mr. Butters, tab 17, and for you would be Bates number 3844 at the bottom right-hand corner. A document that's rectangular and near the top it's entitled "Corporation or Other Organization Signature Card." It's four documents from the back. 3844. Do you see that there?

A    Yes.

Q    Okay. Great. That document is entitled "Corporation or Other Organization Signature Card," is that right?

A    That's correct.

Q    What is that document?

A    It is a sample of the signatures from the people that are authorized to have access to the account.

Q    And what account does this signature card relate to? What's the title of that account?

A    Eaglesmith Partners, Inc., Two, and the "Two" is

868

written out this time.

Q   And we're on page 003844?

A   That is correct.

Q   I see.  Business address two.  You're saying this is Eaglesmith Partners, Inc., II, and it has "two" typed below it?

A   Correct.

Q   Okay.  So who is the titleholder of that account then?

A   The Eaglesmith Partners, Inc., II.

Q   Okay.  And is there a tax ID number that's contained on that page?

A   Yes, it is.

Q   What is the tax ID number?

A   58-2005018.

Q   And a tax ID number is a unique number; is that right?

A   That's correct.

Q   A unique number that would be assigned to a particular corporation; correct?

A   Correct.

Q   So when the corporation is formed, then it would just be like a human being born.  It's given a tax ID number like a human would be given a Social Security number.  Is that fair?

A   Yes.  That's fair.

Q   Okay.  And there's only one tax ID number; correct?

A    Absolutely.  Yes.

Q    Just like a Social Security number.  You don't share them with others.

A    Right.

Q    At least not properly; right?

A    No.

Q    Okay.  So this taxpayer ID number relates to the entity the title of the account which says Eaglesmith Partners, Inc., and then there is a "Two" written underneath; is that right?

A    That is correct.

Q    And the account, then, would be titled Eaglesmith Partners, Inc., and the cash inside belongs to Eaglesmith Partners, Inc.?

A    Correct.

Q    Okay.  Now, you see that there is a name and a title and a signature, three columns right across the center.  Do you see that there?

A    Mm-hmm.  Yes.

Q    Typewritten on the first line it says, "Peter S. Manown, President," and then there's a signature there.  Do you see that?

A    Yes, I do.

Q    Okay.  Does that mean that Peter S. Manown owns the cash in that account?

A    No.   It means Eaglesmith Partners, Inc., II, owns the cash in the account --

Q    And what does --

A    -- and he has access to it.

Q    Okay.   He has access to it.

So does that mean, then, that Mr. Manown would be authorized to act on behalf of Eaglesmith Partners, Inc., II, with respect to the cash and activity in that account?

A    Correct.

Q    And down below, am I reading it correct when it says that, "The undersigned secretary of the above-named corporation or other organization hereby certified that the above-named persons are those persons currently empowered to act under our resolutions authorizing doing business with you."

Is that -- I only read a fragment of it but did I read that accurately?

A    Yeah, that represents it.

Q    And does that mean that there is a representation by the secretary?

A    Mm-hmm.

Q    And do you recognize the signature next to the secretary?

A    You mean down on the bottom?

Q    Yes.   Bottom right, ma'am.

A    Peter S. Manown.

Q    And this is dated February 14th, Valentine's Day, 1995; is that right?

A    That's correct.

Q    So that means that there's a representation that the two names typewritten, one of which is Peter S. Manown, has authority to act on behalf of the account titleholder, which is a corporation?

A    That is correct.

Q    But the money does not belong to Peter S. Manown.

A    No.  Belongs to the corporation.

Q    Okay.  There's another name under Peter S. Manown typewritten there; isn't it?

A    Yes, there is.

Q    What name is that?

A    Gaston Glock.

Q    Okay.  And what's the title that he is listed as holding?

A    Vice president.

Q    Does that mean that Gaston Glock owns the money in Eaglesmith Partners, Inc., II?

A    No.  Eaglesmith Partners, II, owns it.

Q    I see.  But Gaston Glock would be authorized to act on behalf of Eaglesmith Partners, Inc., II, with respect to the account?

A    Yes.

Q    And what are the last four digits of the account number that's listed on this corporation or other organization's signature card?

A    5719.

Q    If you could keep that document in front of you, please, and we are going to move to 3738.

And for the Court and Mr. Butters' reference, that would be tab 18.  Do you see the document that's marked 3738?

A    Yes, I do.

Q    Okay.  What is that document?

A    That is also our corporate or other organization signature card.

Q    Okay.  And what's the account number that relates to that signature card?

A    5727.

Q    Okay.  And the signature card that we saw before, the account number is 5719; is that right?

A    Correct.

Q    Okay.  And who is the titleholder of the account 5727 according to the signature card?

A    Eaglesmith Partners, Inc., II.

Q    Does that mean that there is another account for the same entity?

A    I don't know, quite frankly.

Q    But who would be the titleholder of 5727?

A    That would be Eaglesmith Partners, Inc., II.

Q    What is the -- if you look at the tax ID number, you'd agree with me that it's the same tax ID number that's listed on the signature card for account number 5719; is that right?

A    That is correct.

Q    Then you see that there is a title there, "Peter S. Manown, president."  Do you see that there?

A    Yes.

Q    And there's a signature next to that; is that correct?

A    That's correct.

Q    Does that mean, as we've talked about before, that Peter S. Manown has authority to act on behalf of a company entitled "Eaglesmith Partners, Inc., II," with respect to the account at Summit National Bank?

A    That's correct.

Q    Okay.  And below Mr. Manown there is a typewritten name, "Gaston Glock."  Do you see that there?

A    Yes, I do.

Q    What title is typed next to Mr. Glock's name?

A    Vice president.

Q    Is there a signature there?

A    No, it's not.

Q    Okay.  And does the fact that -- you'd agree with me,

then, simply having Mr. Gaston Glock's name typed next to the word "Vice President" on a signature card for an account entitled "Eaglesmith Partners, Inc., II," does not mean that Mr. Glock owns the cash in that account; right?

A    That is correct.

Q    As you've stated probably, I don't know, half a dozen times now, the money in that account belongs to Eaglesmith Partners, Inc., II.

A    That's correct.

Q    If you'll turn to page 3842, please.

MR. SMITH:   And that's tab 19, Your Honor.

THE COURT:   Yes, sir.

Q    (By Mr. Smith)  If you could identify that document when you have a chance.   Tell me what that document is, please.

A    That is a later version of the signature card.

Q    And when you say "later version," what does that mean?

A    After the one that we just discussed.

Q    Is there a part of that that's cut off, or does it just look different than the ones we looked at before?

A    It just looks different.

Q    Okay.  And there's an account number.  What are the last four digits of the account number?

A    4768.

Q    Okay.  And that's different than the 5719, 5727 that

we just looked at; is that right?

A    That is correct.

Q    All right.  And who is the titleholder of that account?

A    Eaglesmith Partners, Inc., II.

Q    Okay.  Same thing, all the money that would be in 4768 would be money that belongs to the corporation and titleholder Eaglesmith Partners, Inc., II; right?

A    That is correct.

Q    And the name "Peter S. Manown" that's typed and "Gaston Glock" that's typed --

A    Yes.

Q    -- with signatures next to them just means that those two folks are authorized to transact business in that account on behalf of a corporation called Eaglesmith Partners, Inc., II; is that right?

A    That is correct.

Q    And if we turn to the next page, 3739, if you could just identify what that document is, please.

A    There is an account opening form that is filled out when an account is opened.

Q    And what's the account number that's being opened with the commercial new-account form with the Bates number 3739?

A    It looks on here as if four accounts were opened.

Q    And what are the last four digits of the four accounts that appear to have been opened?

A    1224, a certificate of deposit.

0557, certificate of deposit was closed.

There was an account 15727 opened on 1/96.

And an account, last four digits 4768.  It doesn't signify when it was opened.

Q    So --

MR. BUTTERS:  Could I interrupt a minute?  What tab are you on?

MR. SMITH:  I'm sorry.  This is tab 20.

MR. BUTTERS:  Thank you.

MR. SMITH:  Did you find it?  Okay.

Q    (By Mr. Smith)  Does the document -- I know we have talked about various accounts and certificates of deposit.  Can you tell from the document what specific account is being opened using this account form?

A    Not really.

Q    Okay.  What is the title of the account that's being addressed by this new-account form?

A    Eaglesmith Partners, Inc., II.

Q    And down in the -- towards the middle, a little bit below center, it says "Officer's/Partner's name."  Do you see that?

A    Yes.

Q    And it's handwritten there, "Peter S. Manown, president."  Is that right?

A    That's correct.

