# Exhibit 2

# Part 9 of 19

# Pages 942-1066

A    No, I don't think it is.

MR. SMITH:  Objection, Your Honor.  The comparison -- "do you think" -- the witness testified from her familiarity the foundation is laid.  Asking just to compare documents, that's not appropriate for a lay witness.

THE COURT:  Overruled.

Q    (By Mr. Butters)  Ma'am, I'm going to hand you State's Exhibit Number 1.  And if I could, State's Exhibit Number 1 is quite similar to State's Exhibit 2, which is in evidence.

And with respect to State's Exhibit 1, can you identify that document?

A    Well, it's the same kind of document that we use to write the check for the insurance.

Q    Okay.  And that "Paid" stamp down at the bottom, that would be a Glock stamp?

A    Yes.

Q    And the "Received" stamp up there would be a Glock stamp?

A    Yes, even though it has the wrong date on it.

Q    Okay.  And is this a document that your department relied on in issuing the check that's referred to down in the bottom left-hand corner?

A    Yes.

942

Q    And who is this document addressed to?

A    Paul Jannuzzo.

Q    And who is it addressed from?  I mean, who is it written from?  Who wrote it?  Who signed it; do you know?

A    I don't know him.  It says "Nairm Marshall."

Q    Nairm Marshall?

A    Yeah.

Q    Okay.  Would this be a document that was kept in the ordinary course of business at Glock in order to support the issuance of that check?

A    Yes.  It would have been behind the check.

Q    Okay.

MR. BUTTERS:  Your Honor, move to tender in evidence Exhibit Number 1.

THE COURT:  Any objection?

MR. SMITH:  The objection we stated earlier, Your Honor, which relates to the substance of the document.  To the extent that -- we would object to it being entered for the truth.  But to the extent it's being entered to show what this witness did or explain it, we don't have an objection.

THE COURT:  Is that the purpose for this State's --

MR. BUTTERS:  Yes, just like Exhibit 2.

THE COURT:  All right.  Ladies and gentlemen, again, this is another document which is not being admitted -- or

943

not being asking to be admitted to prove the truth of the matters asserted in the correspondence portion of that document of State's Exhibit 1 but only that the entries that were made by Glock that Ms. Berens just testified to were made.

So you would consider it for that limited purpose, and that is not for the truth of the matters in the correspondence but for the transaction that she just spoke of.

MR. BUTTERS:  And that's all the questions that the State has, Your Honor.

THE COURT:  Thank you.

Is there cross-examination for this witness?

And I don't think I was clear, but State's Exhibit 1 is admitted for that limited purpose, if I did not say that specifically.

THE BAILIFF:  May I approach, sir?

THE COURT:  Yes.  Thank you.

Ms. Berens, if you wouldn't mind speaking more directly into the microphone.  The jurors are having a little bit of difficulty hearing you.

CROSS-EXAMINATION

BY MR. SMITH:

Q    Hi, Ms. Berens.

A    Hi.

Q   What is your current position at Glock?

A   Accounting manager.

Q   How long have you been at Glock?

A   21 years.

Q   Have you had the same title for all those 21 years?

A   No.  1996, I became accounting manager.  Before that I was accounting clerk.

Q   Okay.  Do you know Mr. Bob Core?

A   Yes.

Q   When did you first meet Mr. Core?

A   Probably, I'm not exactly sure, one to two years ago.

Q   How did you meet him?

A   He came to Glock and requested a meeting with me.

Q   Mr. Core did?

A   Mm-hmm.

Q   Mr. Core -- Mr. Core -- Mr. Core himself requested the meeting with you, or did someone else tell you you needed to talk to him?

A   I believe counsel at Glock told me that he was coming.

Q   Is that Mr. Renzulli?

A   No.  Mr. Carlos Guevara.

Q   Carlos Guevara.  So Carlos Guevara roughly -- you think it was one to two years ago?  You think it was 2009 or earlier or later?

945

A    No later than two years ago, but I can't tell you exactly when it was.

Q    Okay.  So --

A    No earlier than that.

Q    Okay.  No earlier than two years ago.  Got it.  So maybe 2009 anywhere up until 2010-ish maybe?

A    Could be.

Q    Okay.  And did Carlos tell you why you needed to meet with Mr. Core?

A    Something to do with this case.

Q    Do you remember what Carlos told you?

A    Not exactly, no.

Q    With respect -- I'm sorry.  Go ahead.

A    It was just something to do with -- you know, to look at the checks and that -- to verify what the numbers on them meant and things like that.

Q    Okay.  What's Carlos' position at Glock?

A    In-house attorney.

Q    And how -- where does Carlos' position at Glock rank with respect to your position?

A    Well, I believe he's above me, if that's what you're asking.

Q    Yeah.  He's above you because he's the general counsel?

A    Yeah.

946

Q    Is he someone you would need to take direction from?

A    Yes, I believe so.

Q    Who do you directly report to?

A    Josh Dorsey.

Q    Did Josh Dorsey tell you anything about meeting with Mr. Core?

A    No.

Q    Did you talk to Josh Dorsey about meeting with Mr. Core?

A    I believe I mentioned that it was told that I needed to, you know, meet with him so that he was aware of it but --

Q    Do you remember what he said?

A    Huh-uh.

Q    Did you understand that when Carlos told you to meet with Mr. Core that it wasn't an option, he was telling you you needed to go meet with Mr. Core?

A    I didn't take it as, like a, you know -- you know, not -- you know, it's part of my job if they have a question about some records that I need to answer those questions.

Q    And as a result, Carlos said you are going to meet with this --

A    Yeah.

Q    -- gentleman named Mr. Core?

A    Right.

Q    Did he tell you who Mr. Core was?

947

A    Mm-hmm.

Q    Who did he tell you he was?

A    Just told me he was an attorney.

Q    Did he tell you what his role was?

A    No.

Q    Did Mr. Core bring documents with him?

A    Yes.

Q    And about how many documents did Mr. Core bring with him?

A    He had a notebook but only a few were, you know, pertinent to me, so some of these same documents.

Q    Did he have -- what kind of notebook did he have?

A    Just a three-binder notebook.

Q    Three-ring binder?

A    Yeah.

Q    Do you remember, one of the skinny notebooks or a big notebook?

A    It was big.

Q    A big notebook?

A    Mm-hmm.

Q    Do you remember what it looked like?  Did it have tabs in it?  Did it have --

A    Yes.

Q    Do you remember what any of the tabs said?

A    No.  I wasn't shown that.  He just took pieces of

948

papers out and showed me what -- asked me questions about certain papers.

Q   Okay.  And so where did you meet with Mr. Core?

A   In the conference area in the Glock building.

Q   At Glock?

A   Mm-hmm.

Q   How long did you meet with him?

A   It probably took maybe 30 minutes.

Q   And have you ever met with Mr. Core again?

A   Yes.

Q   Okay.  Is Mr. Core in the room now?

A   Yes.

Q   Okay.  When did you meet with Mr. Core again after your first meeting one to two years ago?

A   More recently.  Maybe six, eight months ago.

Q   That was the second time you met with him?

A   Mm-hmm.  Yeah.

Q   Where did you meet with Mr. Core six to eight months ago?

A   At the Glock building, in the conference room.

Q   Same conference room?

A   Mm-hmm.

Q   Did he have a binder with him?

A   Yes.

Q   The same binder or looked similar?

949

A    Looked similar, yeah.

Q    Same big, thick three-ring binder?

A    Yes.

Q    How did you know Mr. Core was going to come meet with you again in the conference room?

A    I was told by the legal department.

Q    Who told you?  Carlos?

A    I don't think it was Carlos this time.  I think it was one his assistants.

Q    And they told you that Mr. Core was coming again?

A    Mm-hmm.

Q    Did they tell you anything else about what you were to talk to him about?

A    No.  Just said they wanted to go over the documents again.

Q    And did Mr. Core show you documents the second time you met with him six to eight months ago?

A    Mm-hmm.

Q    Do you remember if they were the same documents you saw the first time?

A    Yes.

Q    Do you remember if they were exactly the same, different at all?

A    I believe they were the same.

Q    He asked you more questions about them?

950

A    No.   Just wanted to go over them again to make sure he understood what those numbers all meant.

Q    Okay.

A    The accounting stamps and --

Q    How long did you meet with Mr. Core six to eight months ago?

A    Probably again 30 minutes.

Q    After meeting with Mr. Core six to eight months ago for 30 minutes, have you ever met with him again?

A    Yes.  Once up here at the D.A.'s office.

Q    You actually met with him at the D.A.'s office?

A    Mm-hmm.

Q    And when was that?

A    Right before the October trial date.

Q    Right before the October trial date?

A    Mm-hmm.

Q    And how did you know to come to the D.A.'s office? This is the Cobb County D.A.'s office you're talking about?

A    Yes.

Q    The office that's prosecuting this case?

A    Mm-hmm.

Q    I see.  When did you -- how did you know to go to that office?

A    I got a phone call.

Q    Who called you?

951

A    I'm trying to think.

Q    That's okay.  Take your time.

A    I don't know if it was this office or if it was somebody at Glock.  Honestly, I can't remember if it was somebody here or if it was somebody at the legal department at Glock.

Q    Have you ever been to the Cobb County District Attorney's Office office before?

A    No.

Q    Did you know where it was?

A    I knew where the courthouse was.

Q    Okay.  Do you remember if the person who told you to come here told you where to go?

A    Yes.  That's why I believe it was the legal department at Glock that set up the appointment.

Q    I see.  And when -- and when was that meeting?

A    It was before the October trial date, but I don't know exactly for sure when.  I want to say maybe a couple weeks before that.

Q    So maybe sometime in October?

A    Yeah.  Mm-hmm.

Q    Did you come here, did you come to the --

A    Yes.

Q    -- District Attorney's Office office?

A    Yes.

Q    And who did you -- who were you told to ask for when you got there?

A    Mr. Butters.

Q    Mr. Butters?

A    Mm-hmm.

Q    And when you go into the office, is there like a waiting area?

A    Mm-hmm.

Q    And a receptionist behind a glass?

A    Right.

Q    Okay.  Did you let them know you were here and you were here to see Mr. Butters?

A    Right.

Q    And then there's a locked door area that goes into the back office?

A    Mm-hmm.

Q    Mr. Butters come out?

A    Yes.

Q    Okay.  And he got you?

A    Yes.

Q    And where did he take you?

A    To a conference room.

Q    And who was in the conference room?

A    He and Bob Core.

Q    Bob Core was already there?

953

A    Mm-hmm.

Q    And did they have any documents with them?

A    Same binder.

Q    Same binder?

A    I don't know if it was the same binder but a binder.

Q    Big binder with three rings in it?

A    Yeah.

Q    And were there multiple binders because there were two people or just one binder?

A    There could have been multiple binders.

Q    Okay.  And how long did that meeting last?

A    Not very long.  Probably no more than 30 minutes or so.

Q    What was the purpose of that meeting?

A    Again, to go over before the trial.

Q    Go over documents?

A    Mm-hmm.

Q    I see.  When is the first time you met Mr. Butters?

A    That was that day.

Q    October of this -- not this year.  October 2011?

A    Right.

Q    So if I understand the chronology, one to two years ago, which would have been 2009, 2010 time frame you met Mr. Core at Glock.

A    Yes.

954

Q   And he showed you some documents and you spoke with him in a conference room.

A   Yes.

Q   Then six to eight months ago.  We're now in February so that would be June, July of 2011?

A   Could be right around that time, yes.

Q   Okay.  So June, July 2011 you met with Mr. Core again at Glock.

A   Yes.

Q   And those two meetings you were told about by either Carlos for the first meeting and maybe someone else -- either Carlos or someone else in the legal department for the second meeting?

A   Yes.

Q   And at that point had you ever heard of Mr. Butters after your second meeting with Mr. Core?

A   I don't believe so.

Q   Had you ever -- did you talk to Detective Simmons?

A   Yes.  That was on the first visit.

Q   Which visit?

A   The first visit with Bob Core.

Q   Okay.  Well, the --

A   Or one detective.  What did you say his name was?

Q   Detective Simmons?  Is there --

A   I don't know.  I don't know.  I can't remember his

955

name.  I know it was a detective.

Q    Okay.  We'll go back to that.

A    Okay.

Q    So when Bob Core came in roughly one to two years ago, a police detective came with him?

A    Mm-hmm.

Q    And you're not sure of his name?

A    No.

Q    Did the detective ask you some questions, too?

A    Well, I believe they were both asking me the same kind of questions about the documents.  I can't tell you which one asked what question.

Q    Did you understand what role Mr. Core was playing and what role the detective was playing in your conversation?

A    Well, I knew it was for something about a case against, you know, Mr. Jannuzzo, but, you know, I'm sure the detective was researching for that or, you know, doing that investigation, and I thought that Bob Core was just an attorney looking into that case, also.

Q    I see.  Did the detective have a binder of documents, too?

A    I think it was the same binder.  I don't think he had a separate one.

Q    So did Mr. Core bring a binder though?

A    Well, it was in the table, on the table.

956

Q    Just one binder with the three rings that was on the table?

A    Yeah. I didn't see them come in so --

Q    How about in June, July 2011 time period, who did you meet with on that day?

A    Just Bob Core.

Q    Where was the Smyrna police detective?

A    He wasn't there.

Q    He wasn't there?  Did they ever tell you why he wasn't going to be there?

A    No.

Q    What other third party was present when you had the conversation with Mr. Core in June, July of 2011?

A    I don't believe there was one.

Q    Just the two of you?

A    Mm-hmm.

Q    In the conference room?

A    Yes.

Q    Do you recall whether Mr. Core took notes of your conversation in June, July of 2011?

A    I don't believe so.

Q    How about in the first meeting?

A    Well, he probably did because he was asking those questions about what the numbers meant and things on the documents.

Q    And in October of 2011 was the third meeting, and that's when you met Bob Core for the third time and that was with Mr. Butters at the Cobb County D.A.'s office.

A    That's correct.