Q    And then below that name is "Gaston Glock, vice president," correct?

A    Correct.

Q    And again, that means that these two folks are officers, and then, based on the signature card, would be authorized to act on behalf of a company called Eaglesmith Partners, Inc., II, account?

A    Right.

Q    And would be able to act on behalf of that company with respect to cash or other monies that are owned by Eaglesmith Partners, Inc., II; right?

A    Correct.

Q    That does not mean, and it is not true, that Gaston Glock, for example, owns the money in the Eaglesmith Partners, Inc., II, account; correct?

A    That's correct.

Q    Because it's owned by Eaglesmith Partners, Inc., II; right?

A    Mm-hmm.

Q    If you would look at tab 21 and Bates number 3740 through 3742.  If you could take a look at those three pages, Miss, and let us know what that document is, please?

A    Mm-hmm.    We have three pages of the deposit agreement for corporations or other organizations.

Q    And what is that?  What is a deposit agreement?

A    That shows who is authorized to act on the account.

Q    Act on the account, who is the account holder of the account that's being addressed in this deposit agreement?

A    Eaglesmith Partners, Inc.

Q    No "II"; correct?

A    No "II."

Q    Just Eaglesmith Partners, Inc., is what's typed there; correct?

A    That's correct.

Q    Okay.  And based on this document, who is authorized to act on behalf of the company which is a separate corporation known as Eaglesmith Partners, Inc.?

A    The president or vice president.  And referring back to that particular signature card, that would have been Peter S. Manown as president and Gaston Glock as vice president.

Q    And those two folks, Mr. Manown and Mr. Glock, based on these documents, would be authorized to act on behalf of Eaglesmith Partners, Inc., as it relates to the account that Eaglesmith Partners, Inc., owns?

A    Correct.

Q    And again, the money in that account belongs to Eaglesmith Partners, Inc.?

A    Yes.

Q    It does not belong to Gaston Glock or Peter S. Manown; correct?

A    Correct.

MR. SMITH:  I am finished with that stack.  I have got one more supplemental stack that I apologize is not in a binder but I have given a copy to Mr. Butters.  And if I could, Your Honor, pass out the copy for the Court.  It's just stapled.

THE COURT:  Yes, sir, that's fine.

MR. SMITH:  Here, Ms. Smith.  Thank you.

If I may approach the witness, please.

THE COURT:  Yes, sir.

(Defendant's Exhibit Number 6 was marked.)

Q    (By Mr. Smith)  I'm going to show you what's been marked as Defense Exhibit Number 6.  If you would kindly just take a moment to review those documents and look up when you have had a chance to see them.

A    Okay.

Q    Do you recognize -- are you generally familiar with the documents that are contained within Defense Exhibit Number 6?

A    Yes.

Q    Do you recognize those as documents that would be created in connection with transactions and business through

Summit National Bank?

A   Yes.

Q   And would those be the types of documents that Summit National Bank would maintain in its regular course of business?

A   Yes.

MR. BUTTERS:   Your Honor, if it will shortcut, the State has no objection to these documents.

THE COURT:   Thank you.

MR. SMITH:   We'd move to tender them into evidence based on the stipulation, Your Honor.

THE COURT:   They are admitted without objection.

Q   (By Mr. Smith)   Is it fair to say that the packet of information contains some copies of checks?

A   Correct.

Q   And it also contains some deposit tickets?

A   Yes.

Q   And it also contains some account statements?

A   Yes.

Q   Okay.   If we could look at what's been marked collectively as Defense Exhibit 6, but particularly the first page which has a Bates number 61923.   Do you see that there?

A   Yeah.

Q   There are three checks there; correct?

A   Yes.

Q   That bottom check, check number 1101; do you see

that?

A     Yes, I do.

Q     Okay.  What -- who is the titleholder for which that check is being written from?  The account it's being written from, who is the titleholder?

A     Eaglesmith Partners, Inc.

Q     And that's typed there on the top left-hand corner; is it not?

A     Correct.

Q     And who is that check made payable to?

A     To Eaglesmith Partners, Inc.

Q     Okay.  So it's a check written from an account that's titled Eaglesmith Partners, Inc., to Eaglesmith Partners, Inc.; is that right?

A     That is correct.

Q     Okay.  What is the account number from which that check is being written from?

A     1005719.

Q     All right.  And who signed that check?

A     Peter S. Manown.

Q     In the amount of $3,200; is that right?

A     Yes.

Q     September 24th, 1996, is the date on it; isn't that right?

A     Correct.

Q    Okay.  If you look at the next page, please.

A    May I make an add-on to this?

Q    Yes, ma'am.

A    In the memo, it indicates that it was for taxes --

Q    Okay.

A    -- and when you pay taxes at your banking institution way back then you had to make the check payable to the company.

Q    And then where does the check go?

A    To the IRS.

Q    I see.  Okay.  And if you look at the next page, 1302.

A    Yeah.

Q    Do you see a deposit ticket there?

A    I see two tickets.

Q    Okay.  On the left side, is that one of the deposit tickets on the left side?

A    Yes, it is.

Q    And what is the account number that that deposit is going into?

A    0124768.

Q    So that means that's a deposit ticket putting money into an account 4768; is that right?

A    Yeah.

Q    Okay.  And what is the date -- is there a date on that deposit ticket?  Is there a typed date next to the account

883

number?

A    There is a date that was typed by the teller machine.

Q    What's that date?

A    9/26/96.

Q    And does that mean that on 9/26/96, the date typed by the teller machine, that there was a deposit with this ticket?

A    Yeah.

Q    And there's three numbers written on that ticket; is that right?

A    Yes, I see it.

Q    One of those numbers is -- what's the middle number?

A    3,200.

Q    Okay.  And is that the same amount that's written on the check on the previous page made payable to Eaglesmith Partners, Inc., tax?

A    Yep.

Q    And would that mean that the Eaglesmith Partners, Inc., check made payable to Eaglesmith Partners, Inc., drawn on account number 5719 was being deposited into an account that had an account number ending in 4768 two days after the check is dated?

A    Yes.

Q    And that would be different than that check being given to the IRS, right, to be deposited; is that right?

A    I would hope so.

Q    Okay.  So if the check was going to be given to the IRS, the way that you had alluded to with tax in the memo, this check would have been put in the mail of some sort and sent to the IRS; correct?

A    Correct.

Q    Okay.  So in this instance, though, even though it says "tax," the money is actually being transferred by way of check from an Eaglesmith Partners, Inc., account number 5719 made payable to Eaglesmith Partners, Inc., into a different account, 4768?

A    It appears that way.

Q    Okay.  And the signature on the check on the bottom right, do you recognize whose signature that is?

A    On check number 1101?

Q    Yes, ma'am.

A    Peter S. Manown.

Q    If we look on page 61931, which I believe is the third page into your packet --

A    Yeah.

Q    -- there's a check there, check number 1105.  Did I read that correctly?

A    1105, yes.

Q    Okay.  And 1105 is a check drawn on an account that has the typed title, "Eaglesmith Partners, Inc."; correct?

A    Yes.

Q    And just like the other one, it's made payable to Eaglesmith Partners, Inc.; correct?

A    Yes.

Q    This one has a date of 12/20/1996; right?

A    Yes.

Q    Signed by Peter S. Manown?

A    Yes.

Q    $3,140?

A    Yes.

Q    With a memo line written "fourth quarter taxes"; right?

A    Yes.

Q    If you look at the next page, please, that has a number 11140.  That is a deposit slip; correct?

A    Yes.

Q    And can you read the date of that deposit or any part of that date?  It looks like there's a stamp on line 11.  I know it's light.

A    December, maybe, 19th or 10th, '96.

Q    Okay.  So you can make out the December '96 clearly --

A    Yeah.

Q    -- but the one in the middle not so sure?

A    Correct.

Q    Okay.  And can you tell if there's a $3,140 deposit

886

that's listed on that ticket?

A    Yes, I see that.

Q    Okay.  And this would mean that this money is being deposited into an account; correct?

A    Correct.

Q    And is that a Summit National Bank deposit ticket there?

A    It appears to be.

Q    Okay.  And the previous check that we looked at, 1105, was made payable to Eaglesmith Partners, Inc.; correct?

A    Correct.

Q    And if the check Eaglesmith Partners, Inc., made payable to Eaglesmith Partners, Inc., were to have been deposited to Summit National Bank, it would have been deposited into an account that was titled "Eaglesmith Partners, Inc."; correct?

A    Yes.

Q    And you'd agree with me that the 3,140 on the December 20, 1996, check 1105 is at least the same dollar amount that's written on the deposit ticket with 11140 on the bottom right?

A    Yes.