Q    And at that meeting you were shown documents again?

A    Yes.

Q    Did Mr. Butters ask you questions at that meeting?

A    Yes.  He just wanted to verify what I had told Mr. Core.

Q    I see.  And how about since that meeting in October 2011, have you met with Mr. Core again?

A    No.

Q    Have you ever talked with John Renzulli about this case?

A    No.

Q    Mr. Core ever communicated with you by e-mail or by telephone?

A    No.

Q    He's only just physically met with you three times?

A    Mm-hmm.

Q    And were you asked to gather any documents?

A    I was asked by our legal department.  That's where some of these documents came from.

Q    You were asked to pull documents?

A    Yes.

Q    Were you asked to pull them before you met with Bob Core or after?

A    Before.

Q    Who directed you to pull documents?

A    Carlos Guevara.

Q    And did he direct you to pull documents by giving you a list, or did he just ask you for categories?

A    Well, he asked me for a list of the items first so -- because I could run them by our accounting system, what was the insurance and who the vendor was and that, so I gave him the list first and then he asked me for the copies of the checks and the document.

Q    So did -- he asked you for documents for a particular subject matter, topic area?

A    Yes.  Mm-hmm.

Q    He didn't just say all documents that you maintain or records you have; right?

A    No, I hope not.

Q    That would take a long time.  He told you what he wanted you to look for and you went and found it and gave it to him?

A    Yes.

Q    And are those the same documents that showed up when Mr. Core and -- Detective Harrison.  I'm sorry.  Detective Harrison.

959

A    Yes, that sounds right.

Q    Okay.  That makes more sense to me, too.

So it was Detective Harrison and Mr. Core in 2009, 2010?

A    Yes.

Q    And were those similar documents that Mr. Core showed you in 2009, 2010?

A    Mm-hmm.

Q    Okay.  After your meeting with Mr. Butters and Mr. Core in October 2011, have you met with Mr. Core again?

A    No.

Q    This is the first time you have seen him --

A    Yes.

Q    -- today since --

A    Well, Thursday.  I was here Thursday, so I saw him Thursday.

Q    Okay.  But you didn't have any meetings with him then?

A    No.

Q    How about Mr. Butters, did you ever meet with Mr. Butters again?

A    No.

Q    So you just met with Mr. Butters just that one time?

A    Yes.

Q    And you met with Detective Harrison just that one

960

time?

A   Yes.

Q   But you met with Mr. Core those three times?

A   Yes.

MR. SMITH:  If I could just have one moment, Your Honor.

THE COURT:  Certainly.

Ma'am, while he's asking that, how do you spell your last name?

THE WITNESS:  B-E-R-E-N-S.

THE COURT:  B-E-R-E-N-S.  Thank you.

Any other questions?

MR. SMITH:  Just very briefly.

Q   (By Mr. Smith)  You had indicated that there was -- the first time you met with Mr. Core there was kind of a big notebook and he took a few pages out for you to show you.

Do you know whether Mr. Core met with other people at Glock either that or at other times?

A   I'm not aware of that, no.

Q   Have you ever seen Mr. Core at Glock other than the meeting that you had with him?

A   No, but I'm in a different building.

Q   What do you mean a different building?

A   We have separate buildings, and I'm in a different building so I don't see the comings and goings of people in the

961

main building.

Q   So you wouldn't know whether he was there or not --

A   No.

Q   -- because he -- you would only know if he came to actually your building where you are?

A   Yes.  Or if they asked me to come over and meet with him so, yeah.

Q   Got it.  And do you know whether he's -- has anyone told you whether he's talked or have you seen him talk with anybody else in your group?

A   Not in my group, no.

Q   So it was just in your group to your knowledge?

A   Yes.

Q   Okay.  Thank you for your time.

A   Thank you.

THE COURT:  Any redirect for this witness?

MR. BUTTERS:  No, Your Honor.

THE COURT:  All right.  May she be excused, gentlemen?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Thank you.  Ma'am, you're excused.  Thank you very much.

You may call your next witness.

MR. BUTTERS:  Your Honor, due to the time, there's one witness I want to get in so I'm going to call

962

Mr. David Kregloski.

THE COURT: All right. Mr. Kregloski.

Jurors, don't forget you can stand up and stretch while those witnesses are coming in. Don't miss that opportunity.

Sir, if you would, come past the bailiff over here, the man with the badge, and come up to the second seat here.

Sir, come past the bailiff over here, the man with the badge, and come all the way up to this second seat up here. Watch your step there. Before you sit down, if you would place your left hand on the Bible there and raise your right hand for me. Thank you, sir.

DAVID KREGLOSKI,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT: Thank you, sir. You can be seated. And if you would, just make sure you pull up close enough to the microphone so everyone can hear you. Thank you.

EXAMINATION

BY MR. BUTTERS:

Q    Would you please state your full name for the record.

A    David Kregloski.

Q    And David, where do you live?

THE COURT: I'm sorry. Could you spell your last

963

name for me?

THE WITNESS:  K-R-E-G-I-O-S-K-I.

THE COURT:  Thank you so much.

Go ahead, Mr. Butters.

Q    (By Mr. Butters)  Could you tell the Court where you live?

A    In Atlanta.

Q    Okay.  And where do you work?

A    I'm self employed.

Q    And what do you do?

A    Custom cabinets.

Q    Did you ever -- are you familiar with Paul Jannuzzo?

A    Yes.

Q    Did you ever build cabinets for Mr. Jannuzzo?

A    Yes.

Q    I'm going to hand you -- are you familiar with the cabinets that you did build for Mr. Jannuzzo?

A    Yes.

Q    Do you think you'd recognize them if you saw them?

A    Yes.

Q    I'm going to hand you a group of pictures that -- I guess I ought to mark them as an exhibit.

Your Honor --

THE COURT:  Ms. Smith has left for a moment.  Why don't you mark it on the front and when she comes back --

964

actually, I see a red sticker right there. Go straight behind there. Looks like there's some right there.

MR. BUTTERS: Right. I'm just going to call this Defendant's Exhibit 500 because I can't remember where we left off.

THE COURT: Yes, sir. You mean State's 500.

MR. BUTTERS: State's 500. Sorry about that.

(State's Exhibit Number 500 was marked.)

Q    (By Mr. Butters) I'm going to hand you a group of photos that I have marked as State's Exhibit 500 and ask you if those accurately depict the cabinets that you built for Mr. Jannuzzo.

A    Yes, they all do.

MR. BUTTERS: Your Honor, I move to tender in exhibit -- State's Exhibit -- I move to tender into evidence State's Exhibit 500.

THE COURT: Any objection?

MR. SMITH: No, sir.

THE COURT: They are admitted.

Q    (By Mr. Butters) Do you recall how much you were paid for those cabinets?

A    Yes.

Q    How much?

A    16,000.

Q    And who paid you?

965

A     It was a wire transfer.

Q     From whom?

A     From Paul --

Q     Okay.

A     -- or Glock, I forget.

Q     Okay.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Any cross-examination for this witness?

CROSS-EXAMINATION

BY MR. SMITH:

Q     Good afternoon.  Nice cabinets.

A     Thanks.

Q     Why would you think the wire transfer was from Glock?

A     Because it came from Austria, I thought.

Q     You think the wire that you received came from Austria?

A     I don't know where it came from.

Q     Why do you think it might have come Austria?

A     I don't know.  I just thought maybe it came from Austria.

Q     What year was this that you built those cabinets?

A     2001.

Q     Is there anything particularly memorable about these cabinets?

966

A    Well, they were very custom and they could be distinguished easily.

Q    Okay. Well, thinking about it 11 years ago, thinking about it could have come from Austria, what is it that gives you the idea that they --

A    I believe I remember him saying that he was going to wire it from Europe.

Q    Okay. Do you know if that happened?

A    No. I know that I got money wired to me.

Q    And you received payment on the account?

A    Yes.

Q    That's all you know?

A    Yes.

Q    Okay.

MR. SMITH: Thank you.

THE COURT: Any redirect for the witness?

MR. BUTTERS: No, Your Honor.

THE COURT: May he be excused, gentlemen?

MR. BUTTERS: Yes.

MR. SMITH: Yes, Your Honor.

THE COURT: Thank you, sir. You are excused. You may call your next witness.

Back across the courtroom and out those back doors.

Thank you, sir.

Who's the State's next witness?

967

MR. BUTTERS: Mr. Byerly.

THE COURT: Byerly?

MR. BUTTERS: Yes.

THE COURT: Thank you. I misplaced the list that you gave me so I was looking for that. I'm sorry.

Mr. Byerly, you can come all the way through the courtroom across to where the bailiff is over there, the gentleman with the badge, and he'll direct you up to the witness stand. Thank you, sir.

Before you sit down, Mr. Byerly, if you'll place your left hand on the Bible there and raise your right hand for me. Thank you, sir.

VIRGIL ROBERT BYERLY, having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT: Thank you. You can be seated. Just make sure you pull the chair up close enough to the mic so that we can hear you. That's great. Thank you, sir. Excuse me one second.

(A bench conference was held off the record at 2:19 p.m.)

THE COURT: All right. Mr. Butters.

VIRGIL BYERLY, having been first duly sworn by the court clerk, was examined and testified as follows:

968

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Would you state your full name for the record?

A    Virgil Robert Byerly.

THE COURT:  How do you spell your last name?  I'm sorry.

THE WITNESS:  B-Y-E-R-L-Y.

THE COURT:  Thank you, sir.

Q    (By Mr. Butters)  Have you ever had any business relationship with an entity by the name of BAITA, B-A-I-T-A?

A    Yes, sir.

Q    Could you tell the jury what that relationship has been?

A    I was a member of BAITA Investment Properties, LLC.

Q    Okay.  I'm going to hand you a document, Exhibit 82, and ask you if you can identify that for the Court and the jury.

A    It looks like a credit enhancement document pertaining to the Ranch Lake development.

Q    Is that a development that you were involved in with BAITA?

A    Yes, sir.

Q    Do you recognize your name and signature at the end of that document?

A    Yes, sir.

969

Q    Let me -- if I could approach you.

A    Right here.

Q    At the last page?

A    Yes, sir.  For Byerly Barry Enterprises, which would be the member.

Q    Is that your signature?

A    It looks like it, yes, sir.

MR. BUTTERS:  I'm sorry, Your Honor.

THE COURT:  Yes, sir.

MR. BUTTERS:  I understand we have to keep them in order and then I take them out.

Q    (By Mr. Butters)  I'm going to also hand you a document that's in evidence and marked as State's Exhibit 83, but before I do, Exhibit 82, you say that is a document you signed in conjunction with a --

A    It appears to be my signature.

Q    Yes.

A    It's -- it's been a long time, but yes, it appears to be.

Q    As you look through that document, is that a BAITA investment deal that you were involved in?

A    Appears so, yes, sir.

Q    Okay.  If you look at Exhibit 83, which is entitled "Credit Enhancement" and Exhibit 82 is also entitled "Credit Enhancement"; correct?

A    Yes, sir, they look --

Q    And do they appear to be dated on the front page --

A    Let's see.

Q    -- at the top?

A    It's not so legible, but yes, it is January of 2002 so --

Q    Okay.  Would you look at 83, look at the back of it, and see if you see your name on it?

A    Well, sir, it says B. Byerly, and my name is Virgil. Bucky would be a nickname so --

Q    Did you sign that document, Exhibit 83?

A    Well, sir, I wouldn't sign "Bucky" to any official document that -- that I do, so I would say that is not my signature.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.  Any cross for this witness?

MR. SMITH:  If we would take a brief --

THE COURT:  Oh, that's right.  I'm sorry.  Yes. We're going to take a break for just a moment.  If you could stay with us, sir.

THE WITNESS:  Yes, sir.

THE COURT:  Ladies and gentlemen, you can step to the jury room for just a short break.

(The jury exits the courtroom at 2:24 p.m.)

971

Mr. Smith, do you think five minutes or so?

MR. SMITH: Yeah, five minutes.

THE COURT: Okay.

You can step down, Mr. Byerly, if you want to for five minutes and then you can come back in the courtroom.

THE WITNESS: Whatever you want me to do.

THE COURT: Whatever makes you more comfortable. You can either sit in that seat, which people don't always find the most comfortable seat, or you can go outside the courtroom.

We will take a break for five minutes, folks, and then come right back.

(Recess taken from 2:25 to 2:34 p.m.)

(Defendant and all parties present.)

THE COURT: Mr. Smith -- you can remain seated folks -- are you prepared to go forward now?

MR. SMITH: I am, Your Honor.

THE COURT: All right. Let's bring the jury back in, Mr. Mau.

(The jury enters the courtroom at 2:34 p.m. with all parties present.)

THE COURT: All right, Mr. Smith. You may continue.

MR. SMITH: Thank you.

CROSS-EXAMINATION

BY MR. SMITH:

972

Q    How are you doing?

A    Fine.  Thank you.

Q    You talked about BAITA Investment Properties, is that the term?

A    Yes.

Q    What was that:  BAITA Investment Properties?  Is that an LLC?

A    I believe so, yes, sir.

Q    Do you remember that?  I mean, I know --

A    I'm pretty sure it's an LLC.

Q    Okay.  What was the purpose of that entity?

A    Basically, we developed a shopping center and purchased some general partnership interests in three additional shopping centers.

Q    What was your role in BAITA Investment Properties, LLC?

A    I was actually -- I was a 100 percent member of Byerly Barry Enterprises, which is a member of BAITA Investment Properties, LLC.

Q    And was BAITA Investment Properties, LLC, formed for this Ranch Lake deal or for something else?

A    For that entire deal, yes.

Q    And did you join BAITA Investment Properties, LLC, for the Ranch Lake deal?

A    For all of the -- for all of those.  I kind of -- I

973

was not the initiator of the deal but I came in.

Q    Who was the initiator?

A    David put the deal together.

Q    Is that David Koleos?

A    Yes, sir.

Q    Okay.  So David Koleos put the deal together, and did he approach you about being a part of deal?