Q    Okay.  And again, to your prior testimony, if, in fact, that was to pay for taxes, based on your experience you would have expected that that check would have been put in the

mail or some other way and transmitted to the IRS; right?

A   Some other way.  It would have gone through a general ledger account.

Q   Would have gone --

A   Through a general ledger account.

Q   Okay.  If we could look at the next page after G11140, do you see it says J062623?  J062623.  It says "deposit ticket."  Looks like this.

A   Yeah.  Yep.

Q   Okay.  How much is being -- can you tell the date of that deposit?

A   12/20/96.

Q   And what is the amount of that deposit?

A   As far as I can make out, $25,394.48.

Q   And if you look at that previous page, the one that had the Bates number 11140 that had that $3,140 handwritten on it, can you tell how much that total deposit slip is at the bottom, the handwriting?

A   25,394.48.

Q   And that appears to match up with the deposit ticket amount that's on 62623; is that right?

A   Correct.

Q   Okay.  And the deposit ticket has a typewritten name on the top left-hand corner.  What is that name?

A   I'm sorry.  Which corner?

Q   The top left-hand corner of the deposit ticket.

A   Eaglesmith Partners, Inc., II.

Q   Okay.  And you would understand that the account, then, would be titled Eaglesmith Partners, Inc., II; correct?

A   Correct.

Q   Okay.  And does it show an account number on the deposit ticket?

A   5727.

Q   All right.

A   Last four digits.

Q   So based on these three documents, the check 1105 that has -- made out to Eaglesmith Partners, Inc., $3,140, the handwritten deposit ticket that contains the writing $3,140, and then the actual deposit ticket of 25,394.48, it matches the amount that's handwritten at the bottom of the handwritten deposit ticket, would you agree that check number 1105 made payable to Eaglesmith Partners, Inc., in the amount of $3,140 was deposited into an account 5727?

A   No.

Q   Okay.  Why not?

A   Because there could have been another check for $3,140 that would have been deposited.

Q   Understood.  So you can't tell from this whether or not the same $3,140 was deposited into the account 5727 as handwritten on this slip?

A    Correct.

Q    But you'd agree with me that the amounts are the same but you just can't be sure that it was the same check?

A    That is correct.

Q    Understood.

Okay.  If we could look at the account 62824.  I'm sorry, not the account, the Bates number on the bottom right-hand side.  And it's right after the deposit ticket we were just looking at together.  Do you see that there?

A    I don't have that number.

Q    It's a -- 62824.  It's an account statement.

A    Oh, yeah.  Now I see it.  Sorry.

Q    Okay.  That's okay.  The account statement is in the name of Eaglesmith Partners, Inc.; is that not right?

A    That is correct.

Q    And I had previously given you a stack of documents that we went through for Eaglesmith Partners, Inc.  Do you have that other stack in front of you still?

A    Yes.

Q    I believe that would have been Defense Exhibit 5 as a stack.

A    That's Eaglesmith Partners.  It's Eaglesmith Partners, II.

Q    Yes, ma'am.  And if -- I'd like to keep these two sets out in front of you, if you wouldn't mind, and go all the

way to the back of that stack that was Defense Exhibit 5, the second-to-the-last document that you previously identified as "Commercial New Account."

For Your Honor's and Mr. Butters' benefit, that was Lab 20.

THE COURT: Yes, sir.

Q   (By Mr. Smith)   Bears the Bates number 3739 in the bold in the bottom right-hand corner.

A   What number did you say?

Q   3739.   It says "Commercial New Account."   It was that document where it had different account numbers handwritten on it and some certificate of deposit numbers.

A   3739?

Q   3739 in the bottom right-hand corner.   Yes, ma'am.

A   Okay.   Thank you.

Q   Okay.   If you could look at that with 62824.   Do you have those next to each other, which was --

A   Yeah.

Q   Okay.   So 62824, that was the -- I believe you identified as an account that belonged to Eaglesmith Partners, Inc.; correct?

A   Correct.

Q   And previously we were looking at a commercial new account that was entitled "Eaglesmith Partners, Inc., II."   Do you remember that?

A     Yes.

Q     On the Commercial New-Account Form, what is the tax ID number that's listed there?

A     582005018.

Q     And on the account statement 62824 entitled Eaglesmith Partners, Inc., no II, what is the tax ID number listed on the statement in the right-hand corner?

A     582005018.

Q     Okay.  Is the account number that's written on a statement for a corporation named Eaglesmith Partners, Inc., II, the same tax ID number as the tax ID number handwritten on the commercial new account for an account named Eaglesmith Partners, Inc., II?

A     Yes.

Q     Okay.

A     Appears that way.

Q     And you testified earlier that there's only -- one tax ID number is used only for one company; correct?

A     Correct.

Q     So that means that the tax ID number that's unique was used for an account titled Eaglesmith Partners, Inc., and also for an account titled Eaglesmith Partners, Inc., II; right?

A     Yes.

Q     And if we could look back to 62824.  That's the

account statement that was titled Eaglesmith Partners, Inc.

A    Yeah.

Q    Do you see that there is a credit or transfer of $7,000? Do you see that there?

A    Yes, I do.

Q    And there's also a check going out for $7,000; is that right?

A    That's correct.

Q    And if you go to the next page, it begins with a G, 0115. It's a page that has a series of check images. Do you see that there?

A    I don't see that.

Q    It was in the stack G10 -- GL010115. It was right after the bank statement, four checks imaged.

MR. BUTTERS: I think it's --

MR. SMITH: Four checks.

MR. BUTTERS: I think the checks are for four --

MR. SMITH: Oh, it might be -- I think I might have switched up my grouping. I apologize. It might be --

THE WITNESS: What are the J numbers?

Q    (By Mr. Smith) G0115. Mr. Butters is correct. It's right before the account statement we were looking at.

A    Oh, right before.

Q    It's my fault. Sorry. I apologize.

A    That's okay. Yeah, now I have it.

893

Q    So you see at the top, that first page is dated 12/30/96. Do you see that there?

A    Yeah.

Q    And that's made payable to cash, is it not?

A    Yes.

Q    And that's drawn on account 4750?

A    4750, yeah.

Q    Okay. And that's entitled "Eaglesmith Partners, Inc."?

A    Yes.

Q    And that's in the amount of $7,000, and then it's signed by Peter Manown?

A    Yes.

Q    And then the previous -- the page after the checks is Eaglesmith Partners, Inc., account statement; correct?

A    Yeah.

Q    And also on 12/30 in an account titled with the account number 4750, that shows on the 12/30 a credit transfer of 7,000 and then a check in the amount of 7,000 going out the same day; correct?

A    Yes.

Q    And does the -- what is the check number of the check that is going out for $7,000 on the statement?

A    1111.

Q    And what is the check number on the top of 115 in the

894

amount of $7,000 made payable to cash?

A    1111.

MR. SMITH:  Okay.  If I could just have a brief moment, Your Honor.  I think I may be concluding.

THE COURT:  Yes, sir.

MR. SMITH:  Your Honor, I just want to make sure I moved D4 into evidence.  I don't know if I did, but if I did not, I seek to move D4, D5, and D6 into evidence.

THE COURT:  I believe D4 was admitted without objection.

MR. BUTTERS:  All of them are.

THE COURT:  It is admitted.

MR. SMITH:  Okay.

Q    (By Mr. Smith)  Earlier -- and I know you weren't here for the testimony -- Peter Manown indicated that Eaglesmith Partners was a company that he had with two Germans.  Do you know if Gaston Glock is a German?

A    No.

Q    You don't know or you do know that he is not?

A    I know he is not.

Q    And what is -- what nationality is Gaston Glock?

A    Austrian.

Q    Okay.  I don't have any other questions.  We appreciate all your time this morning.

A    Thank you.

THE COURT: Mr. Butters, is there redirect for the witness?

MR. BUTTERS: No, Your Honor.

THE COURT: Thank you.

Gentlemen, may this witness excused?

MR. BUTTERS: Yes.

MR. SMITH: Yes, Your Honor.

THE COURT: And she has asked me to make certain that you're not planning to recall her because she has to leave to attend to a family member.

MR. BUTTERS: That's fine with the State.

MR. SMITH: If I could just confirm after she steps down and confirm with Mr. McGovern that that's not necessary. If there's anything else that we know of that we have in light of that schedule, we will take care of it today, but I think that should be it.

THE COURT: All right. Well, why don't you confer with him for just a moment before we let Ms. Hein leave, and that way we can let her know whether she is free to go.

MR. SMITH: That would be perfect.

THE COURT: Give us just a moment, ma'am.