A    We had been speaking about it, yes, and so I came in as a member.

Q    And what was your -- what was the reason that you joined?  What was your role?

A    I joined because I felt like it was a good investment.

Q    And what did you bring to the table?  Did you bring experience?  Did you bring money?  Did you bring everything?

A    I brought a client to the table and I brought my own money.

Q    And was the client also someone who had been financing it then?

A    He was a equal partner with us in the beginning, and he eventually became the main partner.

Q    And the main partner, does that relate -- you use the word "main partner," is that --

A    The biggest interest partner.

Q    Financially?

974

A    Yes, sir.

Q    And he was your client?

A    He was a friend of mine, yes, sir.

Q    Okay.  So when you put your own money into this deal --

A    I did.

Q    -- you did so because you believed it was a good deal?

A    I did so, yes, sir.

Q    And you also -- did you bring it to the person who was a friend of yours and a client?

A    Yes, sir.

Q    And did you recommend it to that person?

A    I did.

Q    Okay.  And you actually brought to his attention the fact that this BAITA Investment Properties, LLC, deal might exist?  You told him all that?  You are the one that brought that --

A    He would have not known about it if it were not for me.

Q    Understood.  And you told him about it because you though it was a good deal?

A    Yes, sir.

Q    The documents that you were shown before, 82 and 83, do you still have those in front of you?

975

A    Yes, sir.

Q    Okay.  Do you remember the documents?

A    Not really, but that's -- looks like my signature on the one.

Q    Okay.  It looks like your signature?

A    I mean, we're going back 11 years ago.

Q    Understood.

A    But I'm pretty sure -- we had a stack of documents, and, I mean, it looks legitimate to me, but it's been a long time.

Q    Okay.  So it's fair to say that you don't have an independent recollection of document 82 or 83?

A    A vague one.  I mean, an equity enhancement -- I know that I signed something in regards to an equity enhancement, but, you know, if you put this and you change three words on it and I read through it, I probably wouldn't be able to identify the three words but I do remember signing something that pertained to an equity enhancement deal, yes, sir.

Q    Okay.  So my question is you remember signing something that related to a -- used the word equity enhancement?

A    I'm sorry, credit enhancement.  Sorry.  That was a misnomer, but that's what I always called it.  I guess I was mislabeling it.

Q    No worries.  So you signed something that you

976

remember being credit enhancement related in connection with --

A    I do have a recollection of that now, and this -- yes, this does look like my signature.

Q    Okay.  And you're saying it looks like your signature on 82?

A    On number 82.  Let me double-check that for you. Yes, sir.

Q    Okay.  And I believe you testified that in legal -- you have a nickname of Bucky; is that right?

A    My nickname is Bucky, and most people call me that, yes, sir.

Q    Okay.  But in legal documents you don't sign --

A    I don't sign Bucky, no.  No, sir.

Q    Okay.  In other types of documents do you sign the name Bucky?

A    Not that I know of.  I mean, I'm sure I've done it before, but I'm not -- credit card statements, everything that I can think of, I sign pretty much the same, so I -- I'm sure I have signed Bucky Byerly on something but I couldn't recall and tell you exactly when, was the situation was.

Q    Okay.  But my understanding from your testimony, as it relates to number 83, was that on legal documents that that was B. Byerly.  Am I pronouncing your last name correctly: Byerly?

A    Byerly, yes, sir.

Q    Okay, sir.  B. Byerly, but that that's not something you would normally you would --

A    No, sir.

Q    -- sign an on official --

A    Nothing official I would sign with Bucky because, I mean, that's really a nickname.  It's not my given name.

Q    And the way that you would sign something official would be through --

A    Yeah, it's kind of chicken scratch, but it's -- it would look something like what's here with kind of this "V" with -- it would be this "V" with a kind of cross back through it.

Q    "B" with a --

A    No, "V," I'm sorry.

Q    "V."

A    Yes.

Q    So what's your full name?

A    Virgil Robert Byerly.

Q    Okay.

A    So yes.  Sorry, I meant to say V, not B, just in case you were asking.

Q    All right so --

A    So that's -- but, to me, the documents look identical.

Q    Okay.  So official documents you signed --

978

A    They would be not identical, but they look -- if you didn't show me the signature, I wouldn't have remembered enough to be able to differentiate between the two.

Q    Understood.  So official documents you sign with a "V" with kind of a scribble, chicken scratch?

A    Yeah.

Q    And maybe in other times that you can't totally recall in nonlegal or official documents, you might sign "B" or "Bucky."  Is that -- am I understanding that right?

A    Probably not, but I'm sure it's happened at some point in my life, but I don't think -- I normally don't do that, but yeah.

(Defendant's Exhibit Number 7 was marked.)

Q    (By Mr. Smith)  Okay.  I'm going to show you an exhibit we're going to mark as Defense Exhibit 7.

MR. SMITH:  Your Honor, I don't have an extra copy for the Court, but if I can pass this up for the Court to see for a moment, would that be okay?

THE COURT:  Sure.  Absolutely.

MR. SMITH:  If I may approach the witness.

THE COURT:  Yes, sir.

Q    (By Mr. Smith)  Here you are, sir.  Would you please take a look at Defense Exhibit 7.  The front page of this letter, sir, the top left-hand corner is something printed that says Seyfarth Shaw, does it not?

979

A    Yes, it does.

Q    And you understand Seyfarth Shaw to be a law firm in town here?

A    I recall Seyfarth Shaw, yes.

Q    I'm sorry?

A    Seyfarth Shaw.

Q    You understand them to be a law firm in town?

A    Yes, sir.

Q    And are you familiar with that firm in connection with the --

A    I am.

Q    -- BAITA investment Properties?

A    Yeah.

Q    How are you familiar with that firm?

A    They were the ones that were -- I think they held a signing at Seyfarth Shaw, if I remember correctly.

Q    The official legal signing for the deal?

A    Yes.

Q    Okay.  And this is a letter that is sent from Seyfarth Shaw or Seyfarth Shaw dated January 11th, 2002; correct?

A    That's what it says.

Q    Okay.  And looking at the front of that letter, do you understand what the purpose is of that letter?

A    Conflicts of interests letter.

980

Okay.  I don't recall this letter but --

Q    Am I reading it right that it says, "As you know" -- "Gentleman, as you know, this firm represents BAITA Investments in connection with a loan from First Union National Bank" --

A    Right.

Q    -- "in the amount of 3,400,000 connection with acquisition by BAITA Investments of a 99 percent interest in Ranch Lake and in connection with the acquisition of certain general partnership interests owned by BAITA International, which general partnerships," -- yada, yada.  Right?  Did I read some of that right up until the --

A    Yeah.  I see the signature page and --

Q    Did I read the first page right, because I'm still on the first page?

A    Oh, sorry.

Q    Did I read the first page right?

A    Could you say it one more time, please?

Q    I won't read it again, but if you could --

A    I see what it says, yeah.  I just want to confirm --

Q    You'd agree with me that this is a legal document from a law firm in connection with this deal; correct?

A    Might be.

Q    Might be?

A    I mean, I don't remember it, but yeah, it could have -- could have happened.

Q    Okay.  And the "re" line says, "Ranch Lake BAITA Investment properties and Byerly Barry Enterprises," does it not?

A    The which line?

Q    The "re" line, regard.  I'm still on page one.

A    It says, "Chapman Property Buyers Advisors and Byerly Barry Enterprises."

Q    Do you see that there?

A    Yes, sir.

Q    Okay.  And if you look at the signature on the back, your signature is back there, is it not?

A    One of them looks like it could be mine.

Q    And how is that signed, that signature?

A    Virgil R. Byerly.

Q    Is there another signature on there?

A    There is.

Q    And how is that signature signed?

A    It says Bucky Byerly.

Q    Did you sign that?

A    I don't think I would have signed it, "Bucky Byerly," but, like I said, I can't recall, but something is off with this, but I couldn't tell you what.

Q    Something is off from this sign --

A    I don't know why I would sign one Bucky Byerly and one Virgil R. Byerly.

982

Q    So you think you might not have signed Bucky Byerly on this letter from Seyfarth Shaw but signed Virgil Byerly below?

A    Looks like it could be my signature.  It's a little bit different, but it's possible it could have happened, like I said.

Q    What's possible?

A    It's possible that I could have signed this, but it doesn't make any sense to me but it's possible.

Q    Why would it not make any sense to you?

A    I'm just -- I just haven't signed any official documents, that I can recall, Bucky Byerly.

Q    When you're saying it doesn't make sense because you wouldn't have signed an official document, you're agreeing with me that -- or you would agree with me this is an official document in the way that you use that term, right, a letter from a law firm --

A    Yeah.

Q    -- in connection with a deal --

A    Yeah.

Q    -- referring to $3.4 million and other types of things?

A    Yeah.  Doesn't make any sense to me, but I don't know.  Yep.  But it appears to be my signature on there.

Q    Which one?

983

A    The one that says -- under "Bucky Byerly" where it says, "Virgil R. Byerly," and then it says, "Byerly Barry Enterprises, LLC, by its manager, Bucky Byerly." Well, it looks like "Bucky Byerly." It looks like something but -- it's very strange because this one looks like mine but this one doesn't but --

Q    The one you're saying "this one" --

A    Like I said, I can't say if it's mine or not, but I don't believe it is.

Q    You don't believe that the signature on the Seyfarth Shaw letter is yours, the one that says "B. Byerly"?

A    It could be but I don't know. I don't think so.

Q    Do you feel the same way about that signature as the one you were talking about on Exhibit 83?

A    Yeah. It doesn't look like my signature.

Q    So neither one -- the one on Exhibit 83 or the one on Defense Exhibit 7 from Seyfarth Shaw --

A    Well, this Virgil R. Byerly looks like my signature.

Q    Mm-hmm.

A    So, I mean -- I don't know why they would have -- maybe they put it -- they could have asked me to sign it that way or something and maybe I did, but I don't remember -- I don't recall this at all, but that -- I mean, this looks like my signature underneath here.

Q    The "Virgil."

984

A    Yes.

Q    But not the "Bucky"?

A    It doesn't.  But it could be.  As far as I know, I don't ever sign anything official "Bucky."

Q    So Exhibit 83, that could be, too, just like Exhibit 7; right?

A    Doesn't look like me.  I just -- I mean, I'm not saying it is or it isn't.  I'm just saying I can't believe that that's me.

Q    Do you feel the same way about Defense Exhibit 7?

A    That one is maybe a little bit closer to my handwriting.

Q    Do you know it's yours?

A    I don't know it's mine, no, sir.

Q    Do you know whether the one on Exhibit 83 is yours?

A    I don't think it's mine.

Q    Do you know it's not yours?

A    I mean, you could show me all my signatures from 11 years ago and I don't think I could tell you definitively if any of them are mine or not mine, but what I can tell you is that, as a rule, I don't sign "Bucky Byerly."

If it's -- this document is a little bit perplexing to me because it says "Bucky" and "Virgil."

Q    That's Defense Exhibit 7 is a little perplexing?

A    Right.  So I don't know what to say to that, but the

writing on this looks or appears a little bit like mine, I would say, but I don't know.

Q    Okay.  Thank you.

A    Okay.

THE COURT:  Any additional questions?

MR. BUTTERS:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. BUTTERS:  Yes.

THE COURT:  Thank you, sir.  You may be excused.

You can just leave them right there.

The State may call its next witness.

MR. BUTTERS:  David Collier.

THE COURT:  Thank you, sir.  If you will come all the way across the courtroom to the bailiff over there, he will direct you up the witness stand.

Thank you.  Watch your step there.

If you would, before you're seated, if you would place your left hand on the Bible there and raise your right hand for me, please.

DAVID COLLIER,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT:  You can be seated.  If you would, just pull the chair up close enough to the mic so everybody can hear.  That should be fine right there.  Thank you, sir.

986

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Mr. Collier, would you please state your name for the record?

A    Curt Michael Collier.

Q    And where do you live?

A    I live at 683 Hillpine Drive, Atlanta.

Q    Back in the year 2002 were you employed at First Union?

A    Yes, I was.

Q    In what capacity?

A    I was senior vice president of commercial real estate lending.

Q    And do you recall working on a loan involving BAITA Investment Properties?

A    Yes, I do.  They were a client of mine.

Q    Okay.  I'm going to -- I'm going to hand you -- who did you deal with at that time?

A    My -- really, my primary -- really, my main contact there was David Koleos.

(State's Exhibit Numbers 188, 189, 219, 220, and 221 were marked.)

Q    (By Mr. Butters)  Okay.  I'm going to hand you documents 188, State's Exhibit 188 and State's Exhibit 189, State's Exhibit 219, 220, and 221.  And if you would just take

987

your time and look through those and tell the Court and the jury what those are about.

A    Okay.  The first document is --

Q    Exhibit number what?

A    188.

Q    Okay.

A    And this is a -- looks to be a standard First Union unconditional guarantee.  It's pretty typical of a document that was signed when a loan was being guaranteed by an individual or an entity for a loan for the money that we extended to someone.

Q    And according to that document, what individual or entity was guaranteeing the loan?

A    This was made between BAITA Investment Properties and Consultinvest, Inc.

Q    Okay.  Is there a signature page where it is signed on behalf of Consultinvest Inc.?

A    Yes, there is.

Q    And can you tell us who signed it on behalf of Consultinvest?

A    Consultinvest, Inc., signed it, by Paul Jannuzzo, chief executive officer.

Q    And Exhibit 188, would that be a document that was maintained in the ordinary course of business of First Union with respect to the subject matter contained therein?

988

A    Yes, it was.

Q    And would it have been part of the ordinary course of business of First Union to maintain such a document?

A    Yes.

Q    And would the document reflect the transactions that occurred on or about as shown in the document?  In other words, I think it's dated January 5th of 2002.  Is that when the company would have maintained that document?

A    Yes.  Yes, it is.

MR. BUTTERS:  Your Honor, I move to tender in evidence State's Exhibit 188.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

Q    (By Mr. Butters)  Now, could you continue on and tell the jury what State's Exhibit 189 is?