MR. BUTTERS: And Your Honor, if you can indulge me, could we take a brief break before the next witness?

THE COURT: Yes, definitely. I need a break myself.

As a matter of fact, ladies and gentlemen -- well, let's hold on just a second. We'll see if this witness is finished.

MR. SMITH: We have concluded, Your Honor, and the witness is released.

THE COURT: Ms. Hein, you're free to go.

All right. Ladies and gentlemen, let's take a brief break, just five minutes or so. You can return to the jury room. We'll be back in just a few minutes.

(The jury exits the courtroom at 11:15 a.m.)

(Recess taken from 11:15 to 11:25 a.m.)

(Defendant and all parties present.)

THE COURT: Gentlemen, before we commence with the next witness, I would like to ask Mr. Core about the subpoena issue that came up earlier this morning. He was not here in the courtroom, I believe, at the time.

Mr. Core, the defense has asked me to inquire with you about a subpoena that was issued by them, I think hand delivered to you one day last week, Friday perhaps, asking for certain documents. What's the update on where those documents stand?

MR. CORE: It's nice to speak to you directly at long last, Your Honor.

THE COURT: Yes, sir.

MR. CORE: Mr. Smith did give me a subpoena on

Thursday for records which are all attorney-client work-product private. It does not have a return date on it.

On Friday I filed a motion to quash and filed it with the Court and mailed a copy to Mr. Smith.

THE COURT: All right. I will see if we can -- you don't happen to have an additional copy, do you?

MR. CORE: Yes.

THE COURT: If you do, I'd like to -- not the subpoena but the motion that was filed.

MR. CORE: Well, the motion contains the subpoena.

THE COURT: Excellent. All right.

What we will do is, Mr. Smith, I will have Mr. Mau make a copy for you of that --

MR. SMITH: Thank you.

THE COURT: -- so that we can review that. We will review it over lunch and take it up immediately after lunch.

MR. SMITH: I appreciate it, Your Honor.

THE COURT: All right.

Thank you, Mr. Core.

And your next witness is Ms. Berens; is that right?

MR. SMITH: Yes.

THE COURT: All right. I think we can bring in the jurors, Mr. Mau.

(The jury enters the courtroom at 11:28 with all parties present.)

THE COURT: The State may call its next witness.

MR. BUTTERS: Vicki Berens.

THE COURT: All right. Get Miss Vicki Berens to the witness stand, please.

Ms. Berens, if you will come across the courtroom and follow the bailiff there, he will point you in the right direction.

If you'll place your left hand on the Bible right there and raise your right hand before you are seated. Thank you, ma'am.

VICKI BERENS,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT: You can be seated. If you'll just pull the chair close enough to the mic so we can hear you. You don't have to be right on top of it.

That's fine. Thank you.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Ms. Berens, would you please state your name for the record.

A    Vicki Berens.

Q    By whom are you employed?

A    Glock, Incorporated.

Q    How long have you worked there?

A    I'm on my 21st year.

Q    And in what capacity have you worked there?

A    Accounting manager.

Q    You're the accounting manager?

A    Yes.

Q    How long have you been the accounting manager?

A    Since 1996.

Q    What do you do as accounting manager?

A    My main job is to make sure that the reporting that goes to Austria, the parent company, that all the accounts are correct, the checks go in the bank, the checks go to the right accounts receivable, customer accounts, the vendors are paid.

Q    And are you familiar with the process at Glock of them when they actually issue a check to pay something?

A    Yes.  Mm-hmm.  I'm in charge of the bank reconciliation.

Q    Do you actually issue the checks?

A    Yes.  My department does.

Q    Your department does.  And that has been true since 1996?

A    Yes.  Mm-hmm.

Q    You know Mr. Jannuzzo; correct?

A    Yes, I do.

900

Q    Okay.  What was his position at Glock when he was there when you were there?

A    When he left, he was vice president or -- I believe he was vice president.

Q    Okay.  Did he have any authority to direct you to issue checks?

A    Yes.

Q    Could you explain that, please?

A    I was told that he and Monika Bereczky were the main ones to, you know, do any kind of authorizations for checks, so if their names were on there then it was good to go.

(State's Exhibit Number 40 was marked.)

Q    (By Mr. Butters)  Okay.  I'm going to hand you a document that's been marked as Exhibit 40.  And can you identify that for the jury?

A    Yes.  This is a Glock check that was issued.

Q    Was that issued by you?

A    By my department, yes.

Q    By your department?

A    Mm-hmm.

Q    Was that check issued in the ordinary course of business of Glock?

A    Yes.  Mm-hmm.

Q    And what -- who directed that -- you to issue that check?

901

A    Well, without seeing the back of the paperwork, but I recognize the name on the vendor and it was Paul Jannuzzo because he was the attorney for this insurance company -- or the attorney that was, you know -- our attorney at Glock that was doing something with the insurance company.

Q    Okay.  And who is the check payable to?

A    CCI.

MR. BUTTERS:  Your Honor.  I move to tender into evidence State's Exhibit 40.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

(State's Exhibit Number 42 was marked.)

Q    (By Mr. Butters)  I'm going to hand you a document that's been marked as State's Exhibit 42.  Can you identify that for the jury?

A    This is also a check from Glock from the accounting department.

Q    And was that check issued in the ordinary course of business at Glock?

A    Yes.

Q    And at whose direction was that check issued?

A    Paul Jannuzzo.

MR. BUTTERS:  Your Honor, I move to tender into evidence State's Exhibit 42.

902

THE COURT: Any objection?

MR. SMITH: No, Your Honor.

THE COURT: It's admitted.

Q    (By Mr. Butters) Can you tell the jury -- you have got two checks in front of you. One is Exhibit 40. How much is that check payable -- what's the amount of that check?

A    $44,250.

Q    And it's payable to whom?

A    CCI.

Q    Okay. And now you have in front of you also check number 42. Who is that made payable to?

A    CCI.

Q    And in what amount?

A    88,500.

(State's Exhibit Number 81 was marked.)

MR. BUTTERS: 81.

Q    (By Mr. Butters) I'm going to hand you a document marked as the State's Exhibit 81. Can you identify that for the jury?

A    It's also a check by Glock.

Q    And was that check issued by you?

A    By my accounting department, yes.

Q    By your accounting department? And by whose -- at whose direction was that check issued?

A    Also Paul Jannuzzo.

903

Q    And was that check issued in the ordinary course of business at Glock?

A    Yes, sir.

MR. BUTTERS:  Your Honor, I move to tender into evidence State's Exhibit 81.

THE COURT:  Any objection to 81?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

Q    (By Mr. Butters)  And would you tell the jury who check number 81 is made payable to?

A    CCI.

Q    And what amount?

A    $44,250.

Q    Can you tell us -- you have got in front of you Exhibits 40, 42, and 81.  What is the date of the check on Exhibit 40, if you can read it?

A    Yeah, it's hard to read the date.  It looks like March 20th, '97.

Q    Okay.  And what about check number 42?

A    March 7th, 1997.

Q    And what about check 81?

A    Well, that one can be June or July, I'm not sure --

Q    Okay.

A    -- 1997.

Q    Now, are you familiar with whether or not there was

904

also a wire transfer from Glock to CCI in the approximate amount of 44,000?

A    Yes.

Q    And when was that?

A    I believe it was around the same time, because I believe it was for the year of this insurance. I believe one was the wire transfer, then the rest were checks.

Q    And would it -- do you recall, was that in the same amount as the 40,260?

A    I want to say it was for one payment: $44,250.

Q    When you say one payment of $40,250, what do you mean?

A    That's how I remember the paperwork coming in. It seems like that there was one for one payment. I don't know if it was a quarter or a month or -- but then we must have missed one payment because that's why this check has two on there.

(State's Exhibit Number 2 was marked.)

Q    (By Mr. Butters)  I'm going to hand you a document that is marked as Exhibit 2 and ask you is any of the writing on that document your writing?

A    Yes.

Q    Can you tell us what writing is yours?

A    The part that says "Check Return to Paul."

Q    And up in the upper right-hand corner there's a stamp that says "Received." Do your recognize that?

905

A    Yes.

Q    What is that?

A    That's a stamp that we put in -- for when the mail comes that we stamp it into the company.

Q    Okay.  And down in the lower right-hand corner there's a "Paid" stamp.  Do you recognize that?

A    Yeah.  That's from the accounting department when we pay -- make a payment, that's how we mark it the paperwork is paid.

Q    Okay.  So would that be marked by your department?

A    Yes.  Mm-hmm.

Q    Okay.  So is it accurate to say that this document your accounting department would have received and issued a check on in the ordinary course of your business?

A    Yes, sir.