A    189 looks like a standard security agreement that -- it looks like between Consultinvest and First Union.

Q    Excuse me.  I didn't mean to interrupt you.  Go ahead.

A    I was just looking --

Q    Does it appear that that's related to the same loan or transaction?

A    Yes, it would.

Q    Okay.  And would that be a document that First Union

989

would have kept in the ordinary course of business with respect to the loan?

A    Yes.

MR. BUTTERS:  Your Honor, move to tender into evidence State's Exhibit 189.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

Q    (By Mr. Butters)  Now, could you turn to State's Exhibit 219, which I think is also in front of you.  Could you tell the jury what that is?

A    This is a normal control agreement whereby First Union or at least the borrower in this transaction is asserting that they have deposit accounts that the bank is seeking to maintain a probably collateral assignment against.

Q    Okay.  And is that document signed on behalf of Consultinvest?

A    Yes.  By Consultinvest and by First Union, by me.

Q    Okay.  And who signed it on behalf of Consultinvest?

A    By Consultinvest, Inc., by Paul Jannuzzo as chief executive officer.

Q    And was 189, which I think you just talked about, was that also signed by Paul Jannuzzo on behalf of Consultinvest?

A    Yes, it was.

Q    Now, if you could, turn -- I believe it's to the last

990

or -- strike that.

Was Exhibit 219 -- would that have been a document that First Union maintained in the ordinary course of its business with respect to the loan?

A    Yes.

MR. BUTTERS:  Your Honor, I move to tender into evidence State's Exhibit 219.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

(State's Exhibit Number 219 was marked.)

Q    (By Mr. Butters)  Now, if you would look at Exhibit 220, and could you tell us what that is.

A    This is a -- this is a control agreement.  It appears that First Union was taking collateral assignment of money to secure a loan; however, that money was in another account.  It was -- it was an account maintained by a financial institution other than First Union.

Q    Okay.

A    In this case, Prudential Securities.

Q    Prudential?

A    Correct.  And this is a document that -- basically, it is a tri-party between the borrower between First Union and between Prudential that basically maintains that everyone cooperates and kind of -- and maintains these functions stay in

991

tact because they are being used or being pledged as collateral for a loan that was extended by First Union.

Q    Okay.  And would Exhibit 220 have been kept in the ordinary course of business by First Union with respect to the loan?

A    Yes, it would.

MR. BUTTERS:  Your Honor, move to tender in evidence State's Exhibit 220.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

(State's Exhibit Number 220 was marked.)

Q    (By Mr. Butters)  Now, if you look at 220 --

MR. BUTTERS:  May I approach and just look at that?

THE COURT:  Yes.

THE WITNESS:  220 what?

Q    (By Mr. Butters)  221.  Sorry.  Let me find -- the numbers may be off a little bit.

On Exhibit 220, which is in evidence, it says, "Neither trading nor payment of interest or dividends permitted."  Could you tell the jury your understanding of what that means with respect to that document?

A    Well, it means that, I think, the loan amount that was extended by First Union was $3.4 million.

I don't know or I didn't see exactly how much was in

the account, but basically I believe that loan was we took a piece of property as collateral, but maybe that property -- the value on that property wasn't sufficient to collateralize the loan, so we additionally took and it was offered to us to take, I guess, a securities account with some amount of money in it.

And that control agreement basically -- it should spell out -- specifically state that you cannot trade in that account or you cannot make distributions out of that account to benefit anyone else other than First Union as long as that -- as long as that money was being held by the bank as additional collateral on the loan.

Q    And your understanding is that the collateral that was held in that account, that's -- you're talking about the Prudential account?

A    That is correct.

Q    And whose -- what's your understanding as to who owned the collateral in that Prudential account?

A    I understand it would be Consultinvest.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.

Any cross-examination?

CROSS-EXAMINATION

BY MR. SMITH:

Q    How are you doing, Mr. Collier?

A    Fine.  Thank you.  How are you?

Q    I'm doing okay.  Would it be fair to say that no one could read all of these documents that you just went through and not know that Consultinvest had pledged assets in connection with this deal?

A    Yes, that would be fair.

Q    Okay.  Thank you.  Have a nice afternoon.

A    Thank you.

THE COURT:  Anything else from this witness?

MR. BUTTERS:  No, Your Honor.

THE COURT:  May he be excused?

MR. BUTTERS:  Yes.

MR. SMITH:  Yes.

THE COURT:  Thank you very much, sir.  You may be excused.

You may call your next witness.

MR. BUTTERS:  Yes.  David Koleos.

THE COURT:  I'm sorry.  I missed that, Mr. Butters.

MR. BUTTERS:  David Koleos.  I'm sorry.

THE COURT:  Sir, if you will come all the way over to where the bailiff is standing back there, the man with the badge, and he'll direct you up to the witness stand, please.

Before you sit down, sir, if you would, place your left hand on the Bible over there and raise your right

994

hand for me.  Thank you.

DAVID KOLEOS,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT:  Thank you, sir.  You can be seated.  And just make sure you pull up close enough to the mic so everyone can hear.  Thank you, sir.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Would you please state your name for record, please.

A    My name is David Koleos.

Q    Good start.

A    Sorry, Your Honor.

THE COURT:  As long as you don't take the call, it really is not as bad.

THE WITNESS:  Sorry.

THE COURT:  That's all right.  No problem.

And can you spell your last name for me, please.

THE WITNESS:  Yes, Your Honor.  It's K-O-L-E-O-S.

THE COURT:  Thank you very much.

Q    (By Mr. Butters)  David, where do you live?

A    I live in Alpharetta, Georgia.

Q    Okay.  Could you tell jury your educational background.

A    I have three baccalaureate degrees from Florida State

University. One in accounting, finance, and management information systems. And I'm a certified public accountant in the state of Georgia. And that's the sum total of my educational experience.

Q   Okay. And were you involved with an organization by the name of BAITA back in approximately 2002?

A   Yes, I was.

Q   Could you tell the jury kind of your history of your involvement with BAITA?

A   In 1995 I accepted a position as the chief financial officer of BAITA Real Estate, Inc. And BAITA had a number of sister companies, and BAITA was -- it's main thrust was investment in retail shopping centers.

And we had -- and development of retail shopping centers, and we got a lot of -- we sourced our equity money from German investors. And so I became a CFO there in 1995 until January of 2000.

Subsequent to January of 2000, I went and did my duty in the dotcom enterprise and then I started my own company, a investment management company specializing in retail real estate in -- I started that in January of 2001. And at that time we incorporated as a Meridian Property Management, LLC.

Q   I didn't hear that. You incorporated as what?

A   As Meridian Property Management.

Q   Meridian?

996

A    Meridian, yes.  M-E-R-I-D-I-A-N.

And then myself, Bucky Byerly, and another individual started BAITA Investment Properties, and we invested in three of the remaining commercial real estate properties at BAITA and one development.  And that was in January of 2002.

Q    Okay.  I'm going to hand you a document that's been marked as State's Exhibit 82 entitled a "Credit Enhancement, Profits Interest and Loan Assumption Agreement."  Do you recognize that document?

A    Yes, I do.

Q    Is that a document that involves BAITA Investment Properties?

A    Yes, it is.

Q    And does it also involve BAITA Real Estate, Inc., that you were talking about or just BAITA Investment Properties?

A    Just BAITA Investment Properties.

Q    Okay.  And that's the one that you got involved with in January of 2001 is BAITA Investment Properties, if I understood you?

A    That's correct.

Q    Okay.  And would you look at the back of that document and tell the Court whether or not you signed that document.

A    I did.  I signed in my capacity as the president and

997

manager of BAITA Investment Properties and as the president of Chapman Property Advisors, LLC.

Q    Okay.  What other entities appear to have signed that document?

A    Byerly Barry Enterprises, LLC, which was -- the two members at that time in BAITA Investment Properties was Chapman Property Advisors, LLC, and Byerly Barry Enterprises, LLC.

Q    Okay.  Any other entities sign that document?

A    No.

Q    Can I take a look at it?

So if I am hearing you correctly, at the second-to-the-last page you have identified who signed it under the term "Borrower"; is that right?

A    Correct.

Q    And look at the last page.  Does it appear to be signed under "Participant" and "CCI"?

A    Yes.  This was the other entities that were to participate in this particular agreement, and they were Consultinvest, Inc., and Captive Consultants, Inc.

Q    And is that a document that you signed?

A    Yes, I did sign this document.

Q    Okay.  And to the best of your knowledge, did the others sign that document also whose names appeared to have signed it?

A    Bucky Byerly signed this document, and Paul Jannuzzo

signed this document.

Q    Okay.  Is that a document that BAITA Investment Properties kept in the ordinary course of business with respect to the transactions involved in that document?

A    Yes.

Q    Was it part of BAITA Investment Properties' business to keep such documents as part of its business records?

A    Yes.

MR. BUTTERS:  Your Honor, I move to tender into evidence State's Exhibit 82.

THE COURT:  Any objection?

MR. SMITH:  No, sir.

THE COURT:  It's admitted.

Q    (By Mr. Butters)  Now, I'm going to hand you State's Exhibit 83, which is in evidence, and put in front of you State's Exhibit 82, which was just -- just went into evidence, and ask you if State's Exhibit 83 was signed by you.

A    I did not sign this.  This is not my signature.

Q    Is there a signature on there that purports to be yours?

A    Yes.

Q    Now, have you reviewed and compared State's Exhibit 82 with State's Exhibit 83?

A    Yes, I have.

Q    And could you tell me under that comparison whether

999

there's any difference in what type of return the -- let me look at the page.

Well, let me back up.  82 and 83 both appear to be signed by Consultinvest; is that correct?

A    Correct.

Q    And they both appear to be signed by Consultinvest by Mr. Jannuzzo; is that correct?

A    That is correct.

Q    Is there any difference in the financial reward that Consultinvest would achieve under Exhibit 83 versus 82 based on your comparison?

A    Yes.

MR. SMITH:  Your Honor.  Objection, leading.  The witness is being asked to just compare the two documents.  That's not an opinion area.  He's asked about his signature.  I understand that.  But if he's just saying read two of them and tell me about specific areas, then he's leading.  We object as to leading.

THE COURT:  Overruled as to leading.

Q    (By Mr. Butters)  Okay.  Go ahead.  Could you tell us your understanding as to the -- how those documents differ with respect to Consultinvest?

A    State Exhibit 83 is -- the underlying terms and conditions of the agreement were altered.  They are different from State's Exhibit 82, the one which I signed.

1000

The overall -- the original intention -- and this is the agreement -- the rules by which we would play by.

Q    You're talking about 83?

A    I'm talking about 82.  The original was supposed to be a 50/50 split of net cash proceeds from the transactions that were to occur in this document.

Here in State's Exhibit 83, among other things, this limits the distribution of proceeds between the parties to $725,000 in section 4b, and that was not the original intent of this agreement, of State's Exhibit 82.

This -- State's Exhibit 83 is a forged document.

Q    It is -- this involves a shopping center in Florida; right?

A    In part, yes.

Q    Okay.  And it involves real estate investment; correct?

A    That is correct.

Q    Okay.  Is the deal over?

A    The deal is over now; correct.

Q    And you're familiar with how the deal played out; correct?

A    Yes.

Q    Okay.  Can you tell the jury in your estimate the difference between what could have gone to Consultinvest in terms of dollars and cents under those two different

agreements, if you know?

A    Yes.  Under the original agreement, the cash that would have been distributed to Consultinvest would have been $3,031,000.

Q    Okay.  And what about under the other one?

A    It would have been limited or capped at 725,000.

Q    Okay.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.  Any cross-examination for this witness?

MR. SMITH:  One moment, Your Honor.

THE COURT:  Yes, sir.

CROSS-EXAMINATION

BY MR. SMITH:

Q    Mr. Koleos, how are you doing?

A    Fine.  Thank you.

Q    Exhibit Number 83 -- do you still have those in front of you?

A    Yes, I do.

Q    Do you know where that came from, Exhibit 83?

A    No, I do not.

Q    Who showed it to you?  Who first showed that document to you?

A    It was shown to me by John Butters.

1002

Q    John Butters?

A    Mm-hmm.

Q    The gentleman sitting over my left shoulder?

A    Yes.

Q    Okay.  When did you first talk to Mr. Butters?

A    He came to my office in Roswell, Georgia, with another detective from Cobb County.

Q    Do you remember who the detective was?

A    It was Keith -- I can't remember his last name.  They came to my office.

Q    Okay.

A    It was at that meeting that they showed me this document.

Q    Keith Harrison?

A    I'm sorry?

Q    Detective Harrison?

A    Yes.  Yes.  Keith Harrison.

Q    I got that wrong earlier.  I wanted to make sure it was right.

Okay.  So Detective Harrison and Mr. Butters came.  Approximately when did that happen; do you remember?  Months ago?  Years ago?

A    2008.  Somewhere in 2008.

Q    And this document was shown to you by Mr. Butters at that meeting?

1003

A    Yes.

Q    And when I say "this document" I mean Exhibit 83.

A    That's correct.

Q    You had no idea where that came from, you personally?

A    No idea.

Q    You don't know who created it?  You don't know?

A    It wasn't me.

Q    Okay.  But you don't know who did it?

A    I have no idea.

Q    You had never seen it before the first time it was shown to you by Mr. Butters?

A    Never.

Q    Did Mr. Butters tell you where he got it?

A    I can't recall specifically.

Q    Okay.  Have you talked with Mr. Butters or Detective Harrison since that meeting in 2008?

A    Certainly.  Yes.

Q    Have you talked with anyone else about this case since then?

A    Yes.

Q    Who else have you talked to?

A    Mr. Core.

Q    Who is that?

A    I'm sorry.

Q    Who is Mr. Core?

A   Bob Core.

Q   Who is Bob Core?

A   He's an attorney from Alexandria, Virginia. Washington, D.C.

Q   When did you meet with Bob Core?