Q    And would that have been done pursuant to request of Mr. Jannuzzo?

A    Yes.

Q    And is that his signature up there?  Do you recognize whose initials those are up --

A    Yes.

Q    -- up by the "Received"?

A    Those are Paul's initials.

Q    Okay.

MR. BUTTERS:  Your Honor, I move to tender into

906

evidence Exhibit 2.

THE COURT:  Any objection?

MR. SMITH:  Yes, Your Honor.  The document appears to be, at least from its face, a piece of correspondence from someone who has a typed name of Nairm Marshall, so the substance of that document is hearsay.

It's communication from Nairm Marshall and would not be subject to any kind of business record.  This is simply correspondence from this person who -- presumably named Nairm Marshall.

To the extent the witness identified handwriting as hers, we don't have an objection to that portion.

I just don't know the probative value of the other portion of a letter written by someone else who's not here.

THE COURT:  Mr. Butters.

MR. BUTTERS:  Yes, Your Honor.  The State is introducing this document not necessarily to say that what's in it, the typewritten portion, is true.

The State introducing this document to explain the conduct of her department in issuing a check, which her handwritten notes were all about and what she's testified to.  So therefore, we do request that it be tendered and be admitted into evidence.

MR. SMITH:  I believe Mr. Butters said "not

907

necessarily." If he's not entering the substance of the letter for the truth of the matter but is merely entering it to show what caused the witness to do something, then we wouldn't have objection to it to the extent what the witness did was relevant and there's an instruction that the substance is not pertaining to the truth.

THE COURT: All right. Then I will admit it with that understanding.

Ladies and gentlemen, from time to time we admit exhibits for specific purposes. This is one of those times.

In this case the State is not admitting State's Exhibit Number 2 to prove the truth of the substance that's in the letter itself.

They are using it for another purpose, which in this case the State has said is to show the reason that the department put the markings on it that it put, the paid stamp and the other stamps, and so you would consider it for that reason and that reason only. And it's admitted for that purpose.

MR. BUTTERS: Thank you, Your Honor.

THE COURT: And that does not include the stamp and the other handwriting the witness identified.

Thank you.

Let me ask, while I have interrupted to speak with

908

the jury, and I'm sorry to interrupt your direct, Mr. Butters.  Is there anyone who needs to go back to the library during the lunch hour to retrieve your car?

All right.

THE COURT CLERK:  They have asked now if everybody will move down here, and there's going to be a bus that will take them down when we go to lunch.

THE COURT:  Okay.  There's going to be a bus to take you folks back to your cars at the library and they're going to have a place reserved for you.

We had a little snafu this morning.  Otherwise, we would have had spaces reserve for you, so I apologize for that, but they're going to have a bus for you at lunch that will take you back over to your cars and they'll ask you to move them down here to a closer space so you'll have some easily accessible parking.  We will get with you on that at lunch time.

Thank you, Mr. Butters.  Sorry to interrupt.

MR. BUTTERS:  No problem.

(State's Exhibit Number 80 was marked.)

MR. BUTTERS:  Number 80.

Q    (By Mr. Butters)  Ms. Berens, I'm going to hand you Exhibit 80.  Do you recognize the handwriting on that document?

A    Yes.

Q    Is that -- well, whose is it?

909

A    Well, it's mine and Carol Bunt, her name was then. Carol Rogers now.

Q    Okay.  And is this a document that -- down there it has a "Paid" stamp on it.  Would that be a document that your department stamped as paid?

A    Yeah.  This is a check request, so yes.

Q    Okay.  So this was a document, a check request, that would -- your department would act on that check request?

A    Yes.  Mm-hmm.

Q    And explain to the jury how the check request -- looking at this how the check requests worked.  Like, who requested it and how it goes.

A    Well, by looking at this, it looks like I requested it or Carol requested it and I approved it.

But because of the fact that it's to CCI about insurance, that it came from the legal department, which probably would be Paul Jannuzzo, and then I wrote -- and then Carol wrote up the check request and then I just signed on it because I had, you know, gotten approval from Paul.

Q    Under the word -- beside the word "Purpose" there is handwriting.  Is that yours or is that Carol's?

A    Well, Carol's is "June," and then I wrote "product liability" on it.

Q    Okay.  And is this a document that -- up there, there is a handwritten "6568."  Do you know what that is?

910

A    Yeah.  That's vendor number.  That's just in the computer system.

Q    Okay.  Is this a document that Glock, Inc., and your department would have kept in the ordinary course of business?

A    Yes.

MR. BUTTERS:  Your Honor, I move to tender into evidence State's Exhibit 80.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

Q    (By Mr. Butters)  Looking at State's Exhibit 80, I want to make sure this is accurate.  Is it correct -- I notice it says "Amount:  CCI" and then it says "Payee:  $44,250."  Should those be reversed?

A    Yeah.

Q    Okay.  And then down there at the bottom where it says "Paid," that's the information as to when it was paid, the date, and the check number; is that correct?

A    That's correct.

Q    Okay.

MR. BUTTERS:  If I can have just a moment, Your Honor.

THE COURT:  Yes, sir.

MR. BUTTERS:  Sorry, Judge.

THE COURT:  Yes, sir.

911

Q    (By Mr. Butters)   Here it is.   I'm going to hand you a document that's in evidence, State's Exhibit 83.

And -- well, before 1 do, let me hand you State's Exhibit 123, and it is in evidence, and down in the lower right-hand corner, do you recognize whose signature that is?

A    Yeah.   It looks like Paul Jannuzzo's.

Q    Are you familiar with Mr. Jannuzzo's signature?

A    Yes.

Q    Did you receive a lot of things in the course of the time that he was there, a lot of documents that were signed by him?

A    Yes.

Q    Okay.   I'm going to ask you to do the same thing with Exhibit 83, and -- which is in evidence, and ask you:   Do you recognize that signature as Paul Jannuzzo's, on the last page on the right?

A    Yes.

Q    Okay.

MR. SMITH:   Mr. Butters, can I just see 83 and 123?

MR. BUTTERS:   Sure.

MR. SMITH:   Are you representing these have been admitted?

MR. BUTTERS:   They have.

MR. SMITH:   Can we have a sidebar, Your Honor?

THE COURT:   Yes, sir.

912

(A bench conference was held off the record from 11:50 to 11:51 a.m.)

THE COURT:  As I said, my list is not the end-all and be-all.  Ms. Smith's is.

(State's Exhibit Number 188 was marked.)

Q    (By Mr. Butters)  I'm going to hand you one more document, State's Exhibit 188.  I'm going to hand you a document, State's Exhibit 188, and ask you to turn to the last page of that document and under the word "Consultinvest, Inc.," I ask you do you recognize that signature?

A    Yes.  It looks like Paul Jannuzzo's signature.

Q    Okay.  Thank you.  I'll take that back and try not to get it confused here.

MR. BUTTERS:  One more, I think, Your Honor, and I'm about to wind up.

THE COURT:  Yes, sir.

(State's Exhibit Number 82 was marked.)

Q    (By Mr. Butters)  I'm going to hand you a document marked as State's Exhibit 82.  And with respect to State's Exhibit 82, I want to direct your attention to the last page of that document, and under the word "Consultinvest, Inc.," do you recognize that signature?

A    Yes.  Paul Jannuzzo.

Q    Thank you.

THE COURT:  What was the number on that, Mr. Butters?

913

MR. BUTTERS:  That was Exhibit 82.

THE COURT:  Thank you, sir.

Q    (By Mr. Butters)  And under the name "Captive Consultants, Inc.," do you recognize that signature?

A    Yeah.  That's Paul's, also.

Q    Thank you.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.  Will there be cross-examination for this witness?

MR. SMITH:  Yes, Your Honor.

THE COURT:  I think what we'll do is have that after our lunch break.  I'm sorry, ma'am.  We will have to keep you around until after lunch.

But ladies and gentlemen, we will want to break for lunch at this time.  I know you have to move your cars, most of you do, at least, and so I will ask you to be back at 1:30 for after the lunch break.  Regroup back on the first floor as you've done in the past.

And again, ladies and gentlemen, remember the instructions that I have previously given you in this case repeatedly so that you know them by heart now, but keep those badges also where people can see them.

I know it's kind of cold out today so if you have got your coat on, try and make sure everyone can see them and

914

we will see you at 1:30.  Thank you, folks.

Just make sure -- there's supposed to be a bus down there.  If you'll just check down there and make sure we know where it is.  She's calling them now.

(The jury exits enters the courtroom at 11:55 a.m.)

THE COURT:  Ma'am, you can be excused until 1:30 as well.  Thank you.

THE WITNESS:  Do I leave these papers right there?