A   I met with Bob Core -- he came to my office with Mr. -- or was it with Keith Harrison. I can't remember. It was either -- I believe it was -- no, it was Mr. Butters. Mr. Butters and Mr. Core came to my office.

Q   Do you remember when chronologically Mr. Butters and Mr. Core came to your office?

A   Probably early 2009.

Q   Okay. So it was after you first met with Butters and Detective Harrison?

A   That is correct.

Q   Okay. And when Butter -- Mr. Butters and Mr. Core came to your office, did they just want to talk about this document, Exhibit 83?

A   No. We talked about a host of other documents.

Q   I see. And did Mr. Butters and/or Mr. Core, did they bring documents with them for you to look at?

A   Yes.

Q   And then you looked at them?

A   Yes.

Q   And you talked with them about it?

1005

A    Yes.

Q    How long did you meet with Mr. Butters and Mr. Core in 2009?

A    Maybe an hour, hour and a half.

Q    Do you remember if anybody took notes?

A    Not that I can recall.

Q    Okay.  So in 2008 you first met with Mr. Butters and Mr. Harrison, and did they come to your office as well?

A    Yes.

Q    Okay.  And then you met with -- the next people you met with in this case would be in 2009 when you met with Mr. Butters and Mr. Core at the same time?

A    That's correct.

Q    After that meeting in 2009, did you have any other meetings in connection with this case?

A    Yes.

Q    Who else did you meet with?

A    I met with Mr. Butters and Mr. Core here sometime in the October of 2011 time frame.

Q    Was that the next meeting that you had involving this matter since 2009?

A    I believe so, yes.

Q    And when you say "here," where did you meet in October 2011?

A    In the offices here, at the D.A.'s office.

1006

Q    Okay.  The D.A.'s office.

A    Yes.

Q    How do you know to come --

A    Not this -- here.

Q    Sure.  How did you know to come to the D.A.'s office?

A    They asked me to come here.

Q    When you say "they," who is "they"?

A    John Butters.

Q    Okay.  So John Butters called you?

A    Or sent me an e-mail.

Q    Okay.  So you corresponded with Mr. Butters by e-mail about this case?

A    I can't specifically recall, but normally -- it was either by phone or by e-mail.

Q    Did you correspond with Mr. Core by phone or e-mail about this case?

A    Yes.

Q    We'll get into that.

But in 2009 -- I'm sorry.  In 2011, then, you were here and you met at the D.A.'s office with Mr. Butters.  He contacted you somehow and asked to you come here?

A    Yes.

Q    Okay.  And you came to the office and met with the receptionist and then went back into the D.A.'s office area; correct?

1007

A    That's correct.

Q    Did you go to a conference room, or where did you meet?

A    It was a conference room.

Q    Who was present?

A    Mr. Butters and Bob Core.

Q    Where was Detective Harrison?

A    For whatever reason, he could not attend the meeting.

Q    Did they tell you that, or he just wasn't there?

A    I didn't really inquire.  He wasn't there.

Q    Okay.  So you don't know whether he could have attended or not.  He just wasn't there?

A    I'm sorry.  I have no idea.

Q    Okay.  And how did you know -- when was -- how was Mr. Core first introduced to you?

A    Him and Mr. Butters came to my office.

Q    And how was he introduced to you?  Did they identify who he was?  How was he introduced; do you remember?

A    Not specifically, no.

Q    In October of 2011 you had a meeting with Mr. Butters and Mr. Core upstairs in the D.A.'s office?

A    Correct.

Q    Okay.

A    Yes.

Q    Since that meeting, did you -- have you met with

anybody else in connection with this case again?

A    I met a second time with them here in -- like a couple weeks afterwards.

Q    Who did you meet with at that time?

A    Mr. Butters and Mr. Core.

Q    Upstairs in the D.A.'s office?

A    No.  Mr. Butters, in his office.

Q    And who was present?

A    Mr. Core.

Q    Okay.  So now we're -- first time was upstairs at the D.A.'s office in a conference room, and now we're in Mr. Butters' office?

A    It was a brief, very short meeting.

Q    Okay.  So there was a short meeting in Mr. Butters' office?

A    That's correct.

Q    His personal office.

A    That's correct.

Q    In there was you, Mr. Butters, and Mr. Core.

A    That's correct.

Q    And where was Detective Harrison?

A    I have no idea.

Q    Okay.  Me either.  So after that meeting, have you met with anybody else in this case again?

A    No.  That would be it.

1009

Q    Those are the only times you met with people?

A    I believe so.

Q    Have you ever met with Bob Core alone in this case?

A    We went to lunch after the meeting with Mr. Butters.

Q    Just you and Bob Core?

A    Yes.

Q    Together?

A    Yes.

Q    Was anyone else present?

A    No.

Q    Have you had any telephone conversations with just Bob Core?

A    Yes.

Q    How many do you think you have had -- how many telephone conversations do you think you have had with Bob Core?

A    Three, maybe four.

Q    Do you remember the first one that you had with him, when that would be?

A    No, not really.  No.  I mean, I guess, shortly after the meeting with John Butters.  I mean, he's an ex-Marine, I'm an ex-Marine.  We -- we --

Q    Get along?

A    Yeah.  I would say that.  He's an American hero, so I just -- we had a lot to talk about.

1010

Q    I see.  You have a lot of respect for him?

A    Very much so, yeah.

Q    And did you have e-mails with him about this case?

A    Yeah.  I mean, he would ask me things that were out of -- I had left BAITA and so I didn't have any direct knowledge and I would tell him I had no direct knowledge of this or he would need to contact this person if he wanted to follow up on that.

Q    Did Mr. Core ever tell you what his role was in this case?

A    Specifically?

Q    Yeah.  Did he ever tell you --

A    That he was assisting Mr. Butters.

Q    And that's how you understood his role to be, assisting Mr. Butters?

A    I don't know who his specific client was.  I assumed it was Mr. Glock, but I had no direct knowledge of that.

Q    How many conversations have you had with Detective Harrison?

A    Keith?  I don't know.  I mean, Keith would call me, like, at 10:30 at night.  He called me a lot.

Q    Okay.  So Detective Harrison would call you sometimes along -- just the two of you?

A    Yes.  At all hours.

Q    And sometimes Mr. Core would just call you alone?

1011

A   No.  He mainly e-mailed me.

Q   Mr. Core did?

A   Yes.

Q   About matters relating to this case?  Yes?

A   Well, yes.

Q   Okay.

A   Some matters related to this case.

Q   I didn't ask you if it was all matters.  But he e-mailed you sometimes about matters relating to this case?

A   Yes, about some matters relating to this case.

Q   Why did you assume that Mr. Core represented Mr. Glock?

A   The subject matter of this case.

MR. SMITH:  Thanks.  Have a good afternoon.

THE COURT:  Mr. Butters, any redirect for this witness?

MR. BUTTERS:  No, Your Honor.

THE COURT:  May he be excused?

MR. BUTTERS:  Yes.

THE COURT:  Thank you, sir.

MR. SMITH:  Your Honor, could we just have one moment?

THE COURT:  Hold on one second.  You were that close.

MR. SMITH:  Can we have a sidebar?

THE COURT:  Just one second, folks.

(A bench conference was held off the record at 3:26 p.m.)

THE COURT:  Actually, what we're going to need to do, ladies and gentlemen, is take a break for just a moment so that we can do something outside of your presence.

I am going to have to ask the witness to stay just for a few minutes, and then you can step outside the courtroom if you want to while we do that, but it's only going to be about five minutes and then we will return and finish up with this witness.

Thank you.

Yes.  If you want to step out -- folks, we are going to need you back in about five minutes, okay, so just stay close.

Thank you, sir.

(The jury exits the courtroom at 3:26 p.m.)

THE COURT:  I will be back on the bench in about five minutes.

MR. SMITH:  Thank you, Your Honor.

(Recess taken from 3:26 to 3:35 p.m.)

(Defendant and all parties present.)

THE COURT:  Would you mind asking the witness to step back in?  Thank you.

Mr. Mau, you can bring the jurors in.

(The jury enters the courtroom at 3:35 p.m with all

parties present.)

THE COURT: You may continue.

(Defendant's Exhibit Number 8 was marked.)

MR. SMITH: Yes, sir. I'm going to pass out what's marked as Defense Exhibit 8. I have showed a copy to Mr. Butters.

THE COURT: Yes, sir.

MR. SMITH: May I approach the witness, sir?

THE COURT: Yes, sir.

Q    (By Mr. Smith) I want to hand you what's marked as Defense Exhibit 8. Do you know what that document is?

A    If you will give me just a second.

Q    Take your time and read through it.

A    Okay.

Q    Do you know -- that's a UCC Financing Statement; correct?

A    That is correct.

Q    And this UCC Financing Statement -- who is the name of the creditor, the creditor or the entity that has interest that's being protected or being notified about -- by this financing statement?

A    It says the secured party's name is Consultinvest, Inc.

Q    Okay. And is the purpose of a financing statement to put others on notice of an interest that an entity has, a

1014

security that an entity has?

A   In this case, the specific interest in which it had a collateral right.

Q   And that specific interest is the collateral right with the loan with Consultinvest; right?

A   Technically, no, not this.

Q   Explain.

A   Because the financing statement covers the debtor's respective member interest.  The member interest is different from any indebtedness.

Q   So what does this financing statement cover?

A   Exactly what it says here, Debtor's respective member interest in the following:  BAITA Investment Properties, LLC. It was a pledge of a member interest --

Q   I see.

A   -- as additional collateral for the indebtedness.

Q   And the reason you file a financing statement is to take steps to protect the interest that you have and ensure that others know you have that interest; right?

A   In this case, it would protect us from pledging the member interest to another party.  That's the purpose of this.

Q   And who does this protect, the financing statement?

A   This protects exactly the secured party, Consultinvest.

Q   To protect Consultinvest?

1015

A    Consultinvest, Inc., in this case.

Q    I understand.

(Defendant's Exhibit Number 9 was marked.)

Q    (By Mr. Smith)  I'm showing you what's been marked as Defense Exhibit Number 9.

MR. SMITH:  If I could pass a copy to the Court, Your Honor, marked as Defense Exhibit 9.  If I could show this to the witness.

THE COURT:  Yes, sir.

Q    (By Mr. Smith)  Look up, sir, once you have had an opportunity to review that.

A    Okay.

Q    Have you had a chance to take a look at that document?

A    Yes.

Q    And what is that?

A    It's a memo to Paul Jannuzzo from myself dated March the 18th, 2002.

Q    And do you recognize that document?

A    Yes.

Q    That's something that was written by you?

A    That is correct.

Q    There's handwriting on there.  Do you recognize the handwriting?

A    It's not my handwriting.

1016

Q    Okay.  The memo -- is it fair to say the memo refers to -- in part to a request that you provide -- that a life insurance policy be taken out on you?

A    That is correct.

Q    What entity was requesting that a life insurance policy be taken out on you?

A    I believe it was Consultinvest, Inc., according to this.

Q    Okay.  And the reason that an entity in an investment deal would take a life insurance out on a key man or a principal player is to protect that entity's interest in the investment; right?

A    That's correct.

Q    And you were a key man or key player in this deal; correct?

A    Correct.

Q    And it would be understandable why an entity that had an investment in this deal would want to protect its interest through a life insurance policy on you because you were the man in this deal, so to speak?

A    If I met my untimely demise; that's correct.

Q    Yes.  Okay.

MR. SMITH:  I'd move that -- Defense Exhibit Number 9, Your Honor, into evidence subject to the handwriting because I don't believe he recognized that.

1017

THE COURT:  Any objection?

MR. BUTTERS:  No objection.

THE COURT:  It's admitted subject to redaction.

And I'm sorry.  What was the number on that?

MR. SMITH:  That was Defense Exhibit 9.

THE COURT:  Thank you, sir.

MR. SMITH:  May I approach, Your Honor?

THE COURT:  Yes, sir.

MR. SMITH:  May I approach the witness, sir?

THE COURT:  Yes, sir.

Q   (By Mr. Smith)  Okay.  Have you had a chance to look at Defense Exhibit 10?

A   Yes.

Q   Do you recognize the signature on that document?

A   That's the only thing I recognize.

Q   And what's the signature?

A   Peter S. Manown.

Q   The typewritten writing in that is in German, isn't it?

A   Correct.

Q   Okay.  That's why you don't recognize -- certainly don't recognize those other things in there?

A   That is correct.  I don't speak or write German.

Q   Okay.  Well, the top line there -- it looks like a fax header.  Do you see that there?

1018

A    Yes.

Q    And what is that -- that's in English; right?

A    That's correct.

Q    And what does that say?

A    It says, "Meridian Property."

Q    And what is Meridian?  That's your business?

A    Yes, that was my business.  He faxed this from my business, I suppose.

Q    And did Mr. Manown work at your business or with your business?

A    When he got laid off, I gave him an opportunity to hang his shingle and work independent of the company.  He did not work directly for the company.  But evidently he used my fax machine.

Q    Okay.  Well, did he work in that office sometimes?

A    Occasionally, yes.

Q    And that's where your fax machine was located, in that office?

A    Yes.  Yes.

Q    Okay.  Now, just very briefly, with respect to this deal that we have been talking about that Mr. Butters was talking to you about, Consultinvest was a participant in that deal; is that right?  Is that how you would define their role, the role of the entity --

A    Yes.

1019

Q    -- as a participant?

And CCI was involved in the deal because you were trying to make good on a debt of the former BAITA real estate; isn't that true?

A    Who is CCI?  I'm not following you.

Q    If you look at the -- hold on one second.  If you look at Exhibit 82 --

A    I don't have Exhibit 82.  I have 8, 9, and 10.

Q    Take a look at Exhibit 82.  I believe Mr. Butters showed that to you earlier.

A    Okay.  I understand.  CCI is who you are referring to as Captive Consultants, Inc.

Q    And that's captioned CCI in that document; isn't it?

A    Yes.

Q    Parenthesis --

A    Correct.

Q    -- quote, CCI?

A    Correct.