THE COURT:  You can just leave them right there.

Yes, ma'am.

Gentlemen, if we could ask -- hold on one second until the jurors get out.

I would ask that you gentlemen come back at 1:15 and, Mr. Core, that you come back at 1:15 as well and we will take up this issue, to the best we can, in the short time that we have with respect to the outstanding documents.

MR. SMITH:  Your Honor, just, also, bring to the court's attention, I had submitted, again, a brief that was dated February 23rd.  I know we ended up with a handful of those.

THE COURT:  You did.

MR. SMITH:  This one begins with the Sixth Amendment.

THE COURT:  Which date did you give that to me?

MR. SMITH:  This was dated February 23rd.

THE COURT:  Give me one second.  I'll find it.

Starts with yes, Sixth Amendment.  I have it.

MR. SMITH:  Last paragraph:  Additionally, the fact that -- talks about the attorney-client privilege, et cetera.

THE COURT:  All right.  I have that and I'll look over that as well.  Thank you.  I'll see y'all at 1:15.  1:15.  Thank you.

MR. SMITH:  Were they able to make a copy of that motion?

THE COURT:  Yes.  Right there, I believe, is your copy of that.

MR. SMITH:  Yes.  I appreciate you doing that.

(Lunch recess taken from 11:56 to 1:15 p.m.)

(Defendant and all parties present.)

THE COURT:  I hope everyone had a nice lunch.  I had four saltine crackers and that was -- I mean, it's still there.  That's all I can say.  That's a very nice lunch for me today.

All right.  At this point, Mr. Core, I will ask you if you will come up and we will talk about the motion to quash that you have filed.

And I have reviewed what Mr. Smith gave to me with respect to the February 23rd brief that was filed, and I'll consider that as well.

All right.  Mr. Core.

MR. CORE: Your Honor, this subpoena, as I said, was defective on its face because it didn't have a return date. Additionally, it calls for -- everything it calls for is attorney-client and/or work product privilege.

I could go down through the list and comment on each one if you wish.

THE COURT: Let's talk about that just so that I get an idea, since these are general categories, of what your position is with those categories of documents.

MR. CORE: Well, category A: All documents which indicate or reflect that you attributed to or controlled trial strategies or decisions including, but not limited to, the decision to offer a plea bargain to Peter Manown.

I had nothing to do with that, Your Honor.

THE COURT: So there are no documents that would satisfy A; is that what you're saying?

MR. CORE: Right.

THE COURT: Okay.

MR. CORE: All documents which indicate or reflect that I conducted pretrial investigation or maintained a separate case file in the above-referenced case.

I think, as Your Honor knows, I have been representing Glock on this matter for quite some time. I've assembled a lot of documents.

I have talked to in-house employee witnesses, spoke

917

with other witnesses to try to get behind the facts of this thing. I have turned everything I have over to the D.A.'s office to include these production from Glock, Inc.

I'm not hiding the fact that I am involved. In fact, I have been subpoenaed to testify for the defense and I'm available to testify for all of those, including what follows.

All documents that indicate or reflect that you interviewed State's witnesses independent of the supervision or control of the Cobb County District Attorney's Office, including but not limited to David Roberts, in the above-referenced case.

I did go to the Caymans. I interviewed David Roberts. And he's already testified. And I think if you look at the exhibits that were entered in through him -- I wasn't here when he was testifying, I was out of the room, but I think those exhibits are relevant to what we talked about.

And as we go down: Indicate or reflect that I provided guidance or information to Cobb County District Attorney's Office about the subject matter --

THE COURT: Wait. Let me back up. With respect to C, though, your position is that documents that would be responsive to that would be what?

MR. CORE: Would be --

918

THE COURT: What's the privilege though?

MR. CORE: It would be -- well, my talking to David Roberts on behalf of the company is privileged work-product information.

I did take a number of documents down there, but I think all of the documents I took down there are in production, and they had to do with the corporate documents of FAIR, structure, directors minutes, things of that nature, the forged Nairm Marshall letters and the forged Gaston Glock letters.

THE COURT: All right. All right. Go ahead.

MR. CORE: Sorry about the eyes here.

THE COURT: Yes, sir.

MR. CORE: All documents that indicate or reflect that you provided guidance or information to the Cobb County District Attorney's Office about the subject matter and/or allegations in the above-referenced matter.

Those are work-product privileged documents, Your Honor?

THE COURT: If turned over to a third party, what's the position about why they would still be work product or privileged.

MR. CORE: Well, I would state that we have a common interest privilege for McKesson with the D.A.'s office, somewhat like a joint defense agreement.

919

THE COURT: All right.

MR. CORE: E: The copies of all binder covers prepared by you and given to the Cobb County District Attorney's Office in the above-referenced case.

I don't recall turning any binders over to the Cobb County District Attorney's Office. I have made binders to keep myself straight on some of these complicated financial transactions and things, but I don't recall ever turning any such binders over to the D.A.'s office.

The binders that you see Mr. Butters using I am assuming are his own creation.

THE COURT: All right.

MR. CORE: All documents contained in any file including but not limited to any case or investigation file that I maintained in connection with the above-referenced case.

Again, that is solely work product. Anything in the way of Brady or anything at all has been turned over to the District Attorney's office, which, in production, they have turned over to the defense, some of the stuff in 2008, probably the lion's share in 2008.

All documents you provided to the Cobb County District Attorney's Office referring, reflecting, or relating to the above-referenced case which were not otherwise produced by the Cobb County District Attorney's

920

Office in discovery in this case.

Once again, we are discussing work product here, Your Honor. I would like to assure the Court that no exculpatory material has been withheld or would be withheld if that's the Court's concern.

THE COURT: All right. Thank you.

MR. CORE: And then all notes taken by you during your interview with David Roberts and all documents shown to Mr. Roberts during the interview.

That's kind of going back to the previous paragraph, C. I just sat down and had a meeting with David Roberts and showed him the documents that we referred to earlier. We just had a conversation.

At the time I went down to the Caymans and spoke with him, he was not a State's witness. He was a man who had done business with one of my clients for many years in the past. I went down and talked to him on that basis.

I didn't go down and make a recording. I didn't take notes. I didn't have him sign a statement or anything you would expect an investigator to do in that regard or a law enforcement officer to do.

THE COURT: All right.

MR. CORE: But anyway, I renew -- orally renew my motion to quash the subpoena.

I'm ready to answer any of the Court's questions if

921

you have any.

THE COURT:  I think that answers at least the initial question I had.  I may have some more in just a moment.

MR. CORE:  Okay.

THE COURT:  Thank you, sir.

Mr. Smith.

MR. SMITH:  Your Honor, Mr. Core is not a prosecutor. Mr. Core has no Brady obligations.  Mr. Core has no exculpatory obligations.  Mr. Core is a hired advocate for a corporation.

The fact that Mr. Core represents to the Court that "I can assure you that all Brady material was turned over" is somewhat humorous because he's not a prosecutor.  He had no obligation to turn over anything that's exculpatory.

In fact, his obligation to Glock, Inc., would say that he should turn over nothing exculpatory because his obligation is to zealously represent his client.

If Mr. Core has gone and talked and spoken to an independent witness in this case, a case that's been called by the State, and the idea that perhaps that the witness wasn't yet on the list but Mr. Core went down and talked with him and then the witness got on the list, we can understand what happened here.

What happened is that Mr. Core investigated this case

922

and provided information to Butters in connection therewith. That's what happened.

So we certainly have a right to know not from Mr. Core that nothing exculpatory has been withheld, not that every document that he showed Mr. Roberts may have been contained within the 65,000 or so that have been produced, but what did he actually show this witness who has testified in your courtroom under oath.

What was that witness shown specifically? What notes were taken, contemporaneous notes were taken, of that witness interview. There's nothing work product or privileged about that.

THE COURT: I think he said there were no notes from the interview.

MR. SMITH: If his representation is that he has none, then I would ask, Your Honor, that he respond: There are no documents. I did not take notes.

We can go down the list. The idea of whether he contributed or controlled the trial strategies or decisions. He just told you, "I didn't."

Really? We know that he's been working with Mr. Butters. We know that he's been providing memos and/or information to Mr. Butters. We know that he's been providing documentation to Mr. Butters.

Mr. Butters produced a notebook cover that has the

923

image of Glock on it. Where did that come from? I assume Mr. Butters didn't create this document with a Glock logo. I would assume it came from Mr. Core.

Now, if Mr. Butters got these books from Glock, then he should just tell us that, but my understanding is that these notebook covers came from Mr. Core with the Glock logo on it.