Q    Okay.  Well, CCI was involved in this deal because you were trying to make good on a debt of the former BAITA real estate through CCI; isn't that right?

A    If CCI was the lender to BAITA Real Estate, Inc.

Q    So if CCI was the lender to BAITA Real Estate, Inc., then it would be correct that CCI was involved in this deal to make good on a debt of the former BAITA Real Estate; is that

right?

A   Bear with me for a minute.  It might be -- I believe that's correct.  There was an amount, and I'm not certain of the amount, but by the close of this transaction this was to help recover portions of an amount that was lent to BAITA; that's correct.

Q   By CCI?

A   I believe it's by CCI; correct.

Q   Okay.

MR. SMITH:  I don't have any other questions, Your Honor.  Thank you.

THE COURT:  Is there redirect?

MR. BUTTERS:  Yes, Your Honor.  Just very briefly.

(State's Exhibit Number 89 was marked.)

REDIRECT EXAMINATION

BY MR. BUTTERS:

Q   I'm going to hand you State's Exhibit 89.  Can you identify that?

A   This is a wire transfer advice dated June 25th, 1998, between BAITA Capital Reserve and Bank of America.

Q   Okay.  Is that a document that BAITA would have kept in the ordinary course of business?

A   Yes.

Q   And is that a transfer that you directed, according to that document?

A    According -- yes.

Q    Okay.  And --

MR. BUTTERS:  Well, Your Honor, I'll move to tender into evidence State's Exhibit 89.

THE COURT:  Any objection?

MR. SMITH:  Yes, Your Honor.  Object to foundation. I don't know that the witness has laid the proper foundation to testify that he remembers this document and what this type of transaction is.

And we would object unless he wants to lay more of a foundation where it came from.

THE COURT:  Sustained.

Q    (By Mr. Butters)  Okay.  Is this a document that is maintained in the business records of BAITA?

A    Yes.

Q    And was it part of BAITA's ordinary course of business to maintain such a document?

A    Yes.

Q    Would this be a document that was generated by BAITA?

A    Yes.

Q    And was it part of the ordinary course of business of BAITA to generate such documents?

A    Yes.

Q    And was this document generated at your direction?

A    I believe it was.  Yes.

1022

Q    And is that because your name appears at the bottom of it?

A    Yes.

Q    And does your name appear at the bottom of it as chief financial officer?

A    Yes, it does.

MR. BUTTERS:  Your Honor, move to tender into evidence State's Exhibit 89.

THE COURT:  Any objection?

MR. SMITH:  Just to the extent I think it's a two-page document.  It looks like there's handwriting on the second page.

MR. BUTTERS:  I think it's just one.  I will be glad to show it to you.

MR. SMITH:  If it's just 6340, we don't have an objection.

MR. BUTTERS:  It's 6340.

MR. SMITH:  Okay.

THE COURT:  All right.  It's admitted.  Thank you.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Anything else from this witness, and may he be excused?

MR. BUTTERS:  By the State, yes.

MR. SMITH:  Yes, Judge.

THE COURT:  Thank you.

You may be excused, sir.

You may call your next witness.

MR. BUTTERS:  Donna Pitcher.

THE COURT:  Thank you.  Ms. Pitcher, if you would, come all the way across the courtroom and past the bailiff over there, this gentleman with the badge on, and he'll direct you up to the witness stand.

Once you get up there, if you want to set that stuff down, you're welcome to.

After you set that down, if you wouldn't mind, please place your left hand on the Bible and raise your right hand.  Thank you, ma'am.

DONNA PITCHER,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT:  Thank you ma'am.  Just make sure you're close enough to the microphone so everyone can hear you.

THE WITNESS:  Okay.

THE COURT:  That should be fine.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Good afternoon.  My name is John Butters.  Would you please take a moment and tell the jury your name.

A    At the time that I was with the former company that

1024

went under that handled all these transactions I was Donna Walker.

Q Donna Walker?

A Right. And I remarried in 2006, so my name is now Donna Pitcher.

Q And were you -- did you at one time hold a position with BAITA Real Estate?

A Yes.

Q Could you tell us what position you held and for how long?

A Okay. I started there in 1996.

Q Okay.

A And initially I went there as a temp for Reto Schneider, who was the president and CEO. Then before I left there as a temp, they asked me to stay and work for the CFO.

Q Who was that?

A David Koleos.

Q And what did you do for David Koleos?

A Correspondence. We would do a lot of proposals with brochures that we would create on different properties.

There were, I'm guessing, probably 12 properties at least that we handled, and each property had its own accounts that had to be handled. And then we also -- accounting was under us, so they reported to us so we intermingled with the accounting department.

Q     Do you recall having any, in the course of working there for Mr. Koleos, any involvement in Ranch Lake Development?

A     I sure do.

Q     You do?

A     Mm-hmm.

Q     Okay.  Are you familiar with the payments that BAITA would have made with respect to the Ranch Lake?

A     I think I have copies in an envelope 1 brought, but yes.

Q     Okay.  Do you recall -- feel free to refer to something if you need to refresh your recollection.  But first of all --

MR. SMITH:  Your Honor, I object to that.  That's not the proper foundation.

He can ask the witness questions, and if he establishes a foundation for refreshing her recollection then we'd like to know what's being shown to the witness so we can see it and then she can look at it, and if that refreshes her recollection she can certainly testify to it from memory.

THE COURT:  Sustained.

MR. BUTTERS:  I planned to do that, Your Honor.

THE WITNESS:  This would be wiring instructions.

Q     (By Mr. Butters)  Pardon me?

A    This would be wiring instructions.

Q    Okay.  Before --

THE COURT:  I agree with what you're saying, so I don't know if that's sustained.  It's not really an objection, but I sustain that to the extent that if she needs to look at something you can certainly see what it is.

MR. BUTTERS:  I'm sorry, Your Honor.

Q    (By Mr. Butters)  Do you recall BATTA wiring money to Mr. Jannuzzo with respect to the Ranch Lake deal?

A    Yes.

Q    What do you recall?

A    We were given several accounts to wire money to.  The accounts were primarily in the Cayman Islands.  There was one either in Austria or right in that area that we had to wire to.  And frequently Mr. Jannuzzo would get very agitated because he had an interest payment due.

Everything in our records reflected the loans, the Jannuzzo loans.  And when he would have a 60-, $80,000 interest payment due that month, he would get agitated if it wasn't ready and ask us to please have it couriered to his home.

Q    Would he communicate that to you?

A    Yes.  Because David Koleos had to direct accounting to either cut the check or wire the money.  And so I answered all of David Koleos' calls and frequently ended up with

1027

Mr. Jannuzzo on the phone.

Q    Okay.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.

Cross-examination?

CROSS-EXAMINATION

BY Mr. SMITH:

Q    Good afternoon.

A    Good afternoon.

Q    How were you first contacted about this case?

A    Actually, I believe it was from Mr. Glock's attorneys in New York or a Smyrna detective.  I'm not sure which.

Q    Okay.  When you say "Mr. Glock's attorneys in New York," who are you talking about?

A    Bob Core.

Q    Bob Core?

A    Mm-hmm.

Q    And when you are talking about a detective, who are you talking about?

A    Keith Harrison.  He was a Smyrna detective.

Q    Do you remember when you were first contacted about this case?

A    Late 2007, I think.

Q    Do you recall who contacted you first?

1028

A    I don't remember which one, because we worked so closely together.

Q    When you say "we worked so closely together," who are you referring to?

A    Mr. Core and Keith Harrison, the detective. The detective would hold certain things and Mr. Core would call and ask me to try to find something on the system. I have the entire records at my house. When BAITA went under, I got -- I was asked by the bankruptcy court to keep it all.

Q    Okay. How many times do you think you were contacted by Mr. Core?

A    Maybe four, five.

Q    How many times have you actually met with Mr. Core in person?

A    One time, I think.

Q    Just the first time, you think?

A    I think just that one time.

Q    Have you ever seen him again since that first time?

A    No.

Q    You just talked to him on the phone?

A    Actually, we talked on the phone. I saw him in person one time when he came to my house.

Q    Okay. Who came -- do you remember when that was Bob Core came to your house?

A    2008.

1029

Q   So that was after the first time you were contacted?

A   Right.

Q   Do you remember if that was the first time you ever met Bob Core?

A   It was, and I haven't seen him since so I wouldn't even know -- I wouldn't recognize him.

Q   Did he bring any documents to your house, or do you remember?

A   No.

Q   Did he bring the -- did he have questions for you?

A   He was looking for some documents that were in my system.

Q   Okay.  Did he come with Detective Harrison?

A   Yes.

Q   He did?

A   Mm-hmm.

Q   It was two of them?

A   And there was one other person that was with Mr. Core, and I don't remember his name.

Q   When was the last time you talked to Mr. Core?  Is that it?

A   I think I talked to him this morning.  He called to alert me to the fact that I would probably be getting a call to come here today.

Q   Mr. Core called you this morning?

A    I believe it was this morning.

Q    Did you receive a call from Mr. Butters this morning?

A    No.

Q    Did you receive a call from Detective Harrison this morning?

A    No.

Q    When is the last time you had a communication with Detective Harrison?

A    Probably 2009.  He came out with a hard drive for me to transfer documents pertinent to everything so he would have the same documents I had.

Q    1 sec.  Well, what did Mr. Core tell you when he called you this morning?

A    He just said that I would probably be called to come this morning but it shouldn't take very long, shouldn't be very long.

Q    Did he tell you anything else?

A    No.

Q    When is the first time you met Mr. Butters?

A    This morning.  Just now.

Q    So Mr. Butters never came out to talk to you with Mr. Core?

A    No.

Q    Mr. Butters never called you about this case?

A    No.  I don't remember who was with Mr. Core when I

1031

saw him, but he did have somebody with him.

Q    Do you know what Mr. Core's role is?  Did he tell you?

A    All I know is he is one of -- his firm handles some legal things for Mr. Glock.

Q    Mr. Glock personally?

A    I don't know if it's personally or the company.

Q    When you indicated that -- and what was the time period that we're talking about with BAITA that you'd spoken to Mr. Butters about --

A    With BAITA I started there in 1996 and in January of 2001 they were forced into involuntary bankruptcy.

Q    I see.

A    And that wasn't discharged until 2006.  The bankruptcy court said you have to maintain all these records, because there were only two people left there.

Q    Okay.

A    I said great.  I really didn't want to have a part of my house for records but I had to.

Q    Okay.  So from '96 to 2001, so we're talking roughly any of the substance that you talked about with Mr. Butters occurred no earlier than 11 years ago?

A    No earlier.

Q    Could have occurred later.  '96 to 2001; right?

A    Right.  And BAITA continued on because all the

partnerships that were involved in -- under it that had different properties. So it continued on until about 2001 or '02.

Q    Understood. When you testified in direct that there were times when money was wired to Mr. Jannuzzo's account -- do you remember saying that?

A    Mm-hmm.

Q    Yes?

A    Yes.

Q    Okay. And you had said maybe an account was in Austria or the Cayman Islands. You referred to both of those places; do you remember that?

A    We wired money several times, quite a few times, to the Cayman Islands. Austria one time.

Q    Okay. Do you know who the titleholder was of the accounts where the money was being sent?

A    I furnished the copies of the wiring instructions showing what bank account it went to and I traced back through the accounting to see basically how much had been paid from different partnerships because it involved quite a few partnerships.

Q    Okay. But do you know who the titleholder was of the accounts that the money was wired to? Do you understand what I mean by titleholder?

A    Right.

Q    Who was that?

A    One was Consultinvest.  One was CCI.  And FIIC. Those were the three.

Q    So when you testified on direct that money had been wired at times to Mr. Jannuzzo, what that included were wiring to accounts titled Consultinvest, CCI, or FIIC, to the best of your recollection?

A    Right.  Except the one to Austria.

Q    And what account -- who was the titleholder of the account in Austria?

A    I don't know.

Q    So when you testified on direct that money was wired to Mr. Jannuzzo, what you meant by that was that it was wired to Consultinvest, CCI, FIIC and maybe one time to some account in Austria but you're not sure how that's titled?

A    Well, each time we would get instructions from Mr. Jannuzzo --

Q    I understand.

A    -- telling us where to wire it.

Q    Okay.  What I'm trying to just make clear is when you testified that it went to an account -- I believe you did, I might be mistaken -- to an account of Mr. Jannuzzo, what you're saying -- I understand your testimony is you received instructions from Mr. Jannuzzo from time to time to wire money to accounts the titleholders of which you recall are

1034

Consultinvest, CCI, FIIC, and one time to Austria but you're not sure of the account holder.

A    Right. And on all of the documents we had Consultinvest and CCI. Mr. Jannuzzo was the principal in those.

Q    Okay.

A    And then all of the checks that were written were payable to Paul Jannuzzo.

Q    Okay. And how many checks were written; do you know?

A    There was one check each month written for interest. When a property would close, when it would be purchased, the original financing of about 80 percent on each property was arranged through a bank or whatever funding institution, and then there would be a gap not funded so Mr. Schneider with BAITA would seek a bridge financing to finish the rest of it, and that's primarily where Mr. Jannuzzo came in.

Q    I see. So wherever the money went, there was a direction provided to you by Mr. Jannuzzo?

A    Right.

Q    Okay. And when you had said before that you received documents and furnished them, who did you furnish them to?

A    To Detective Harrison. He brought me a blank drive and asked me if I would put all the documents on that drive so they could have them to look at and review, and so I went ahead and put them on there.

1035

Q    Did you furnish the documents to anybody else?

A    No.

Q    Just Detective Harrison?  Just Detective Harrison?

A    Detective Harrison.

Q    Okay.

MR. SMITH:  One moment.

THE COURT:  Yes.

Q    (By Mr. Smith)  Do you know a man by the name of Uli Hengler(sic)?

A    Uli Henzler.  I do.  He was over and he came from Europe.  He was a friend of Reto Schneider's and he came over to manage BAITA.  He was going to invest some money for a Dr. Lothar Hardt, H-A-R-D-T.