So to the extent that he controlled trial strategies with the office and has documents, to the extent that he conducted a pretrial investigation that contains a separate case file, again, those requests came out of the federal court case that we talked about before about the areas for examination that would be appropriate in a habeas matter.

We are using this to show bias in this case. We're using this to show that there has been an involvement by the victim that it's improper.

And in order to do that, one of the things that would certainly be a factor in that would be whether or not the alleged victim, through his counsel, controlled trial strategies, talked to Mr. Butters about who did he talk to.

I mean, Judge, we've been present in this room for over a week. In between sessions Mr. Core leans over and talks Mr. Butters. If he's not talking about the case and

924

trial strategy, what is he talking about.

So your view is that information is perfectly appropriate, it's needed by us to put on a full and fair defense in this matter.

Second, that if he conducted a pretrial investigation or maintained a separate case -- we provided a case that says that information and participation in this case is relevant. Information conveyed to an attorney for the purpose of being conveyed to others is not confidential and therefore not privileged.

If he conducted a pretrial investigation, which started, Your Honor, before the indictment, I think we are entitled to those documents so that we could prove the role the victim has had since the very beginning.

Glock, Inc., as we understand, Your Honor, tried to bring this case to the federal government, and they said no. I believe it happened twice.

Then they brought it to the Smyrna police, and they brought it to the police with all their investigation and documents that Mr. Core and Mr. Renzulli put together, and then they got an indictment. That's the order of events.

So this is not a, you know, alleged corporate victim that helps out; it has a paralegal pull some documents for the prosecutor.

This is an alleged victim that has pulled this case

925

together and brought it to the Smyrna police after being declined by the feds to get an indictment.

We are entitled to know what that involvement has been. It could contain exculpatory evidence, and the defendant, who is accused with serious felonies, doesn't have to take Mr. Core's word of what is and what is not exculpatory.

All documents which indicate that he interviewed State's witnesses. We are entitled to know what witnesses he's interviewed and who he's talked to.

If Detective Harrison had spoken to those witnesses, we would know that and we would have -- we would have memos from them and we would have a recording or statements taken, and Detective Harrison would take precautions, I assume, that he's been trained to take before he talks to those witnesses.

Mr. Core is a hired advocate. Why shouldn't we know if he's talked to witnesses that are going to testify on behalf of the State? That's area for fair cross-examination.

Documents that were provided or information to the Cobb County District Attorney's Office, how in the world could that be privileged? How in the world could that be work product?

Work product is the mental impressions of an attorney

926

in connection with a case or opinion. What mental impressions would Mr. Core have in any documents that he wrote for Glock, Inc., in connection with a criminal case? It makes no sense.

And the answer, Your Honor, that there's a common interest or joint defense absolutely -- and I can't say it emphatically enough, illustrates the point.

McKesson doesn't talk about a prosecutor's office being able to have a joint defense or common interest privilege with the victim. They're not parties in this case. The prosecutor's office is a party, and the victim is a third-party witness.

It is highly improper to say that there's a common interest or joint defense because there's nothing joint. The State's interest is to represent the State of Georgia. Glock, Inc., to the extent that it's relevant, is merely a witness.

So -- and I have not seen any case where a victim -- and we've worked hard to give the Court a lot of cases. We've tried and submitted lots of briefs. I have not seen a single case from Mr. Butters that says that when a victim hires a lawyer and that lawyer works with the prosecutor's office, they're entitled to a joint defense of some sort or a common interest.

That, in our view, demonstrates the whole bias that

927

the defense is seeking to prove in this case.

The binder covers, again, we have this binder cover.

If Mr. Core --

THE COURT: Just wanted to make sure nobody could hear what we're talking about. Go ahead.

MR. SMITH: Yes, sir. If Mr. Core says that he did not provide these binder covers, he doesn't have them, but Mr. Butters got it from somewhere, and I assume Mr. Butters is not creating binder covers with Glock's insignia on it. So if Mr. Core has them, he should produce them.

Documents contained in the file that include any case or investigation filed that he maintained, whatever Mr. Core has done on behalf of either the State or behalf of his client that relates to this case, we should be entitled to see.

Mr. Guevara testified that they paid Mr. Core -- "they" being Glock, Inc., and before Glock, Inc., he represented, apparently, Mr. Gaston Glock -- to investigate this matter. That money was paid to him to interview witnesses and, you know, and, what our defense will be, gin up charges to get Mr. Jannuzzo and then bring something to the Smyrna Police Department and convince them to register an indictment is absolutely a fair area of defense for bias, especially since the feds rejected it

928

twice.

In addition, documents that he provided to the D.A.'s office that have not been produced to us in this case, so we'd try to limit it.

If Mr. Core in connection with Glock, Inc., provided documents to Mr. Butters to produce -- have produced the documents, we're not asking for that.

We're asking for all the e-mails, all the memos, all the notes, all the advice, all the ideas that he provided to the prosecutor's office in connection with the criminal prosecution. Why aren't we entitled to that? How could that be work product? How could that be privileged?

And lastly, notes taken during interviews, in addition, with Mr. Roberts and -- or any interview with another witness. Our understanding is Mr. Core has interviewed many of the witnesses in this case, whether they were witnesses at the time because they were on a list or because he found them and then the State made them witnesses.

It's just as relevant that Mr. Core flew down to Cayman, spent a couple days, talked to Mr. Roberts, and then he became a State's witness. That's just as relevant to our position that if he was already on the witness list.

And lastly, Your Honor, while we didn't identify

929

billing records particularly, we believe they would fit within some of these requests at demonstrating his investigation and involvement, and certainly to the extent the Court deems that it does, then we would ask for them, all the billing records, and we understand the Court has made a ruling with respect to Glock's records and redacted it so we would certainly make that request consistent with the Court's prior finding on that point.

And we would expand that, of course, to have billing records going all the way back to the involvement with Gaston Glock as it relates to this case and Glock, Inc., because that will cover a span that proceeds the indictment and then travels all the way up to, you know, 27th of February as we stand here today.

So that's our position, Your Honor.

THE COURT: All right. Thank you.

Mr. Core, anything else you want to add?

MR. CORE: Just a couple of brief points, Your Honor.

THE COURT: Yes, sir. Come forward.

MR. CORE: Last week I was a special prosecutor and this week I'm not a prosecutor. I am an officer of the court, and I have taken an oath to see that justice is done. And I can assure the Court no Brady material has been withheld or would be withheld.

And I was an FBI agent for 28 years, and we were

there to see justice was done on the railroad people. And if I had found any exculpatory evidence, I certainly would have brought it to the attention of the defense and the D.A.'s office.

I had one other point but it's left me. But again, I renew my motion to quash, Your Honor.

THE COURT: Let me make sure I understand, and I think you answered this a few minutes ago. But with respect to subsection E, binder covers, you indicated there were none as far as you knew.

MR. CORE: Oh, that was it, Your Honor. I don't have Glock, Inc., binder covers. I don't use their logo on stuff. I've got my own office. I'm an outside counsel.

I don't know where that binder cover came from. I would guess it did come from someone at Glock, Inc., but it didn't come from me.

THE COURT: Thank you.

Mr. Butters, anything that you want to add?

MR. BUTTERS: Can I see that binder cover?

Your Honor, I will state that this binder cover that I was directed to give a copy of --

THE COURT: Yes, sir.

MR. BUTTERS: -- I believe that's the binder that they looked at on my desk when we had the motions. That's my guess.

THE COURT: Yes, sir.

MR. BUTTERS: And this is -- I will say this is my handwriting on the front of it. It was on the front of it at the time of the motion. I think it's been on the front of it ever since I received it, and it says, "Plea in Bar, June 16th, 2009." And it says -- and I have circled the word "Transcript."

The binder is a copy of the transcript of the hearing in June 16th, 2009, that I am assuming the Court records will show that Glock probably ordered a copy of it and sent me a copy. That's -- that's my understanding.

MR. SMITH: Well, Your Honor, if Glock is paying for things like transcripts and then sending those things to the prosecutor's office, that's no different than them writing a check.

If Mr. Butters felt that he needed more money to prosecute this case because he couldn't afford a transcript so Glock said let me stroke a check to you, Mr. Butters, for a thousand bucks, here Mr. Butters, memo line, for this case, he deposited that in the coffers and then wrote a check to the court reporter for a transcript, that would be improper. We'd all understand that.

So if Glock is going out and ordering copies of transcripts, paying for things that it is then gifting to the district attorney's office, that's horribly

932

inappropriate.

As it relates to Mr. Core, I appreciate that he used to be with the FBI and I appreciate that he has this affinity towards exculpatoriness but right now he is a private lawyer and the rules of professional conduct say his obligation is to zealously represent his client, and he cannot represent his client if his loyalties are conflicted.