Q    I see.

A    And a condition was that he was going to oversee BAITA's spending, and only BAITA's spending, to try to bring it out of its financial problems.

Q    Was he a creditor, also?

A    No, he was not.

Q    He just worked there?

A    He got a fee for what he was doing.

Q    And when BAITA went into bankruptcy, you agree with me that BAITA had a handful of creditors, didn't it?

A    Well, the -- they were forced into involuntary bankruptcy by the original investors.  The company had been in

business about 20 years and there were four -- three or four major investors that had never been paid off.

Q    I see.  And BAITA was put into an involuntary bankruptcy?

A    Right.

Q    That's when the creditors forced the company into bankruptcy because they are owed money when the debtor hasn't paid; right.

A    Well, it was only those four that forced it.

Q    Okay.  What I am asking you, though, is that the four put BAITA into an involuntary bankruptcy because BAITA wasn't paying its debt to those four creditors; right?

A    Right.

Q    And that means, unlike a voluntary bankruptcy where an entity files it themselves, an voluntary bankruptcy is where the creditors say you haven't paid us, we need to go, we're filing bankruptcy on you, so to speak, is that fair?

A    That's fair.

Q    Okay.  And so you'd agree with me that there were a handful of creditors that were bugging Reto Schneider or at least contacting BAITA to try and get paid prior to the forcible bankruptcy; isn't that true?

A    No.  We didn't have a lot of creditors calling us, because he thought that he could wait to pay these people. They had -- they all had notes.  They had an interest in the

1037

company itself.

Q    I see, so but would you agree --

A    And he thought he had them at bay, so he wasn't worried about them.

Q    Who was he worried about?

A    He was just worried about the properties that he was developing and the ones he was buying.

Q    Isn't it true that Mr. Schneider would pay those creditors that kind of hounded him and gave him the hardest time, that when people would call and call repeatedly then he might make some of the payments on the debt?  Isn't that fair to say?

A    No.  When David Koleos left of BAITA -- before David left I was office manager as well, and after David left I had to be Reto Schneider's executive assistant, so I had to handle correspondence, incoming phone calls, and all of that type things.

Q    Okay.

A    And there were not calls from each one of them. That's what surprised us so much, because they all knew each other, they all decided, hey, we're not getting paid each month per our agreement, we get a payment here, a payment there, so we will just put them in Chapter Seven.

Q    By those four creditors?

A    By the those four.

1038

MR. SMITH: Okay. Thank you.

THE COURT: Any additional questions for this witness?

MR. BUTTERS: No, Your Honor.

THE COURT: May she be excused?

MR. BUTTERS: Yes.

THE COURT: Thank you, ma'am. You may be excused. You can just leave the documents right there, please.

THE WITNESS: Okay. These are just for my records.

THE COURT: Yeah, those are yours. You can take those with you.

You may call your next witness.

MR. BUTTERS: Mike Nations.

THE COURT: Thank you. I'm also going to stand up while we change witnesses.

Mr. Nations, if you will just come all the way across the courtroom and over to the bailiff there, he will direct you up to the witness stand.

Once you get up there, sir, before you sit down, if you would place your left hand on that Bible that's right there and raise you right hand, please. Thank you.

MICHAEL T. NATIONS,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT: You can be seated, and then just make

sure you're close enough to the microphone so we can hear you. That will fine right there. Thank you.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Mr. Nations, would you please state your name for the record.

A    It's Michael T. Nations.

Q    And Mr. Nations, would you please tell the jury your educational background and what degrees you have.

A    I went to college at Duke University. I think that's an AB or it might be a BA. I can never remember.

Q    Okay.

A    And law school at Harvard Law School.

Q    Okay. And since you got out of Harvard Law School, have you been engaged in the practice of law?

A    Yes.

Q    And are you engaged in the practice of law in the Atlanta area?

A    Yes, in the City of Atlanta.

Q    What is the name of your firm?

A    Nations Toman & McKnight.

Q    Okay. Was there a time that it was under the name of Nations Toman & Nutter?

A    Yes.

Q    Okay. Are you familiar with -- take you back in time

1040

back around 2001 with your law firm dealing with transactions involving BAITA.

A    Yes, I'm familiar with that.

Q    Just in a nutshell, could you kind of tell the jury what your law firm's involvement was.

A    Well, it was just coincidence that we were on the same floor in the Tower Place office building on Peachtree Street -- Peachtree Road, so we knew some of the BAITA people just from seeing them in the elevator.

We had a client, a citizen of Minorca, Dr. Lothar Hardt, who had some money he'd invested in some real estate partnerships that BAITA had sponsored. And he -- this was before we knew Dr. Hardt.

This is going back into the late '90s or early 2000 or something. And he was not receiving the payments or the interest payments regularly that he expected or was told to expect.

So we eventually were retained to assist in trying to just figure out what these partnerships were, what their financial status was, whether we could get some more additional security for Dr. Hardt and work toward getting him paid off.

(State's Exhibit Number 278 was marked.)

Q    (By Mr. Butters)  Okay.  I'm going to hand you a document that's been marked as State's Exhibits -- State's Exhibit 278 and ask you if you can identify that for the jury.

1041

A   Yes. That's a letter from me addressed to Paul Jannuzzo dated July 6th, 2001.

Q   And is that a record that your law firm would have generated and kept in the ordinary course of its business?

A   Yes.

Q   Was it part of your law firm's ordinary course of business to keep such a record?

A   Yes.

Q   And would it maintain -- would it generate and keep such a record at or about the time of the transactions reflected in this document?

A   Yes, that's correct.

MR. BUTTERS: Your Honor, move to tender into evidence State's Exhibit 272(sic).

THE COURT: Any objection?

MR. SMITH: No, sir.

THE COURT: It's admitted.

Q   (By Mr. Butters) Can you tell jury -- now that that's admitted, can you tell the jury, essentially, what is going on in that letter as you understand it?

A   This is dated in July.

Q   Of 2001?

A   Of 2001.

Q   Okay.

A   And it is a cover letter enclosing a statement for

1042

legal services during June.

Along the way in our representation of Dr. Hardt, he had a friend and business associate named Henzler from -- who lived in Switzerland. They were both Germans.

Henzler was sort of acting as Hardt's agent and trying to renegotiate some arrangements with BAITA and get additional security for Dr. Hardt, and then we would document -- like, if BAITA placed some more partnership units as additional securities, we would provide the documentation.

Somewhere along in the late spring or early summer, I think May or June of 2001, Mr. Henzler introduced us to Mr. Jannuzzo, and basically the issue was that Mr. Jannuzzo represented some people or he was affiliated with Glock.

Whether it was Glock corporate money or personal money or Mr. Glock personally wasn't sure, but the issue was that they also had a debt owed by BAITA and they also wanted some additional security.

Dr. Schneider, who was the head of BAITA, was apparently willing to grant them some additional security interest, and we had just prepared -- sort of slogged through these interlocking partnerships that BAITA had and figured all that out, and it was pretty efficient for us to take what we had done for Dr. Hardt and adapt it for Mr. Jannuzzo, so we checked with Dr. Hardt and it was fine with him because Dr. Hardt was going to be paid first and then Mr. Jannuzzo

would come after that, so there was no conflict.

Therefore, we prepared I think it was really a pledge agreement where BAITA pledged to Mr. Jannuzzo's people additional unencumbered partnership units, so that whenever they closed on that particular partnership or sold the shopping center that it was developing or refinanced it or whatever they were doing then Dr. Hardt would get some money off the top and then Mr. Jannuzzo, so this was a bill simply for that documentation.

Q    And this is document 278.  Was it -- was Exhibit 278, which appears to have the letterhead Nations Toman & Nutter, is that a document that your law firm prepared and maintained in the ordinary course of business?

A    Yes.

MR. SMITH:  Your Honor, we will stipulate to that document.

THE COURT:  All right.  Thank you.  It's admitted.

MR. BUTTERS:  Okay.  Thank you.

(State's Exhibit Number 293 was marked.)

Q    (By Mr. Butters)  And I'm going to hand you another document that's been marked as State's Exhibit 93(sic).  And can you identify this as a one, two, three -- four-page document?

If you could take your time and look through that see if you can identify that, for the four pages of that document.

MR. SMITH:  What's the number?

MR. BUTTERS:  293.

MR. SMITH:  93?

MR. BUTTERS:  293.

MR. SMITH:  Okay.  Thank you.

THE WITNESS:  Yes.  This is a series of e-mails, fax cover sheets I'm familiar with.

Q    (By Mr. Butters)  Okay.  Were these documents that are marked as State's Exhibit 293, were those documents maintained by your law firm in the ordinary course of business?

A    Yes.

Q    And were they generated by your law firm or received by your law firm in the ordinary course of business?

A    Yes.

Q    Particularly with respect to the e-mails, those were either generated or received by your law firm; is that correct?

A    Yes; that's correct.

Q    And the last page where Nations and Nutter name appears on it, that would have been a document generated in the ordinary course of your business?

A    Yes, it was.

MR. BUTTERS:  Your Honor, move to tender into evidence State's Exhibit 293.

THE COURT:  Any objection?

MR. SMITH:  Your Honor, to the extent that I do see

1045

an e-mail that's written -- appears to be written from Mr. Nutter --

THE COURT: Yes.

MR. SMITH: -- but then there's a facsimile that contains a bank record, so we'd object to the extent that the record of another bank is coming in as for the truth of the matter asserted as any sort of business record because it's not -- there's no custodian from the bank.

We understand a record from the bank was sent to him and he kept it, but that doesn't transform the underlying record into something different.

THE COURT: Mr. Butters.

MR. SMITH: That's the fourth page.

THE COURT: Let me take a quick look at that, Mr. Nations.

Mr. Butters.

MR. BUTTERS: Your Honor, the fourth page has a bank record on it?

MR. SMITH: That's what I have. I'll show you my four pages as I understood the exhibit to be.

MR. BUTTERS: I think yours is different than that.

THE COURT: The one that the witness has is two e-mail chains, and then those are separate -- two separate pages, and then two facsimile cover pages, so let me let you look at those and see if the objection is the same.

1046

MR. BUTTERS: May I may approach, Your Honor?

THE COURT: Sure.

Q (By Mr. Butters) Do you recognize -- there appears to be handwriting on the first page of Exhibit 293. Do you recognize that?

A Yes. That's my handwriting.

MR. BUTTERS: Your Honor. We move to tender into evidence State's Exhibit 293.

THE COURT: With that foundation, any objection?

MR. SMITH: No, sir.

THE COURT: It is admitted.

Q (By Mr. Butters) Okay. Would you tell the jury what's going on with respect to Exhibit 293.

A Well, as I said, we had billed for documenting some additional security back in June or July. In August, I guess it was, the latter part of August, BAITA -- I don't remember specifically if they sold the shopping center that the partnership owned or they refinanced it, but he had said -- Dr. Schneider had said they were going to be getting some money, and they did, and so he disbursed -- unrelated to this, there was a interest payment to Dr. Hardt that came to our escrow account and we wired it to Europe, but then we received some money on behalf of Mr. Jannuzzo's people.

Q And how much did you receive?

A The total, as I recall, was $57,000 or something like

that.

Q    Is the total reflected in Exhibit 278 that you looked at?

A    Well, this has to do with two wire transfers.  This was -- there was -- the total is -- I'm sorry.  The total was 58,650.

Q    Okay.

A    That was the total that was wired from BAITA into our escrow account.

Q    Okay.  And then in Exhibit 293, could you tell us what's going on with respect to that money that was wired into your escrow account?

A    Well, we had another bill to Mr. Jannuzzo that was $1,579.75, and he authorized us to first pay our bill, which we did.  That reduced the amount to $57,070.25.

And then he instructed us to wire $22,500 of that to one place and said that he would be back to us the next day or in a day or two with additional instructions for the balance.

Q    And according to this document, did you wire transfer -- or did you transfer $16,000 of that money?

A    Yes.  There was -- there was a misunderstanding, and I remember that, and it's reflected in here that we had -- we had paid our fee.  We had wired the 22,500.  We were awaiting instructions.

I particularly remember this because Mr. Jannuzzo had

said that he would be back to us the next day -- I think it was September the 4th -- but we didn't hear from him until the 10th, which wouldn't be significant except the next day was September the 11th, 2001.  And I remember some of these wire -- trying to think about these wire transfers while all of that was going on.

But there was a mistake, a minor mistake. Mr. Jannuzzo had told us to wire the balance in two sums of seventeen thousand five-hundred and sixteen thousand(sic), but when we added those up they were short about a thousand.

We had about a thousand dollars more than that.  So we emailed back and said we're actually holding a slightly larger number.

And he sent back word that -- well, as he said, all of life's problems should be so difficult.  Just make the 18 -- make it 18,000-odd that one transfer instead of 17.

So with that minor correction, we then sent the wire transfers as directed.

Q    And you sent up -- with respect to the wire transfers, you sent $18,000-some-odd to the Cayman Islands; is that right?

A    Well, it was to the Bank of America in New York.  And the instructions we had were -- for Mr. Jannuzzo were that the beneficiary bank was Cayman National Bank, and then there was for further credit to CCI and then an account number.

1049

Q    Okay.  And what about the 16,000, where was that transferred to?

A    As I recall, that was -- yeah, that was a local wire transfer to a Wachovia account in Atlanta, and we were instructed to wire that 16,000 to Wachovia for further credit to the Facility, Inc., Roman Numeral II, with that account number.

Q    Okay.  Did you know what the Facility, Inc., II, was?

A    No.  No, other than apparently a corporation.

Q    Okay.  But both of those wires were done pursuant to the instructions of Mr. Jannuzzo?

A    Yes.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.

Is there cross-examination for this witness?

CROSS-EXAMINATION

BY MR. SMITH:

Q    Afternoon, Mr. Nutter.

A    Nations.

Q    Just briefly.  The money that was in your law firm was -- Mr. Nations, I'm sorry.  The money that was in your law firm, it was in a trust account; correct?

A    Correct.