So therefore, as a private lawyer who's not barred in this State, as a private lawyer representing a company, his professional duties are to zealously advocate for his client.

He could not fulfill his professional duties to his client if he was also concerned about, quote/unquote, justice and making sure that exculpatory evidence was given to a criminal defendant, Mr. Jannuzzo. He can't do it.

So it's interesting and anecdotal, but as the Court, I'm sure, understands, it's not possible. His interest is to advocate for his client. Documents were generated at the client's expense.

Things were handed to the district attorney's office in connection with this case, and it is our feeling that we are entitled to get those materials so that we can demonstrate the extent of Glock, Inc.'s involvement and

933

show the bias that we believe has led to this prosecution.

THE COURT: Thank you.

First, let me go back. With respect to the motion to compel that has been filed, I'll deny the motion to compel because as I look at the copy of the subpoena I do see that there doesn't appear to be a return date on it, and so I don't think I can grant a motion to compel when the individual who has been served with a subpoena hasn't violated the subpoena.

MR. SMITH: I understand. If that wasn't filled in, Your Honor, that was an oversight.

THE COURT: I understand.

With respect to the motion to quash, with respect to A -- subsection capital A and subsection capital E, the representation has been that there are no such documents.

The Court can't order the party to produce something that doesn't exist, and I don't know of any way that this Court would have of fashioning an order to make a determination of that.

Obviously, if there's something that makes an appearance in this case that appears to fit under one of those categories, then the Court has at its disposal some ways of dealing with the party who makes a false representation to the Court, but that's the best I can do with respect to A and to E.

934

With respect to the other categories of documents, as I expressed now I think three days ago, or at least three trial days ago, about five actual days ago, had we dealt with this issue some months ago, which I think could have been done, I might have -- and I don't know this but I might have come to a different conclusion.

But given where we are, I believe that the motion to quash is appropriate with respect to the remaining categories of documents.

Again, I don't know how I can possibly fashion an order for these broad categories of documents that would tell Mr. Core what to provide and a mechanism for providing it in such a time as the Court could review it, which I would, I believe have to do in camera to make a determination whether or not there is work product there or attorney-client privileged material there.

And the categories of documents here, at least as I review it, are extremely broad. I have not said that the defense can't inquire of Mr. Core what he did or what information he gave with respect to this investigation or how he assisted the district attorney's office. I haven't said that. That question hasn't come up yet.

But in -- I know that the defense has put Mr. Core on its list of witnesses, and I believe that there are questions that can be asked of Mr. Core that the Court

935

will probably allow to be asked of him with respect to his participation in this.

But with respect to the documents that were subpoenaed of him late last week, I will grant the motion to quash with respect to those remaining categories of documents that I --

MR. SMITH: Your Honor, with respect to the billing records.

THE COURT: Yes, sir.

MR. SMITH: He said that -- we could certainly make the request if the Court doesn't feel it's encompassed within the more general request --

THE COURT: It definitely doesn't seem to be encompassed within the request.

MR. SMITH: We would ask -- I mean that has been given to us by Glock, Inc., and we know that it was for a more narrow period of time because apparently he was representing Mr. Glock at the time. We would ask at a minimum that we receive the billing records. And again, whether it's in here, or I could just write it and make it again, ask for it now.

THE COURT: Well, I think that's what you'll have to do so that I can again allow the parties to address that specific issue. I'll be happy to hear that. We can do it today and give it to Mr. Core. That's something that you

936

can certainly do.

MR. SMITH: And then documents -- I mean to the extent -- I mean, the court options are, obviously, to quash the whole document or to narrow the scope to an area that you feel the Court deems appropriate.

THE COURT: And that's the frustration that I'm expressing is I don't know how I could do that. I've looked at it and I've looked at what you've asked for.

MR. SMITH: We don't know what we're asking for, Judge. Respectfully, we don't know, because I don't know what he's done, but if he's given documents to the D.A.'s office, I don't understand how that could be privileged. So we said all documents you provided, all e-mails, that seems to be a fairly narrow scope.

Anything you have given to the D.A.'s office or communicated with them about Mr. Jannuzzo's case.

THE COURT: I don't know whether Mr. Core was one of the individuals who helped participate in providing the documents to the D.A.'s office that were ultimately produced in this case.

But that, again, is one of the same problems that I have is what you're expressing, which is I have heard time and time again that there were approximately 60,000 pages of documents produced in this case.

I would assume, although I don't know that, that

937

Mr. Core helped with the production of some, if not all, of those documents to the district attorney's office, and my guess is that if he's been participating as long as he indicates he's been participating, at this point he probably does not know how many documents he helped provided or provided to the district attorney's office.

And so in trying to figure out a way to rewrite the general request that the defense has made, I scratch my head to determine how I could do it.

Now, when you ask for something like binder covers, as you did with the D.A.'s office, that's something I can sink my teeth into because I can say, yes, if you have any binder covers that say "Glock, Inc.," on them, then that will be easy to find and easy enough to produce.

So the problem that I have is, again, given the time period in which I'm working on day five of trial, I just can't do that, so that's where I am.

So I'll grant the motion to quash. If you want to give the other subpoena with respect to the billing records Mr. Core and then he can respond appropriately and then I'll take that up, you know, tomorrow or the next day or whenever it comes to the Court's attention, I'll be happy to do that.

MR. SMITH: Okay.

THE COURT: All right. Thank you very much.

938

Are we ready to proceed with the rest of Ms. Berens' testimony?

MR. BUTTERS: Yes, Your Honor, we are.

THE COURT: All right.

MR. BUTTERS: I can't remember. Had I rested with her or not?

THE COURT: Let's see what my notes show.

MR. BUTTERS: Yes, sir.

THE COURT: No, I don't believe that you -- hold on.

MR. BUTTERS: I didn't think I had.

THE COURT: No, you had not.

MR. BUTTERS: Okay. All right. Well, then I'll --

THE COURT: I make a little note for myself in the transition from direct to cross. I try to, at least.

All right, Mr. Mau, you may bring the jurors in.

(The jury enters the courtroom at 1:49 p.m with all parties present.)

THE COURT: Good afternoon, ladies and gentlemen. First of all, I hope they got you a much better parking space.

And second, thank you all for your prompt return. We have been working while you were gone. We came back at 1:15 and I just now got finished dealing with some issues that we needed to take up that, again, hopefully will expedite a few things later this afternoon, but thank you

939

for your patience.

And with that, the State may continue its examination of this witness.

MR. BUTTERS: Okay. Thank you, Your Honor.

Q    (By Mr. Butters)  I'm going to hand you State's Exhibit Number 4, which is in evidence, and ask you: Do you recognize on Exhibit 4 that to be Gaston Glock's signature?

A    It doesn't look like Mr. Glock's signature to me.

Q    Okay. I'm going to hand you --

MR. SMITH: Your Honor, I'd just object to the foundation. He hasn't laid a foundation of her familiarity at all with Mr. Glock's signature, and if he's seeking to compare -- introduce evidence to compare signatures, that's a foundation that's required.

THE COURT: Sustained.

Q    (By Mr. Butters)  Are you familiar with Mr. Glock's signature?

A    Yes.

Q    Based on your familiarity with Mr. Glock's signature, does that look like Mr. Glock's signature?

A    It doesn't look like it.

MR. SMITH: Same objection. Your Honor.

Q    (By Mr. Butters)  How is it --

THE COURT: Wait. Wait. Wait. There's an objection pending.

940

I sustain the objection. I think there's a bit more foundation to be laid before she can identify that.

Q    (By Mr. Butters)  Are you familiar with Mr. Glock's signature as a result of your employment at Glock?

A    Yes, I am.

Q    Could you tell the Court and the jury how it is you're familiar with Mr. Glock's signature?

A    He has signed some documents that -- for me for the accounting department, bank signature cards, and also I have seen his signature on the checks.

Q    In Defendant's Exhibit Number 5, which is in evidence, if you turn under tab 17, or I think it's referred to as J003844, there it appears to be on that card "Gaston Glock" in typed form and then it says "Vice President" and then appears to be a signature beside it.  Do you recognize that to be Gaston Glock's signature?

A    Yes, that looks like Mr. Glock's signature.

Q    And?

MR. BUTTERS:  Your Honor, I move to tender into evidence exhibit -- well, strike that.  Exhibit 4 is in evidence.

THE COURT:  It is.  Yes, sir.

Q    (By Mr. Butters)  Okay.  And based upon that comparison, do you think that the signature on Exhibit 4 is Mr. Gaston Glock's signature?

941