Q    And a lawyer's trust account is something that

1050

lawyers need to take very seriously and keep records of how money is put into the trust account and disbursed; isn't that right?

A    Correct.

Q    And when you receive instructions from a client to -- of how to disburse money from a trust account, that is something a lawyer understands that a law firm needs to keep a record of so that they can document how money was disbursed; right?

A    Correct.

Q    Because when money is in a trust account for a law firm, there are certain fiduciary responsibilities; correct?

A    That's right.

Q    So a client could not instruct a law firm to transfer money out of a trust account with any reasonable expectation that that wouldn't be documented where it went; right?

A    Absolutely.

MR. SMITH:  Those are the only questions I have, Your Honor.  Thank you.

THE COURT:  Anything else from this witness?

MR. BUTTERS:  No, Your Honor.

THE COURT:  May he be excused?

MR. BUTTERS:  That's right.  Yes.

THE COURT:  All right.  Mr. Nations, you may be excused.  Thank you.

Can counsel approach?  I have a quick question for you.

(A bench conference was held off the record from 4:31 to 4:32 p.m.)

THE COURT:  The State may call its next witness.

MR. BUTTERS:  Yes.  Officer Riester.

THE COURT:  Ladies and gentlemen, before this witness testifies, there's one quick matter that I need to take up outside of your presence with the lawyers, so if you wouldn't mind stepping to the jury room just for a minute, we will be right back with you.  Don't get comfortable is what I'm saying.

(The jury exits the courtroom at 4:33 p.m.)

THE COURT:  Officer, why don't you come on up to the witness stand.  All the way up to the second chair up there, if you would, please.

That chair is not made for people with a utility belt on.

OFFICER REISTER:  I remember.

THE COURT:  You may take it with you when you go.  It's that tough.

Officer, the reason that I wanted to speak with you just for a second before the jury -- before we begin your testimony is that there's been a previous ruling in this case with respect to some of the evidence that may come

out during your testimony and I wanted to caution you about that so that it wouldn't accidentally come out while we were talking with you.

I have ruled and told the parties that references to domestic violence and for this being a domestic violence call that you responded to is not something that the jury needs to hear in this case because that's not the allegations of this particular case.

And so Mr. Butters, if he asks you a question, I just wanted you to know he's not asking you to talk about that, and that would include anything that's directly related to the domestic violence.  In other words, things like injuries to the parties and that sort of thing.

I don't know how much more specific I can get with respect to the testimony that we may have with you, but those are the things that I have specifically excluded.

Does that make sense to you?

MR. BUTTERS:  And Your Honor, maybe this would help.

As I understood the Court's ruling, the Court was saying that the State could go into kind of -- could go into who called, that guns were seized, who -- where the guns were and things like that, but that not to refer to the -- not use the term "domestic violence" and not refer to pictures or descriptions of domestic violence.

THE COURT:  That is correct, except, I believe, with

1053

respect to who called. I assume you got a dispatch anyway.

OFFICER RIESTER: Yes. That's why I was there.

THE COURT: Right. And there -- you can certainly say. You can certainly say that you --

OFFICER RIESTER: I won't say for guns. It was just a surprise.

THE COURT: Right. You can certainly say that you were called and that once you arrived there on the call, you know, that you located guns and whatever your testimony would be with respect to removal of those guns from the premises.

MR. SMITH: If I could just add, Mr. Butters, we fought about that pretty hard and it was absolutely not who called. That was not a part of the stipulation. It was received a call.

THE COURT: And that's what I'm saying. Yes. That you received a call but not who called. That would not be something that was a part of it.

Okay. And if at any point during the testimony you are unclear about whether you should go into something, all you have to do is turn to me and say, "I'm not sure if that's -- if I know what you're asking," and I'll send the jury out for a moment and we can clarify just so that we don't get into some issues that I have already ruled on.

1054

MR. SMITH: As I understand it, Your Honor, then, it's a lead-in that the officer received a call and came to that location.

I mean, from what I understand the Court's ruling, that's the extent of anything prior to arriving at the location and that there's just not to be any testimony about the other aspects of the location other than the issue related to the gun.

THE COURT: Sure. As I said, I assume you got a dispatch from somebody and you went to the location as a result of this dispatch, so you can certainly say that but just don't say what the nature of the call was that you were called out to. Does that make sense?

OFFICER RIESTER: Sure.

THE COURT: I think that will do it then. Like I said, if you have any questions about whether you should go into something --

OFFICER RIESTER: Okay.

THE COURT: -- you can turn to me.

All right, Mr. Mau, you can bring them back in.

(The jury enters the courtroom at 4:37 p.m. with all parties present.)

THE COURT: For once, ladies and gentlemen, I was relatively accurate about how short the break would be. That's the first time that's happened in this case, so

1055

thank you.

I'm sorry. I have not sworn in the witness. Would you place your left hand on the Bible and raise your right hand for me, please. Thank you.

OFFICER KATIE RIESTER, APD, having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT: Now you may proceed, Mr. Butters.

MR. BUTTERS: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. BUTTERS:

Q   Would you please state your name for the record.

A   Katie Riester.

Q   And your last name is Riester?

A   Yes.

Q   Did your last name change fairly recently?

A   Almost three years ago.

Q   Okay. That's recent to me. What was your name, last name, prior to Riester?

A   Ahearn.

Q   Okay. I take it you got married. Congratulations.

A   Thank you.

Q   Now, at or about August of 2002, did you receive a call to report to a location in Ansley Park on the Prado?

A   I believe it was '07.

1056

Q    Excuse me.  I'm looking at it but I'm not saying it.

A    '07, yes.

Q    In about August of 2007 did you receive a call?  And thank you for correcting me.

A    No problem.  Yes, I did.

Q    Okay.  And did you go to that location?

A    Yes.

Q    And can you tell us whether the defendant, Mr. Jannuzzo, lived there?

A    Yes.

Q    He did live there?

A    Yes.

Q    Okay.  And when you were at that location, did you observe guns in the location?

A    Yes, I did.

Q    Was it a condominium?  Is that what it was?

A    Yeah.  It was an apartment type condo looking -- yeah.  It wasn't a single house.

Q    Would you tell us what guns you observed and what, if anything, you did with them.

A    I definitely remember observing in the bedroom a long gun in the corner and other guns scattered about on top of --

Q    In what bedroom?

A    -- dressers, in the -- in the living room, in the bedroom.

1057

Q   Was there more than one bedroom?

A   There was more than -- in the child's room there was -- in the daughter's room, yes, there was.

Q   What kind of gun was in there?

A   A long gun.  I don't know exactly what kind but --

Q   It wasn't a handgun?

A   Correct.

Q   Did you -- at the time that you were there, did you gather up the guns and take them back to the police station?

A   We took them to property, yes.

Q   Yes.  And by whom are you employed?

A   City of Atlanta.

Q   City of Atlanta police.  And you were at that time of this call?

A   Yes.

Q   And so you took the guns back to City of Atlanta property?

A   Yes.

Q   Okay.  And what did you do with them?

A   Turned them in to property as evidence.

Q   Okay.  And once they are turned in to property as evidence, are they -- what happens in terms of reporting them or keeping track of them?

A   You fill out a log with specific serial numbers that are on each gun, and they keep track -- they file that and put

1058

it in the computer.

Q    Okay.  And then if somebody were trying to locate a gun, is that information put in any system that would allow officers or people in other --

A    Yes.  GCIC.  It's entered into -- well, before they are entered into property, they are ran through GCIC to see if they are stolen or anything like that.

Q    Okay.  And could you tell the jury what GCIC is?

A    Georgia Crime Information Center, I'm pretty sure.  It's been a while since the academy.

Q    Okay.  And were these guns run through GCIC?

A    Yes.

Q    And were there any -- did any of them come up as -- on GCIC?

A    They are ran after the fact, after I leave.

Q    So you just turn them in and then they do that?

A    Yes.

Q    Okay.  Do you know how many guns were gathered up?

A    I had -- my trunk was full, so I don't remember exactly how many.

Q    Do you have any recollection of any specific guns as to the, like, type and make?

A    I know there were quite a few long guns.

Q    Okay.  I just want to know what you remember.

A    Mm-hmm.

1059

Q    Okay.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.

Cross-examination.

MR. SMITH:  We don't have any questions, Your Honor.

THE COURT:  All right.  May this witness be excused?

MR. BUTTERS:  Yes.

THE COURT:  All right.  Thank you.

You are excused.

Mr. Butters, pursuant to our conversation at sidebar, the State's next witness you think will be --

MR. BUTTERS:  Chad Mathis and --

THE COURT:  And that's one of the witnesses that --

MR. BUTTERS:  If they want --

THE COURT:  Mr. Smith, that was one of the witnesses that Mr. Citronberg wanted to deal with; is that --

MR. SMITH:  I think if we could, Your Honor, we'd like to put Mr. Mathis on tomorrow.

THE COURT:  Ladies and gentlemen, step back to the jury room for me one minute and let me confer with the lawyers about something and we will get right back to you. Thanks.

(The jury exits the courtroom at 4:44 p.m.)

THE COURT:  It's just difficult at sidebar for me to

understand everything everyone is saying.

The four remaining witness that are on the State's witness list, those are -- are those all witnesses, Mr. Smith, that you would like to request that the Court pushes to tomorrow, or is there any one of those witnesses that we might could take up today?

I know Detective Harrison, obviously, is for tomorrow, and Mr. Balsam, I think, is your expert. He would be tomorrow as well.

What about Mr. Carl Walter? I don't recognize his name.

MR. SMITH: We would prefer that one to be tomorrow.

THE COURT: Tomorrow as well.

MR. SMITH: Is that the last one?

MR. BUTTERS: Yeah. The State has no problem with putting all four of those witnesses tomorrow and I anticipate the State, assuming we start at 9:00, will be done very quickly.

I would say -- it's not stamped in stone but I would think we would be done, if they're not -- there's not much cross-examination, we would be done within two hours.

THE COURT: All right.

And you gentlemen have obviously indicated, the defense at least -- I know Mr. Citronberg, said the other day he anticipated a motion that might take some time once

the State rests, and so we'll try to work it so that perhaps we could do some of that during the lunch break and let the jury take a long lunch break and then maybe that will give me some time to rule on everything and figure out where that leaves us, so I think that makes sense. I don't have any problem with stopping now and --

MR. SMITH: Also, so the Court's aware, I did serve Mr. Core with another subpoena, so there's going to be questions, so if that's something the Court would like to address today, we could do that. If you'd like to address it in the morning --

THE COURT: Probably the first thing in the morning. I'll let Mr. Core check on the documents and see if there's anything else that he needs to deal with.

Was it only for that one specific category, or did you ask something else, too.

MR. SMITH: It was -- not that one specific category. That was one of the categories. The other three were more specific.

I don't know if it goes against the Court's ruling. If it does, then obviously the Court will rule appropriately on the other three.

THE COURT: That's fine.

MR. SMITH: I can pass it up to the Judge.

THE COURT: Yeah. I was going to say if we could

just have a copy of that so that when we get to it I'll be prepared to take it up tomorrow. We'll touch on that tomorrow.

MR. SMITH: It did have a return date today, but obviously until tomorrow morning is -- that certainly -- we'll do that to the extent the Court wants to address it at that time.

THE COURT: Sure.

MR. BUTTERS: Your Honor, are we going to -- I need to let the witnesses know, are we were going to start at 9:00?

THE COURT: Yes, 9:00 tomorrow morning. Thank you.

All right. I think let's bring in the jurors and I'll let them know what we're doing for today.

(The jury enters the courtroom at 4:47 p.m. with all parties present.)

THE COURT: Thank you, folks. I have spoken with the lawyers about what we need to complete for tomorrow and where we are currently in the case, and I think that what we are going to do at this point is stop for the day today and begin tomorrow morning with the next few witnesses that the State has stated it intends to call tomorrow morning, so that means that we have ended the testimony for today.

Same instructions that I have given you in the past

1063

days will apply tomorrow. And what I anticipate -- again, I'm sort of projecting forward, but what I anticipate tomorrow is that we will take some witnesses.

We may have a somewhat lengthy lunch break because there, I think, are some legal issues that the lawyers will deal with during the lunch break tomorrow, so it may be a little bit longer for you folks than usual so that we can do those things outside your presence but keep moving the case forward.

And then, as I indicated to you, again trying to prepare for, from my perspective, a worst case scenario, if you could make some arrangements in case we had to go late on Wednesday, Thursday, and/or Friday evenings, that will give us a little bit of flexibility based on where I think we are in the case.

And so I would request that you try to do those and then let me know if there are issues through the bailiffs or let the bailiffs know if there are issues and I'll try to bring those to the lawyers' attention and we will address them.

But again, I thank you all sincerely for all your attentiveness and your cooperation. And we will release you. We will ask you to be back to the first floor tomorrow at 9:00 a.m.

Hopefully everyone will be feeling better tomorrow,

and all of you will be as healthy as you've been today. So we will see you at 9:00 tomorrow morning.

Thank you, folks.

(The jury exits the courtroom at 4:49 p.m.)

THE COURT:  I will see you folks at 9:00 tomorrow morning as well.

Thank you very much.

(Proceedings adjourned at 4:50 p.m.)

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF COBB:

I hereby certify that the foregoing transcript was taken down as stated in the caption, that the witnesses were first duly sworn, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing volume 6, pages 817 through 1065 represent a true, correct, and complete transcript of the evidence given upon said hearing.

Items which may have been either tendered or admitted into evidence on the date of this hearing have been retained by the office of Superior Court Clerk pursuant to policy of Jay Stephenson, Clerk, Cobb Superior Court, and are therefore not attached to this transcript.

And I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This certification is expressly withdrawn and denied upon the disassembly and/or photocopying of the foregoing transcript or any part thereof unless disassembly and photocopying is done by the undersigned court reporter and original signature and official seal attached thereto.

This, the 9th day of July, 2012.

KATHLEEN J. SHERWOOD, RPR, B-2039
My Commission Expires the
17th day of October, 2012

1066