# Exhibit 2

# Part 10 of 19

Pages 1067-1158

IN THE SUPERIOR COURT OF COBB COUNTY

STATE OF GEORGIA

STATE OF GEORGIA,                    )
                                     )
        Plaintiff,                   ) CRIMINAL FILE
                                     ) NO. 09-9-2603
        vs.                          )
                                     ) DAY 6
PAUL F. JANNUZZO,                    ) VOLUME 7
                                     ) FEBRUARY 28, 2012
        Defendant.                   ) PAGES 1067 TO 1250

JURY TRIAL OF PAUL JANNUZZO

FEBRUARY 28, 2012

THE HONORABLE C. LATAIN KELL, SR., PRESIDING

Cobb County Superior Court
Marietta, Georgia

APPEARANCES OF COUNSEL:

On Behalf of the Plaintiff:     John Butters
                                Assistant District Attorney

On Behalf of the Defendant:     Robert Citronberg, Esq.
                                John DaGrosa Smith, Esq.

Kathleen J. Sherwood, RPR, CCR, B-2039
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia  30090
(770)528-1872

1067

VOLUME 7

FEBRUARY 28, 2012

PAGE/VOL

KATIE RIESTER

Redirect Examination by Mr. Butters (continued)        1179 v7

Recross-Examination by Mr. Smith                        1186 v7

JAMES C. MATHIS

Direct Examination by Mr. Butters                      1097 v7

Cross-Examination by Mr. Citronberg                    1103 v7

KARL WALTER

Direct Examination by Mr. Butters                      1108 v7

Cross-Examination by Mr. Citronberg                    1116 v7

Redirect Examination by Mr. Butters                    1135 v7

Recross-Examination by Mr. Citronberg                  1137 v7

K. K. WROZIER

Cross-Examination by Mr. Butters                       1187 v7

Cross-Examination by Mr. Smith                         1191 v7

Redirect Examination by Mr. Butters                    1193 v7

R. K. HARRISON

Direct Examination by Mr. Butters                      1200 v7

Cross-Examination by Mr. Citronberg                    1218 v7

PLAINTIFF'S EXHIBITS

                                                  Marked    Admitted

Exhibit          Description

                                                  1179 v7   1181 v7

  501    Incident report

                                                  1181 v7   1183 v7

  502    Photograph of gun

                                                          1068

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 503 | Photograph of gun showing tag | 1183 v7 | 1184 v7 |
| 504 | 12/13/07 "Item Detail by Bar code" document | 1184 v7 | 1186 v7 |
| 505 | Smyrna Incident Report | 1189 v7 | 1190 v7 |
| 506 | 12/14/07 Supplementary Investigation Report | 1190 v7 | 1190 v7 |
| 507 | Chain of Custody Report | 1201 v7 | 1206 v7 |
| 600 | White Box, .45 LaFrance gun inside | 1207 v7 | 1209 v7 |
| 601 | Bench Warrant | 1215 v7 | 1216 v7 |

DEFENDANT'S EXHIBITS

| Exhibit | Description | Marked | Admitted |
|---|---|---|---|
| 11 | Recorded statement | 1122 v7 | |
| 12 | Brief with photographs attached | 1153 v7 | |

1069

P R O C E E D I N G S

(February 28, 2012, at 9:06 a.m. in open court with all parties present.)

THE COURT: Mr. Citronberg, welcome back, sir.

MR. CITRONBERG: Thank you, Judge.

THE COURT: Hope you're feeling all right. I'm about half speed today, so we'll keep pace with each other.

Mr. Butters, are you feeling a little better today, too?

MR. BUTTERS: I am, Your Honor. Thank you.

THE COURT: Good. Maybe we will all be able to keep pace with each other today.

The jury is not quite upstairs yet. I think they may be waiting on one other person, but I thought I'd come out and see if there were any preliminary issues that we needed to deal with today.

Mr. Butters, you got anything that we need to --

MR. BUTTERS: Not from the State, Your Honor.

The only thing I would ask, Your Honor, is the State is planning on -- it's looking like it will be Mr. Chad Mathis, Karl Walter, Detective Harrison, and Robert Balsam. Before Robert Balsam I would ask that we could take a break before he testifies, because I need an easel and to set up an easel.

THE COURT: That's fine. Shouldn't be a problem with

1070

taking a short break before him.

Anything preliminarily from the defense?

MR. CITRONBERG: Yes, Judge. We'd like to have our expert to be able to -- you have already ruled on Mr. Balsam.

THE COURT: Right.

MR. CITRONBERG: But also for the -- I'm not sure what Detective Harrison is going to get into, but I think we probably need him in on Detective Harrison depending upon what Detective Harrison talks about.

MR. BUTTERS: That's fine with the State, Your Honor.

THE COURT: All right. Well, then he can stay in here on Detective Harrison as well.

Anything else preliminarily we need to talk about?

MR. SMITH: I think late in the day, Your Honor, we provided the Court with a courtesy copy of the revised subpoena to Mr. Core.

THE COURT: Right.

MR. SMITH: We had it due yesterday, as the Court knows, and said that we could address it this morning.

THE COURT: Sure.

MR. SMITH: I haven't yet seen Mr. Core. But --

THE COURT: I haven't either. Once he gets here, I'll address the issues with him of compliance with the subpoena and we'll see what we can do about that.

1071

MR. CITRONBERG: One second, Judge.

THE COURT: Yeah.

MR. SMITH: Your Honor, also with respect to -- I think there will be a series of entry issues I think are going to come up today with certain of the witnesses.

THE COURT: Okay.

MR. SMITH: One of them, Karl Walter, who is -- I believe is going to be the second or third witness today, it's our understanding that Mr. Walter would -- the State may seek to introduce a statement made by -- allegedly made by Mr. Jannuzzo that does not relate to any of the acts alleged in the indictment and for -- based on the prior brief that we submitted, we would seek to exclude that statement because it's not relevant to any of the acts alleged.

And to the extent that the Court would seek to include that as other examples or other acts in furtherance of the alleged RICO count, we'd note that those other bad acts were not provided to us ten days prior to the start of trial as required by Uniform Superior Court Rules.

So we have not even been provided with a list of any other types of acts, nor have we been put on notice through the indictment of what we believe that the prosecution will ask Mr. Walter to testify to, and we

1072

think that would violate our client's due process, and a curative instruction would not be sufficient.

THE COURT: You kind of got me at a disadvantage because I don't know what the witness is going to testify about and all of you probably do, so that may be something that I will need to hear a proffer on or something along those lines. I don't know. But I will ask Mr. Butters -- maybe you can enlighten me a little bit about what that would be.

MR. BUTTERS: Your Honor, I would think this might be a good time to take it up --

THE COURT: That's fine.

MR. BUTTERS: -- because I would anticipate calling him first or second.

THE COURT: Okay.

MR. BUTTERS: And I will need for defense counsel to articulate what he's talking about, because right now I don't know what acts he's talking about.

THE COURT: Okay. Well, just, yeah, enlighten me a little bit, because that will certainly help, Mr. Smith, and tell me what the statement is that you anticipate that witness would have.

MR. SMITH: Well, I believe that, based on the -- what we have received in discovery that there's going to be a statement that Mr. Walter is going to -- I mean,

1073

instead of the kind of guessing games, I mean, perhaps Mr. Butters can let us know what the purpose is of this witness, and if part of the purpose is to repeat the statement that he was told, that's what we're talking about.

MR. BUTTERS: I don't know what you're talking about.

THE COURT: Tell me what the statement is, Mr. Smith, just so --

MR. SMITH: I don't have the exact language.

Do you know what it is, Bob, the exact language of the statement?

THE COURT: Or just get me in the ballpark so I can understand what it is we're talking about and then --

MR. SMITH: We're looking back through his interview.

THE COURT: Okay. Sure.

MR. SMITH: Your Honor, there's a statement in Mr. Walter's interview.

MR. BUTTERS: Is there a page?

MR. SMITH: That's on Bates number is 50879. It's page 14, the top left-hand corner. And the statement that was made to Detective Harrison, according to the subjective interview document was --

THE COURT: Can you guys back up? Tell me who Mr. Walter is because I'm just -- I'm kind of in the dark here. Did he work for Glock or is he a -- who is he?

1074

MR. SMITH:   Karl Walter previously worked for Glock --

THE COURT:   Okay.

MR. SMITH:   -- and then worked with Mr. Jannuzzo after Mr. Jannuzzo left Glock.

THE COURT:   Okay.  That gives me a little context. Okay.  So he made a statement to Detective Harrison?

MR. SMITH:   Detective Harrison.

THE COURT:   Okay.  And what did it say?

MR. SMITH:   One of the statements that he -- it's a thick transcript, but one of the areas he says -- "he" being Walter:  "One day he approached me and admitted that he, when he closed down an insurance company with Pete Manown, I guess Glock was self insured at that time that some -- they diverted money and he was afraid that, uh, Glock was going after him."

There's no allegation in the indictment that relates to any such conduct when Peter Manown and/or Mr. Jannuzzo allegedly shut down an insurance company, and it wouldn't appear that this is relevant for any of the acts alleged, nor is it relevant for count one or count two.

And it would seem to, if anything, refer to an other alleged bad act of some sort that was not -- that we were not put on notice of within the ten-day period, nor is it contained in the indictment.  So on relevancy grounds,

1075

among others, we'd object and ask for a ruling in limine on that statement.

THE COURT: Mr. Butters.

MR. BUTTERS: Yes, Your Honor. I think what he's referring to is relevant, and it's certainly relevant to the pattern of racketeering activities.

Certainly consistent with the lead-off testimony of Mr. Manown or Mr. Manown saying they basically engaged in lots of different activities to steal from Glock.

And so it would be part of the pattern of racketeering activity that would be relevant and would be an admission.

MR. SMITH: We would incorporate, Your Honor, that the prior letter brief that we submitted and I would just draw two points to your attention, Your Honor.

One is the concept that other acts not alleged in the indictment of general principle is that, you know, prior alleged bad acts shouldn't come in to show action conforming therewith. That's number one.

Number two, the Uniform Superior Court Rule requires, to the extent you're going to use any such acts, that they be provided according to the Uniform Superior Court Rules so that the defense is put on notice.

So even to the extent that Mr. Butters' argument was compelling to the Court, that it shows pattern and

1076

therefore overcomes the general principal that prior bad acts can't show actual conformity therewith, the law clearly envisions that no defendant should have to defend criminal charges in a prosecution by ambush, so that everyone knows about what's coming.

And the State failed to provide any such notice and therefore should be barred from raising such bad acts as they come out through witnesses.

THE COURT: Just to let you know, I'm reviewing the specifics of the indictment to see whether the statement that you have just told me about is in some way related to what's specifically described in the indictment.

MR. BUTTERS: Your Honor, could I be heard?

THE COURT: You can. Yes, sir.

MR. BUTTERS: Whenever the Court is ready.

THE COURT: Let me take a quick look at this and then I will be happy to.

All right, Mr. Butters.

MR. BUTTERS: Yes. Your Honor, what counsel is talking about about prior bad acts, as the Court would know, that even under that if it's a part of a scheme it's not really a separate prior bad act even under the standard of -- required by the rule for prior notification.

Of course, if we do have a hearing on priors and the

1077

Court determines that it's part of a scheme, then you don't even have to -- you don't get to the stage of bent of mind and all that.

But moreover, under the RICO statute when it talks about pattern of racketeering activity, the law is very clear that where you have a common victim, you have a common method, you have common people in common doing it that it's part of the pattern of racketeering activity and therefore it's part of the substantive crime.

And the State would take the clear position that it's not a prior act that has to be articulated and dealt with under the rule. It's part of the racketeering activity.

And I think that the Court in Overcash and others dealt with if you have got the common victim, common people engaging in it and part of the conspiracy, obviously, which Mr. Manown has established that he and the defendant did conspire, then those acts and statements by Mr. Jannuzzo would come in as part of the count two racketeering activity.

MR. SMITH: I'm looking for the letter brief, Your Honor.

THE COURT: Yes, sir.

MR. SMITH: But as we take off our technical law hat and think about the purpose of these rules, the idea is that everyone can appropriately prepare for trial and a

1078

defendant understands the charges that have been levied against him and has a reasonable understanding and expectation of the proof that the State and evidence that the State seeks to introduce thereof.

That is why the general rule is that you can only prove, as stated in our letter brief, the evidence that would be illustrative of or consistent with allegations in the indictment. That way the defendant understands it.

THE COURT: I guess I'm a little bit confused. Stop on that point just so I understand.

I'm looking at paragraph 7 of the indictment under the section heading which is part B under Racketeering Activity, and in paragraph 7 there's a specific reference to the taking of money that belongs to -- I guess it was Consultinvest through the device of using this -- this insurance company in the Cayman Islands Casualty Contracts, Inc., I believe it is what it is.

And again, I don't know the evidence as well as you gentlemen, so -- but the statement that you have just read to me seems to be related to what's being described in paragraph 7 of the indictment.

I don't know because I don't know how this gentleman is going to testify about it. But in terms of what you have given me so far, it at least seems to be related to that.

1079

MR. SMITH:  I mean, the two of them mention the word "insurance."  That's true.  There is the paragraph in the indictment that uses the word "insurance," but the allegation is not --

THE COURT:  Again, Mr. Smith, you know more about what the specific witness is going to say than I, but based on what you have told me thus far, that's all I know.

MR. SMITH:  This is all I know, Your Honor.  All I know is what's listed in this interview statement, so probably the person who would know the most would be Mr. Butters.

But to the extent that it's what's listed in this statement, there's no allegation in the indictment that Mr. Jannuzzo and Mr. Manown closed down an insurance company and diverted money.

So simply because there is a reference to something insurance related in the indictment I don't believe gives rise to just any statement that uses the word "insurance." That's not the act that's alleged.  The act --

THE COURT:  Well, what I understood your argument to be a moment ago was that you weren't on notice that this issue might arise at trial.  And what I am saying is this seems to be directly related to the statement you just read to me, at least in some fashion.

1080

MR. SMITH:  Well, they both contain the word "insurance."  The position of notice is that the indictment contains a very specific allegation, and that specific allegation is that Manown caused authorization of fraudulent liability insurance billings to be paid from Glock to an offshore Cayman company.  That's the allegation.

This statement talks about two people allegedly closing down an insurance company.  That's not the act that's alleged in the indictment.

That's the -- I mean, it's not -- we weren't on notice that there was an allegation relating to some purported insurance company.  We're on notice of what's in 7.  I don't dispute that.  But that's not what this statement talks about.

And the notice issue, Your Honor, it's not whether we were on actual notice.  The notice issue is does the indictment identify it.

And if the indictment doesn't identify it, is it provided to us in accordance with the Uniform Superior Court Rules ahead of trial in a formal fashion.

And I suspect that this issue may come up with other witnesses as well outside of this particular statement. And Mr. Butters' position if it's simply alleged by the State to be in furtherance of the conspiracy or in

1081

furtherance of the alleged racketeering charge, that any witness can talk about it, we could be standing here right now and I have no idea what they are going to be introducing that they would claim is part of some conspiracy. I can comfortably tell you I don't know.

So it just doesn't make sense to me, and I don't know that to the extent the Court determines it's not admissible, I don't know that a curative instruction to the jury that heard some alleged statement of wrongdoing could be cured by saying "please ignore that" or "please disregard."

THE COURT: All right. Thank you.

Well, based upon what's been presented at this time, I'll deny the motion in limine with respect to the statement by Mr. Walter.

Is there anything else preliminarily that we need to take up?

MR. BUTTERS: Not by the State, Your Honor.

MR. CITRONBERG: Judge, we haven't -- of course, I was out yesterday.

THE COURT: Yes, sir.

MR. CITRONBERG: And I haven't gotten any new exhibits. Are we getting any more exhibits or we are just done with exhibits?

MR. BUTTERS: I think I have given you --

1082

MR. CITRONBERG:  Because the last exhibit we had was for Chad Mathis.

MR. BUTTERS:  Okay.

MR. CITRONBERG:  That's it?

MR. BUTTERS:  I think so.  I mean, I'm not -- it's not whetted in stone, but I believe so.

MR. CITRONBERG:  And I guess I'd just like an offer of proof of what Detective Harrison is going to testify to, because I'm not really sure how much he could actually testify to, and I don't want certain things to come out in the presence of the jury that would cause a mistrial.

THE COURT:  Can you be more specific than that, because I don't think I want to let him testify twice.  I mean, have an offer of proof on this entire testify?

MR. CITRONBERG:  I don't want to hear him.  I would just ask Mr. Butters to tell us what he's going to testify to.

THE COURT:  Well, on what basis?

MR. CITRONBERG:  Well, for example, if there's going to be -- if he's going to testify about introducing guns, there are certain foundation problems on introducing the guns.

If he's going to testify about anything else, I mean, that is going to be possible problems with tainting the jury.  I don't know what he's going to talk about.

1083

MR. BUTTERS: Your Honor, I have got the guns here, so yes, I plan to introduce the guns.

MR. SMITH: Then on the basis of the objection as it relates to guns, the request for the offer of proof is appropriate for the party who is introducing a witness, if the other side requests, to simply ask why that witness is being presented, what the purpose is, what the relevancy is, what the appropriateness is. That's what we've asked.

THE COURT: If that's you -- I didn't understand that to be the question. I understood the question to be tell me what all he's going to say, which I don't know that that's --

MR. SMITH: And that's understood, Your Honor. It's really the offer of proof.

THE COURT: Okay.

Mr. Butters, then tell me what the basis is for what Mr. -- I'm sorry, Detective Harrison is going to testify about.

MR. BUTTERS: Yeah. With respect to the guns, he will testify that these are the guns that were taken from the Prado and that were on the GCIC and that they -- Smyrna police eventually obtained these guns, and one was the LaFrance gun, which is the subject of count number one. It's the gun.

MR. CITRONBERG: Is that the extent of it?

1084

MR. BUTTERS: With respect to the gun, yeah.

No, I'm going to have him testify about other things, and I don't think I'm obligated to tell what he's supposed to testify about.

If they have got some area that they think, like, for example, we went into with the other detective about some area that they think they don't want gone into because it's highly prejudicial, they can bring it up, but I'm going to object to a procedure whereby they think they can just tell the State: Oh, give us a preview of what you want to do with every witness and then we will decide if we want to raise any objections. That's not proper.

MR. SMITH: Well, Judge, as relates to the gun, let's start with that because Mr. Butters has identified that. Yesterday we heard from an Atlanta police officer, Fulton County police officer, that -- who testified that she went to a residence at the Prado and recovered weapons.

Mr. Butters asked her did you recover how many weapons.

She said, I filled the trunk of my car with weapons. Something to that effect.

She never identified that she recovered the LaFrance pistol. She never laid a foundation that she saw it. Sh never laid a foundation that it was actually taken out of the house. She never laid a foundation that it was put o

1085

a property receipt. She never laid a foundation that it had a property receipt number.

She didn't provide the serial number of the weapon. She didn't talk about how it would be put in an evidence bag. She didn't talk about how it's kept in the property room.

There's no foundation whatsoever in this record that that weapon was recovered from Mr. Jannuzzo's residence or from -- in Mr. Jannuzzo's possession. There's no chain of custody. The Court has heard enough.

So our objection would be Detective Harris wasn't at the scene. He didn't recover the weapon. He didn't get it from a property bag. There's no chain of custody whatsoever.

So if Detective Harrison, who wasn't there, simply states, "Here's this gun that I have that was recovered by the Atlanta PD from this residence and then I ran it through GCIC," that would be rote hearsay.

There's no link of that weapon to my client's residence. In fact, there's no link to that weapon as to where it came from.

So I don't understand how there could be any connection between the officer's testimony yesterday, which was simply, "I put a bunch of guns in the trunk," and Detective Harrison's testimony that one specific gun

1086

was this one and it came from, you know, this person's residence.

THE COURT: And I don't know what he's going to be able to testify to either with respect to that, but I guess I'll kind of have to wait and see if they can establish any link for purposes of chain of custody. I don't know.

MR. SMITH: And the concern we have is if Detective Harrison says, "This is the gun that was recovered from Mr. Jannuzzo's house."

"Objection. No foundation. Hearsay." The jury has heard that, so that is appropriate based on the evidence we have so far and the fact that there's no one on today's witness list that's going to precede Detective Harrison who could lay a foundation. Defendant Harrison wasn't at the house. He didn't recover the weapon.

THE COURT: I understand.

MR. SMITH: So before that witness gets up and says that, we had asked for a specific offer of proof as to how that witness is going to properly testify about the weapon from Mr. Butters, and that is perfectly appropriate when we have identified a specific evidentiary issue.

THE COURT: Well, tell me then, Mr. Butters, what's the foundation going to be for Detective Harrison to testify about this LaFrance pistol.

1087

MR. BUTTERS: Your Honor, I believe that Detective Harrison will testify that the LaFrance pistol was the serial number and everything. And I believe Detective Ahearn said that when she took the guns from the condominium, she put them in the evidence at the City of Atlanta, including serial numbers and everything else, and then the City of Atlanta would put them into the GCIC according to the serial numbers.

And Detective Harrison would testify that the Smyrna Police Department learned through GCIC that that serial number and that gun that had -- for which they had had a warrant for did appear on GCIC.

And then Detective Harrison would testify as to the steps he went through to obtain the gun from the City of Atlanta -- from the Atlanta Police Department and that he would follow the chain of custody from the time he got it from the Atlanta Police Department through it coming into this courtroom.

THE COURT: But the issue that Mr. Smith raises is how is the jury going to know that this LaFrance pistol was one of the many guns that was obtained from the searc of the apartment in the city of Atlanta? How do we establish --

MR. BUTTERS: Okay.

THE COURT: -- that chain of custody.

1088

MR. BUTTERS: How do we establish that the gun that was seized from the condo was put into the GCIC from seizing from the condo?

THE COURT: Yeah, the specific gun. I mean, she certainly said the guns that were seized at the apartment were placed in GCIC --

You can sit down, Mr. Smith.

-- were placed in GCIC. The question is: How does the jury know and how do I know that this specific gun named in the indictment was one of those guns?

I understand what you're going to say is that Detective Harrison got a hit on GCIC, went to the city of Atlanta and picked up this LaFrance pistol from the city of Atlanta, but who is going to testify that that's the gun or a gun that was seized from Mr. Jannuzzo's apartment?

MR. BUTTERS: Okay. Well, I guess, then, Your Honor --

THE COURT: Because, just to be clear --

MR. BUTTERS: I see --

THE COURT: -- her testimony was very general about what was seized.

MR. BUTTERS: Right. Well, as a matter of fact, she said the stuff that was seized and then she turned it in to property and property handled it from there.

1089

THE COURT: That's exactly right.

MR. BUTTERS: Right. So -- and I guess what I am hearing them say is Detective Harrison can't say that property -- he can't say that the ones that were in property is the one that came from that condominium, as I hear what they're saying.

THE COURT: I think that's right. I think the person who seized them could probably say, "I seized guns with the following serial numbers and turned them over to property," but that's not what the witness who testified yesterday said. She wasn't that specific.

MR. BUTTERS: Okay. Your Honor, then I'm left in the position of trying to call another witness to bridge that link, and I will have to do that at the end of when we proceed, and I'll have to do it before I put Detective Harrison on, so I will have to ask the Court's indulgence to reshuffle witnesses and seek that witness.

THE COURT: We will see what we can do with respect to that, but I think the defense has raised an issue that -- before you put on Detective Harrison with respect to that testimony at least, will need to be addressed.

MR. BUTTERS: Okay.

THE COURT: All right.

Does that cover the specific portions of Detective Harrison's testimony, gentlemen, that we need to discuss?

1090

MR. SMITH:  I think -- again, Your Honor made a good point of not knowing exactly what Detective Harrison is going to say, but obviously whenever you have a detective testifying about what a -- you know, a officer -- patrol officer did or testifying about statements or things the detective learned through talking with folks, you have all the hearsay and other issues.

I mean, the officers can testify to what they did, as the Court noted with the recovery of the weapon, but not other people.

So in this case Detective Harrison conducted an investigation, I understand, talked to a bunch of people, looked at documents.

So to the extent that there would be testimony elicited from Detective Harrison about this investigation generally, that would, in the defense view, be a way to smuggle in, you know, hearsay obtained from review of documents and people, so we would just -- I don't know that there's any ruling that we need for that other than to say, you know, unless Detective Harrison has personal knowledge of whatever it is that Detective Harrison is going to talk about, absent the gun issue, which the Court has addressed, then we would obviously object, and it might be that certain of those objections should be had at sidebar.

1091

THE COURT:  Or unless there's a specifics exception to the hearsay rule that would determine that.

MR. SMITH:  Yes.

THE COURT:  You know, I don't want to be having to remind everybody what hearsay is during that.  And so I guess every time I have someone, particularly a detective on the stand, I'm always attentive to what they are saying for that reason because they do -- it's the nature of their job to go out and interview people and repeat what they say.

And so I caution both sides that, you know, remember -- let's not try to elicit hearsay from them, but at the same time let's remember what is and isn't hearsay.

MR. SMITH:  Understood, Your Honor.  There's police reports that seek to represent statements from other people.  Of course that's hearsay.

THE COURT:  Absolutely.  And some portions are admissible and some aren't, of those reports, so -- all right.  Well, we will just have to be very attentive to what Detective Harrison is testifying about.

MR. SMITH:  I apologize, Your Honor.  I believe that there's a reference to two guns.  There's only one gun charged in the indictment.

THE COURT:  Yes.

MR. SMITH:  So to the extent Detective Harrison is

seeking to talk about another weapon that's not in the indictment, then our objection would be relevancy, among others.

THE COURT: Is there a reason for introducing the other weapon into evidence, Mr. Butters?

MR. BUTTERS: Not really.

THE COURT: Okay. And let me just tell everybody the way I like to handle weapons in the courtroom so kind of listen up, folks, if you would.

First of all, before you pull out the weapon, tell me you are going to do it and I will instruct the jury that the weapon has been checked out and made so that it can't be operated. That just tends to make everybody feel a little bit more comfortable.

And then when you are handling the weapon, of course, we will be able to show them that the weapon has been made so that it can't operate.

But just tell me before you pull it out and I'll give them that quick instruction.

MR. BUTTERS: Your Honor, I think, then, what I woul like to do this morning, since it is 9:30, I would like t proceed with Mr. Mathis, Mr. Walter, and maybe Mr. Balsam and then I'll hold Mr. Harrison.

I would like to -- before I do get to Mr. Balsam, that's when I'll need to take the break to get set up.

1093

THE COURT: That will be fine, and we will probably be ready for a break at that point anyway so that's fine.

MR. SMITH: If there are any documents Mr. Butters plans on using, such as property receipt, which is the normal documents that you would see when you establish chain of custody, if he has those documents ahead of time, that would, of course, just make things go smoother.

THE COURT: Sure. Yeah. Maybe during that break before we take up his testimony we can pass those around so we can expedite the document exchange.

All right, gentlemen. With that, then, I think we can get started.

Let's bring in the jurors.

MR. CITRONBERG: Judge.

THE COURT: Oh, I'm sorry. Hold on. Hang on one second.

MR. CITRONBERG: Judge, because of all the new meds I'm on, I have to run to the restroom. I'm sorry.

THE COURT: That's fine. All right.

MR. CITRONBERG: I think it's probably going to happen.

THE COURT: That's fine. Just go ahead and take a quick break. From now on just get my attention and we'll let you do that.

We'll just take a two- or three-minute break, folks,

1094

And then I'll come back on the bench and we'll get started at that time. Thank you.

(Recess taken from 9:39 to 9:44 a.m.)

(Defendant and all parties present.)

THE COURT: We can bring in the jurors. Thank you.

MR. CITRONBERG: Judge, would it be all right if Mr. Smith continues the objections and I do the examinations?

THE COURT: Certainly.

(The jury enters the courtroom at 9:44 a.m. with all parties present.)

THE COURT: Folks, don't be afraid to mix it up, sit in different spots. We are creatures of habit.

Good morning, ladies and gentlemen. I hope everyone had a nice night's sleep. I think -- we have a full contingent today, and hopefully everyone is sort of back on their feet. We were kind of -- everyone was a little under the weather yesterday, but I think we're back, so I certainly am feeling better. Hope all of you are well as well.

We are going to continue with testimony today. Just a little idea of how I think things are going to go. We will continue with testimony this morning.

I think -- it looks like from the series of things, that we will probably just have a normal lunch break

1095

today, I think at the normal time, and then we may finish up a bit early, as I told you yesterday, I believe it was, we have to finish by about 4:45 today. We'll have to stop at that point. And so it should be a normal day.

My anticipation, as I indicated yesterday, is that tomorrow we will probably go longer than we normally do, so hopefully you were able to make some plans with respect to that, and we will just kind of see from there, but I'll give you better instructions about that later on in the day once I get a gauge of where we are. Thank you all for that.

With that the State may call its next witness.

MR. BUTTERS: Your Honor, it's going to be Chad Mathis, and the victim witness person stepped out so I'll need to go get the witness.

THE COURT: Yes, sir. Thank you.

Mr. Mathis, if you would, just go over past the bailiff there and up to the witness stand, please. Thank you.

Once you get up there, if you'd place your left hand on the Bible there and raise your right hand for me, please. Thank you.

JAMES C. MATHIS,

having been first duly sworn by the court clerk, was examined and testified as follows:

1096

THE COURT: Thank you, sir. You can be seated. Just make sure you pull up the chair close enough to the mic so we can hear you. That should be fine right there. Thank you, sir.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Mr. Mathis, would you please state your name for record.

A    It's James C. Mathis.

Q    Do you go by Chad?

A    Yes, sir.

Q    Where are you employed?

A    At Glock, Inc.

Q    And how long have you been there?

A    19 years.

Q    What is your current position?

A    Vice president of operations.

Q    How long have you been vice president of operations?

A    Four years.

Q    So 2008?

A    The beginning of '08, yes, sir.

Q    Okay. What about -- what did you do there before '08?

A    Operations manager for two and a half years before that, so worked in the operations department, warranty and

1097

technical department.

Q    Warranty and technical?

A    Yes, sir.

Q    And how long were you in the warranty and technical department?

A    Seven years.

Q    Okay.  So is it safe to say that you've been in the operations department nearly your whole time at Glock?

A    My whole career, yes, sir.

Q    What does the operations department at Glock do?

A    Currently, we have manufacturing, production, technical service, security and facilities.

Q    Okay.  Do you manufacture Glock guns at the Smyrna facility?

A    Yes, sir.

Q    Okay.  And is it part of operations' function to keep track of where guns are within the plant?

A    Correct.

Q    Okay.  I want to direct your attention back to 2001.  In 2001 what, roughly, was your position at Glock?

A    I worked for the operations manager at that time.

Q    And who was your operations manager?

A    Klaus Haagen.

Q    In 2001 were you given the assignment to sell off some non-Glock guns that were at the Glock facility?

1098

A    Yes.

MR. CITRONBERG: Objection. Leading.

THE COURT: Overruled.

Q    (By Mr. Butters) Pardon me?

A    Yes, sir.

Q    Okay. Can you tell the jury about that, what you were -- what you did?

A    We had -- across the factory had a number of non-Glock pistols that we used for testing evaluation. We used them for comparing competitors' products against Glock products. And I was instructed to take the non-Glock pistols that were not needed any longer and put them up for sale to a distributor or someone that would buy them in bulk.

Q    Okay. And what did you do?

A    Went around to the departments, asked to collect all the pistols, and took them to the operations office. And --

Q    What did you do with them when you took them to the operations office?

A    Inspected them, made sure that they could be sold and that we hadn't damaged them in some of our testing evaluation, and prepared them for sale.

Q    Okay. Did you display them in any way?

A    They were spread out across the table that we had in the back of the office, yes, sir.

Q    And what was the purpose of having them spread out

1099

the table?

A    Just so that I can inspect them and tag them:  This one can go, and this one cannot, those.

Q    Do you remember whether or not there was a LaFrance pistol among them?

A    Yes, there was.

Q    Okay.  And did you have any interaction with Mr. Jannuzzo with regard to the LaFrance pistol when the LaFrance pistol was on the table?

A    Yes, I did.

Q    Could you tell the jury what that interaction was?

A    I had the pistol laid on the table, and Mr. Jannuzzo walked in, saw the LaFrance there, and asked me what I was doing with the pistol.

And I explained that I was selling them to a distributor.

And he says, "No, that one is not for sale.  That one that one is mine."

Q    What was Mr. Jannuzzo's position at that time?

A    He was the boss.  He was vice president and general counsel at the time, but it was just boss.

Q    Okay.  Do you know -- do you collect guns?

A    Not necessarily, no.

Q    Do you kind of know about -- have knowledge about guns that are rare or special or anything like that?

1100

A    It's an interest, yes.

Q    Okay.  Did you have any view as to the LaFrance gun as to how you viewed that?

MR. SMITH:  Objection, Your Honor.  It's an improper opinion as to how this witness viewed something.

THE COURT:  Sustained.

Q    (By Mr. Butters)  Did you think that -- in your view, did you see the LaFrance gun as a special gun?

MR. SMITH:  Objection.  Object to the question.  He's trying to smuggle in testimony Mr. Butters would like to elicit, and the witness's view is irrelevant.

THE COURT:  Sustained.

Q    (By Mr. Butters)  Do you have any idea what the value of the LaFrance gun was?

MR. SMITH:  Same objection, Your Honor.  He's asking for an opinion.

THE COURT:  Well, I'll overrule as to opinion.  I think there has not been a sufficient foundation for this individual to give that opinion at this point in time or that testimony at this time.

Q    (By Mr. Butters)  In your dealings with the operations department, did you customarily deal with guns other than just Glock guns?

A    Yes.  Every day.

Q    Every day?

1101

A    Yes.

Q    And in your position of dealing with other guns every day in the operations department, did you learn the value of guns?

A    Yes.

Q    And by the value of guns, I mean did you learn the dollar value of guns if they were on the market?

A    Correct.

Q    And based upon your experience in the operations department and your knowledge of the dollar value of guns as a result of that experience, did you have -- did you have an opinion as to the value of the LaFrance gun?

MR. SMITH:  Objection, Your Honor.  Simply because the witness claims to have a knowledge of values of guns does not make him qualified to provide testimony as to the value of every gun in the world.

There's been no foundation relating to this particular weapon or any knowledge that he had.

THE COURT:  Overruled.  I think that goes to the weight of the admissibility.

Q    (By Mr. Butters)  Okay.  Could you please answer the question, Mr. Mathis?

A    Actually, I would not have had an opinion on that pistol.  I actually know what the company paid for it.

Q    What did the company pay for it?

1102

A    2,500.

Q    At that time what would be the price of a Glock pistol on the retail market?

A    Approximately 500.

MR. BUTTERS:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.

Any cross-examination for this witness?

MR. CITRONBERG:  One moment please, Judge.

THE COURT:  Yes, sir.

CROSS-EXAMINATION

BY MR. CITRONBERG:

Q    Good morning, Mr. Mathis.  How are you?

A    Good morning.

Q    This spreading out on the table you talked about, what year did that occur?

A    2001.

Q    2001.

A    Mm-hmm.

Q    And there were a lot of guns spread out on that table; correct?

A    More than 10, less than 20.

Q    And these were non-Glock guns; correct?

A    Correct.

Q    Do you know -- are you aware of why -- I'll rephrase

1103

the question.

You know that non-Glock guns were acquired by the legal department to use in litigation; correct?

A    Some, yes.

Q    And that was a common occurrence, wasn't it?

A    Sometimes.

Q    It happened, didn't it?  It's not your custom.  It happened, didn't it?

A    Yes.

Q    And the reason for that is they may have to prepare a gun or use the gun as an example of a gun by someone in a case in a deposition or something else; correct?

A    Correct.

Q    So it wouldn't be unusual to have non-Glock guns around.

A    Not at all.

Q    Now, you're aware that this particular gun had been checked in and checked out any number of times; correct?

A    I wouldn't have known that.

Q    You wouldn't have known that?

A    No.

Q    Okay.  No one ever told you that?

A    They could have, but I wouldn't have been involved with the paperwork.

Q    Okay.  And when Mr. Jannuzzo said, "That's mine," a

1104

far as you know he simply could have still needed it back in 2001 for litigation or whatever they used it for; correct?

A   Yes.

Q   That would be a perfectly rational explanation of what happened there; correct?

A   Correct.

Q   Don't sell it.  Okay.

Now, you said you got -- you had this gun and other guns.  You went around and collected the guns from various places.  Do you know where you collected this particular firearm from?

A   No, sir.

Q   You don't know where it came from?

A   No, sir.

Q   Did other people bring them and give them to you at some point?

A   Yes, sir.

Q   Do you know a gentleman named Robert Core?

A   Yes, sir.

Q   And who is Robert Core?

A   He works with -- has worked with our legal department.  I have seen him at the factory.

Q   Have you met him?

A   Yes.

Q   Have you met with him on this case?

1105

A    One time.

Q    And was he alone or was he with other people?

A    It was with Mr. Butters and Mr. Core one time.

Q    Okay.  What about any e-mails from him?

A    Not that I know of.  It has always mostly been face to face.

Q    Well, mostly been face to face.  That would, I guess, imply to mean more than one time.

A    Well, seen him in the factory and saying hello when I passed -- he passes.

Q    How often do you see him down at the factory?

A    I haven't seen him since September.

Q    Okay.  And I think you said you met one time with he and Mr. Butters?

A    Yes, sir.

Q    How about Detective Harrison, do you know -- have you ever met with a detective named Harrison?

A    I do know Detective Harrison, yes.

Q    Did you meet with him on this case?

A    Not this case, no.

Q    And when you met --

MR. CITRONBERG:  That's all I have.  One moment, please, Judge.

THE COURT:  Yes, sir.

Q    (By Mr. Citronberg)  Just out of curiosity, do you

1106

happen to know what a LaFrance pistol goes for today?

A    No, sir, I do not.

MR. CITRONBERG:  That's all I have.

THE COURT:  Thank you.  Any redirect for the witness?

MR. BUTTERS:  No, Your Honor.

THE COURT:  All right.  May this witness be excused, gentlemen?

MR. BUTTERS:  Yes.

THE COURT:  Thank you, sir.  You may be excused.

The State may call its next witness.

MR. BUTTERS:  Karl Walter.

THE COURT:  Mr. Butters, did I hear you say that was Mr. Walter, the next witness?

MR. BUTTERS:  Yes.

THE COURT:  Thank you, sir.

Good morning, Mr. Walter.  If you will come all the way across the courtroom and past the bailiff over here, he will direct you up to the witness stand.  Thank you.

Once you get up there, sir, before you sit down if you would place your left hand on that Bible that's right there and raise your right hand, please.  Thank you.

KARL WALTER,

having been first duly sworn by the court clerk, was examined and testified as follows:

THE COURT:  Thank you, sir.  You can be seated, and

1107

then just make sure you are close enough to the mic close enough up so we can hear you. That should be fine right there. Thank you.

DIRECT EXAMINATION

BY MR. BUTTERS:

Q    Mr. Walter, would you please state your full name for the record.

A    Karl Walter.

Q    Okay. Mr. Walter, would you please give the jury kind of your educational background?

A    I was educated in Austria. Attended technical school and graduated as an engineer.

Q    How long have you lived and worked in the United States?

A    Since late 1969.

Q    Can you kind of give us your work history from late 1969 when you came to America through today?

A    I worked for companies such as Elliot's(ph) in Chicago, Schtier Varderpool(ph) in Austria. Glock, Inc.

Q    When did you go to Glock, Inc.?

A    In November -- November 1985.

Q    November '85. How long were you there?

A    Through December 1992.

Q    And what did you do at Glock from November of '85 through December of '92?

1108

A    Initially, I formed the company in the United States with Mr. Glock and was appointed executive vice president/director.

Q    And is that -- was that in Smyrna, Georgia?

A    It was in Smyrna, Georgia, yes.

Q    Okay.  And then let's take this -- after December of '92, after your time with Glock, what was your next position?

A    I consulted briefly for Schtier in Austria.  Then I was employed by Taser International.

After Taser International, I was hired again by Schtier but this time the tank division.

And after that I went to -- formed a small company in Kennesaw.

And since 2008 I'm self employed.

Q    And what's the name of the company in Kennesaw?

A    Hofer candles.

Q    H-O-F-F-E-R?

A    H-O-F-E-R.

Q    H-O-F-E-R.  And when did you start with Hofer?

A    That was in May or June -- May, June of 2003.

Q    And you have been affiliated with Hofer ever since then?

A    We broke up in 2004.

Q    Okay.  During the year 2004, did you have any interaction with Paul Jannuzzo?

1109

A    Yes, I did.

Q    Could you tell the jury what that was?

A    We met in -- I believe it was in March of 2003. We talked about a project with Hofer, and we decided to pursue this project, and we formed Hofer company where both of us were partners.

Q    And what was the company you formed?

A    I beg your pardon?

Q    What was the name of the company you formed?

A    Hofer Candle Company.

Q    Hofer Candle. And what did Hofer Candle Company do?

A    Import and market candles. Very nice candles.

Q    Do you recall an incident in 2004 where -- observing that Mr. Jannuzzo seemed to be depressed?

A    That started really in 2003.

Q    Okay.

A    Fall to -- late fall in 2003.

Q    Did you ever talk to Mr. Jannuzzo about him being depressed?

A    Yes, I did.

MR. SMITH: Objection, Your Honor. Mr. Butters is introducing terms. He's asking -- he's leading, saying: At a time when Mr. Jannuzzo was depressed.

If the witness wants to testify to recollections t[...] witness has and characterize it the way the witness wou[...]

1110

like, we have no objection.

THE COURT: Overruled as to the question that was asked.

Q    (By Mr. Butters)  Can you tell us what you talked about with respect to him being depressed?

MR. SMITH: Same objection.

THE COURT: Overruled.

THE WITNESS: It was quite difficult to work at the company. Paul sometimes was absent, was distracted. And I asked him what his problem is, and we sat down and he indicated that he might be in difficulties with Glock because he has taken money from the company.

MR. SMITH: Objection.  Your Honor.  To the extent that the witness is testifying to what was indicated.  If the witness wants to testify to what was said --

THE WITNESS: Was said.

MR. SMITH: -- we have no objection.

THE COURT: Overruled.

Q    (By Mr. Butters)  Is that what was said?

A    That was said, yes.

Q    Were there any -- at the time were you and Mr. Jannuzzo the only partners in the Hofer Candle Company?

A    Yes.

Q    Was anybody else present when you had this conversation?

1111

A    No.

Q    How many employees did you have with the company at that time?

A    There were about, all of us together, about four. Four or five.

Q    And you said -- when did you say Hofer Candle Company closed down?

A    In early 2004.

Q    Did it close down after your discussion with Mr. Jannuzzo about depression or before?

A    After.

Q    Okay.  Why did it close down?

A    It was undercapitalized.

Q    Did Mr. Jannuzzo tell you anything more about the -- what he was concerned about at Glock other than what you have said?

A    Yes.  He stated that he took money from Glock by shutting down a Glock insurance company and took about $300,000.

Q    Is that --

MR. SMITH:  Can we have a sidebar?

THE COURT:  Yes, sir.  Excuse us just a moment.

(A bench conference was held as follows:)

MR. SMITH:  The nature of the objection is corpus delicti, the body of the crime, which, of course, means

1112

that an act or an alleged crime cannot be proven solely by testimony or alleged testimony from either the defendant or a co-conspirator.

You have to have independent proof of a crime and then testimony or alleged statements by a co-conspirator defendant to implicate the defendant in a crime.

There's been no evidence at all in this case about any sort of $300,000 moving or anything like that. In fact, as you will hear in directed verdict, in our view there's been no evidence to any crime, certainly not what he's talking about.

So to the extent that he's offering statements by the defendant for the purpose of either establishing a crime or for the purpose of establishing an act, we would object on the grounds of corpus delecti, that there hasn't been independent proof.

And the concept would be if someone were to testify that, you know, that a person told them that they smoked crack the day before, they can't be prosecuted for that statement. You have to prove that they were in possessio of a drug.

So what we're getting to now is people now attempti to testify or testifying to what the defendant allegedly told them, but there's been no independent proof that a crime even happened.

1113

So we'd object to testimony that would seek to both establish and implicate the defendant in a crime based on corpus delecti.

THE COURT: All right.

Mr. Butters.

MR. BUTTERS: Your Honor, there is evidence that the defendant has engaged in theft from Glock.

THE COURT: In the form of?

MR. BUTTERS: The testimony of Mr. Manown and the actual documents in evidence showing the payments going to CCI from Glock, the memos of Mr. Jannuzzo directing the payments. It's completely consistent with Mr. Manown's testimony that that's exactly what they did.

There is -- and Mr. Manown specifically testified about the insurance thing with CCI.

MR. SMITH: I'll represent to the Court I have read all of Manown's testimony. I have read just about every witnesses' testimony up until the last few from yesterday that we haven't yet gotten.

And when you hear our directed verdict argument, you will hear that they have not proved independently any suc crime.

There's been no testimony. Mr. Manown didn't say that we conspired to committing a crime. Documents that show the movement of money does not establish a crime.

1114

different that if Your Honor had a transfer out of your account, that doesn't show a crime.

There needs to be testimony that you're unauthorized to take money from somebody. That's not happened. It's all innuendo and speculation.

And the mere fact that something was moved does not establish a crime. And this witness can't implicate a crime that hasn't been established. If you haven't proven a car has been stolen, how could someone testify that he said he stole a car?

THE COURT: I understand. I'll overrule the objection. I'll allow the witness to testify.

When we get to the stage of directed verdict, whether that evidence proves what's required to be proved to meet the legal standard for proving a crime is an issue that is yet to be determined, but I think the witness can testify with respect to what he's already testified to, so I'll overrule the objection.

MR. SMITH: Just to the second point. Does it relat to one of the counts in the indictment? We're back to that issue. The statement about 300,000.

THE COURT: I think that's the issue that we covere before the witness's testimony, so from that perspective I'll overrule it.

MR. SMITH: Okay.

1115

(Bench conference concluded at 10:16 a.m.)

THE COURT: Thank you. The objection is overruled.

You may continue.

MR. BUTTERS: That's all the questions I have, Your Honor.

THE COURT: Thank you.

Is there cross-examination for this witness?

MR. CITRONBERG: Yes, Your Honor. One moment.

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. CITRONBERG:

Q   Mr. -- is it Walter or Water?

A   Walter.

Q   Walter. You told Mr. Butters you left Glock in 1992; correct?

A   That is correct.

Q   You were fired from Glock, weren't you?

A   No.

Q   You were not fired from Glock?

A   No, I was not.

Q   What caused you to leave?

A   A change in the contract. I didn't accept it and 1 left.

Q   You left -- you're saying now you left on your own?

A   Yes.

1116

Q  You wanted to leave?

A  No, I did not want to leave.

Q  Okay.  But they didn't give you what you had asked --

A  I was given an ultimatum.

Q  Okay.  I'm sorry.  Who gave you the ultimatum?

A  Mr. Manown.

Q  And what did he tell you?

A  Accept a new contract or you're terminated, and I didn't accept it.

Q  So you were terminated.

A  If you're looking at those terms, yes.

Q  That would be the same as being fired; correct?

A  Okay.  Fine.

Q  I'm not trying --

A  I'm not going to argue with you.

Q  -- pick words with you.

A  Okay.  But it was my choice.

Q  It was your choice to be terminated.

A  That's correct.

Q  Now, you knew, did you not, that Mr. Glock complaine

about you, that you had stolen millions from him; isn't that

true?

A  I did?

Q  Isn't that what you heard, that he said that about

you?

1117

A    No.

Q    Never heard that?

A    Never heard that.

Q    In fact, you ended up suing Mr. Glock after you were terminated; correct?

A    No, I did not.

Q    You didn't sue Mr. Glock?

A    No, I did not.

Q    Wasn't there a lawsuit?

A    No, there was never a lawsuit placed.

Q    Was there threats of a lawsuit?

A    No.  There was a settlement discussion.

Q    There was a settlement discussion?

A    Not with Mr. Glock.  With an attorney for Mr. Glock.

Q    And who was the attorney for Mr. Glock?  It was Mr. Jannuzzo, wasn't it?

A    That is correct.

Q    And you were upset about being terminated; isn't that true?

A    It did bother me for some time.  Yes.

Q    For some time?

A    Yeah.

Q    And Mr. Jannuzzo over there represented Glock; righ

A    That is correct.

Q    And you were angry about that, weren't you?

1118

A    No, I was not angry with Mr. Jannuzzo.

Q    You were just angry in general?

A    No.  Just angry about the situation that I received an ultimatum to accept a new contract.

Q    It all left a bitter taste in your mouth, didn't it?

A    To an extent, yes, but not because of Jannuzzo.

Q    And subsequent to being terminated, you go to the SHOT Shows; is that correct?

A    I went to the SHOT Shows, yes.

Q    Well, let me ask you this.  After you -- after you left or terminated, where did you go to work then?

A    I worked for -- after Glock for Sturm Ruger Company.  Sorry.  Forgot to mention that before.

Q    And how long did you work for them?

A    Four years.

Q    And what happened there?  You were terminated there?

A    No.  I was called by Schtier to manage a project in Kuwait, and they were looking for somebody to be a liaison between General Dynamics and Schtier.  And since I also speak the language, German and English, that was a very nice position.

Q    Okay.  And how long did you work for them?  Four years?

A    Yes.

Q    Didn't you have a disagreement with the owner of th

1119

company and made a knock-off of that weapon?

A    Beg your pardon?

Q    I mean, where did you go after Glock?  I'm confused.

A    To Sturm Ruger Company.

Q    Why did you leave Ruger?

A    Because I received an offer to, as I just mentioned before, to manage a project in Kuwait.

Q    And you didn't have problems with anybody at Ruger?

A    No.

Q    Okay.  And then where did you go?

A    After Ruger I went to Schtier to manage the project in Kuwait for four years.

Q    And how long were you there?

A    Four years.

Q    And what did that company do?

A    Manufactured tanks.

Q    I'm sorry.  That was a tank manufacturer?

A    That is correct.

Q    And how long were you there?

A    I just said four years.

Q    And why did you leave there?

A    I received an offer to work for Taser International.

Q    And how long did you work for Taser for?

A    About a year.

Q    And you were -- you had to leave there, too; right?

1120

A    No.  I left there on my own accord.

Q    Why did you leave there?

A    Just -- it was not the same I was used to.  They asked me to do the same thing working for Glock.  I implemented similar marketing strategies, but I did not have the, I would say, total control how to initiate it.

Q    Well, you were angry about their press releases, weren't you?

A    No.

Q    Isn't that why you left?

A    No.  There were no negative press releases.

Q    Well, what was being put in the press releases?

A    There was only one press release that I left Taser International, and afterwards there was a press release that Taser was investigated by the Security and Exchange Commission and that Karl Walter does not want to testify.

Q    So you didn't want to testify?

A    That's correct.

Q    Now, when you -- you indicated here today that you had a conversation with Mr. Jannuzzo in March of 2003; is that right?

A    It was in February or March of 2003, yes --

Q    Do you remember on --

A    -- or early 2003.

Q    Do you remember on an earlier date saying that thi

1121

conversation was in September of October of 2003?

A   Don't remember.  What conversation?

MR. CITRONBERG:  May I approach?

THE COURT:  Yes, sir.

(Defendant's Exhibit Number 11 was marked.)

Q   (By Mr. Citronberg)  I'd like to show you what's been marked for identification only Defense 11.  If you could take a look at what I am showing you.

A   Yeah.  But the question you just raised that I met Jannuzzo in early 2003, which is correct, this was a conversation we had September, October of 2003.

Q   Did you -- well, you had met him long before 2003.

A   No.  That's when we met for --

THE COURT:  Excuse me a second.

Mr. Walter, can you move the microphone a little bit closer?

THE WITNESS:  Yes.

THE COURT:  That will be a lot easier.  Thank you.

THE WITNESS:  That's when -- you asked before when I met Mr. Jannuzzo, and I said we met for the Hofer busines in early 2003.

The conversation I had with Paul about that subject you referred to took place in September or October of 2003.

Q   (By Mr. Citronberg)  And this was now almost nine

1122

years ago; correct?

A    That is correct.  So I'm not quite -- I would say -- please forgive me if I don't have the exact date with me of when the conversation took place.

Q    And I want to go back to this -- this was when you were working with the candle company; isn't that true?

A    That is true.

Q    And there were problems at the candle company; isn't that true?

A    There were no problems initially.  There was a business plan.  We reviewed the business plan.  We tried to implement the business plan, as I said earlier.  The company was undercapitalized.

Q    And you said the company was uncapitalized.  You didn't put any capital into the company, did you?

A    I put capital into it, but the main contributions were to come from Paul.

Q    I'm sorry?

A    The main contributions should have come from Paul.

Q    The main contributions?

A    That is correct.  Capitalization.  I'm sorry.

Q    Isn't it true that it was supposed to be 50/50 on t capitalization?

A    No.

Q    Isn't it true that Mr. Jannuzzo asked you to help

1123

with the capitalization?

A    And I did whatever I could.

Q    You did whatever you could. Well, you didn't really do whatever you, could you?

A    Yes, I did.

Q    Well.

A    But that's your assumption.

Q    We will get to that. Okay. Mr. Jannuzzo complained to you about the dinners you bought for focus groups, didn't he?

A    No, I did not.

Q    He didn't?

A    There were no focus groups.

Q    And he complained you were paying too much for your dry-cleaning and personal bills --

A    No.

Q    -- out of petty cash, didn't he?

A    No.

Q    And he complained that you didn't put up enough capital, and he asked you to put up some assets or sell some assets.

A    He knew from the beginning how much capital I would have available to invest.

Q    Well, you had some things of value, didn't you? You had some paintings, didn't you?

1124

A    Paintings have nothing to do with this.

Q    You had some paintings, didn't you?

A    No.  I mean, yeah, personally.

Q    You had some personal valuable paintings; correct?

A    Not very valuable.  I don't know.

Q    Okay.  And who -- that was -- those were Adolph Hitler paintings; isn't that correct?

A    I was -- I had some of these, yes.

Q    And they were in your personal collection?

A    That's not a collection.  Those were given to me as a present.

Q    Oh, they are a present.  And he was asking you to sell your Hitler paintings to capitalize the company; isn't that right?

A    Those things were worth at the most $500 because it was never established if they are genuine or fake.

Q    But you are holding onto them?

A    No, I don't.

Q    You were holding onto them then?

A    At the time there was no reason to sell them.

Q    There was no reason to sell them even though the company failed --

A    No.

Q    Let me finish my question and then you can answer.

Okay.

1125

The company failed, according to your testimony, because it was undercapitalized; correct?

A   That is correct.

Q   All right.  I want to ask you about the statement that supposedly allegedly occurred.  This was in -- sometime in 2003; correct?

A   What?

Q   This statement that you say Mr. Jannuzzo made to you.

A   Yes.

Q   Did you say, "Oh, my goodness, I can't be in business with this man"?  You didn't say that, did you?

A   No, I didn't say that, but initially I didn't believe what he said.  I mean, it was hard for me to comprehend.  I tried to focus on the candle business and not to -- try to help him somehow, to focus his efforts on the company, too.

Q   So you didn't focus on the statement?

A   I really didn't pay a lot of attention, but it did stick in my mind.  That's all I can say.

Q   Did you say, "Oh, my goodness, I have to call the police"?

A   No.  Never occurred to me.

Q   Say, "Oh, my goodness I have to tell somebody"?

A   And I didn't.

Q   I'm sorry?

1126

A   And I didn't.

Q   And you didn't?

A   No.

Q   Didn't say a word?

A   No.

Q   Did you write it down --

A   I didn't write it down either.

Q   -- what he supposedly said?

A   No.

Q   Did you tell it to anybody what he supposedly said?

A   Later years, yes.

Q   I'm sorry?

A   In later years.

Q   In later years.  In fact, it was many years later; correct?

A   2009.

Q   Six years later?

A   Yes.

Q   And you got to admit things change between happening over six years; correct?  Memories change, don't they?

A   To some, maybe.

Q   Of course they do.

A   Mm-hmm.

Q   Of course they do.

    Let's talk a little bit about the SHOT Shows.  Afte

1127

the SHOT Shows -- after the SHOT Shows -- well, let me ask you this. You would go back to the SHOT Shows, correct, after you left Glock?

A    Yes.

Q    And every year Glock would throw a party; correct?

A    Yes.

Q    And you needed an invitation; correct?

A    No.

Q    It wasn't invitation only?

A    I never got an invitation.

Q    All right. So you had to try and get in without an invitation; correct?

A    I didn't have to try. When I came up to it, I mean, I've only been to --

Q    I'm sorry?

A    Only been to two parties since 2000 -- since 1992.

Q    And you knew Mr. Jannuzzo -- you had to go get Mr. Jannuzzo to get Mr. Glock to allow you in; isn't that true?

A    No. Not true.

Q    And isn't it true for years, for years, you talked about how Mr. Jannuzzo had represented Glock and in those negotiations?

A    What negotiations?

Q    When you got terminated.

A    Basically, I had very little contact, I believe, wi

1128

Paul during those days. My primary contact was my attorney, and I don't remember who it was.

Q   Well, you told us earlier you had a bad taste in your mouth; right?

A   To an extent, yes.

Q   And it went on for a long time; correct?

A   The bad taste in my mouth? Yes, it did.

Q   And you were angry about it; correct?

A   Angry? I don't know. "Bad taste" is a bad phrase.

Q   That's your phrase.

A   You just said that.

Q   You didn't say "bad taste"?

A   No.

Q   Okay.

THE COURT: Anything else, Mr. Citronberg?

MR. CITRONBERG: Yes.

Q   (By Mr. Citronberg) You never told anybody about this statement, did you?

A   As I said earlier, I mentioned it the first time to someone in 2009.

Q   You didn't tell the police. You didn't tell Mr. Glock. You didn't tell anybody.

A   No, I did not.

Q   I want to ask you about one other thing.

MR. CITRONBERG: Excuse me, Judge. I just need a

1129

sticker.

THE COURT: Yes, sir.

MR. CITRONBERG: May I approach?

Q    (By Mr. Citronberg)  Ask you to take a look at what's in evidence as Defense Exhibit 2.  Tell me if you can identify it.

A    Fire Arms Insurance Registry, Limited.

Q    And what is Fire Arms Insurance Registry, Limited?

A    I'm not familiar with the company.

Q    All right.  Can you tell us what the policy period on this policy is?

A    Period from '03 to '04.  From 7/1/2003 to 7/1/2004.

Q    All right.  So we know that the Fire Arms Insurance Registry, Limited, coverage extends to July of '04; is that correct?

A    Yeah.  Mm-hmm.  Yes.

Q    One other thing.  When you left Hofer and Hofer broke up, there was a problem with the tax loss, wasn't there?

A    I don't remember.

Q    You had heated conversations about the tax loss and who would take the tax loss, isn't that true with, Mr. Jannuzzo?

A    I did not have any heated conversation with Mr. Jannuzzo.  Mr. Jannuzzo basically had the conversations with an accountant.

1130

Q    And Mr. Jannuzzo told you that if you took the tax loss he was going to report you to the IRS; isn't that right?

A    I took my loss.

Q    Yes.    And he told if you took your loss and if you took 50 percent, he was going to report you to the IRS?

A    I do not -- 1 don't recall that conversation.

Q    You don't recall that conversation?

A    No.

Q    But that could have happened?

A    I don't know if it did happen or could happen.    I don't know.

Q    So you -- that may have happened and you may have just forgot about it?

A    I didn't forget about it.    I just do not recall that conversation.

Q    Okay.    You are not denying it because you know it happened; isn't that so?

A    No.

Q    And you were mad -- in fact, you were furious -- because Mr. Jannuzzo was threatening to report you to the IRS, isn't that so?

A    No.    There was no IRS issue at all.

Q    You just said that Mr. Jannuzzo had been talking to an accountant; right?

A    Yes, he may have talked an accountant but I did

1131

not -- I do not recall having a conversation about this matter at all --

Q    You don't recall?

A    -- with Paul.

Q    You don't recall.  Did you have that conversation with anybody?

A    No.

Q    Do you recall that?

A    No.  I just did my taxes with my accountant that I used for well over 25 years, every year.

Q    That's very nice, but there was a dispute about the tax loss, wasn't there?

A    No, there was no dispute.  Maybe on his side but not on mine.

Q    Oh, there was on his side?

A    Maybe.

Q    And you think -- you're saying now he didn't talk to you about it?  There was a dispute and he just didn't talk to you about it?

A    To be honest with you, I don't remember having a conversation of this nature at all, and -- I don't remember.  But as far as I'm concerned, I don't believe such conversation took place.

Q    Oh, okay.  And after you spoke to Paul, supposedly, in 2003 and he said this, which doesn't get repeated until

1132

2009, you also spoke with Mr. Glock; right?

A    Yes, I did, in 2003.

Q    You didn't say anything to him about this, did you?

A    No, I didn't.

MR. CITRONBERG:  One moment.

THE COURT:  Yes, sir.

Q    (By Mr. Citronberg)  Do you know Mr. Core?

A    I beg your pardon?

Q    Do you know Robert Core?

A    Yes.

Q    Have you met Robert Core?

A    Yes.

Q    Have you met with him about this case?

A    That was in -- yes, I did.

Q    And how many times have you met with Mr. Core?

A    Once.

Q    And when was that?

A    Late fall of last year.

Q    Who was present beside Mr. Core?

A    The counsel of Glock, Incorporated.

Q    Mr. Guevara?

A    Yes.

Q    Anyone else?

A    Mr. Butters, I believe.  Yes.

Q    An Mr. Core was participating in an interview?

1133

A    Yes.

Q    Was he leading -- he was leading the interview, wasn't he?

A    No.

Q    He was there.  How about Detective Harrison?

A    No, he was not there.

Q    Never met him?

A    Yes, I did.

Q    Just one time?

A    One time, yes.

Q    But the last meeting he wasn't there either?

A    That is correct.

Q    In 2009 when you finally told somebody this statement for the first time, correct --

A    Mm-hmm.

Q    -- that was to a member of the press; isn't that so?

A    That is correct.

MR. CITRONBERG:  That's all I have.

THE COURT:  Thank you.  Any redirect for the witness?

MR. BUTTERS:  Just a little bit.

THE COURT:  Mr. Butters, before you do that, I have had a request from the jury that we take a quick break, so let's go ahead and take a break, ladies and gentlemen, for a moment, and then Mr. Butters will finish up with you in just a moment.  You can take a break as well if you wish

1134

to.    About five minutes, folks, I think.

(The jury exits the courtroom at 10:42 a.m.)

(Recess taken from 10:42 to 10:50 a.m.)

(Defendant and all parties present.)

THE COURT:  Mr. Butters, I think you misinterpreted how long our five-minute break was going to last.

MR. BUTTERS:  I apologize to the Court.

We are still with Mr. Walter.

THE COURT:  We are.  As one interesting side note, with all the illness we had yesterday, my son woke up this morning with what I suspect to be strep throat, so it just continues to -- I'd say continue to use your hand sanitizer liberally, everyone in the courtroom.

We are with Mr. Walter.

Mr. Mau, if you wouldn't mind going ahead and getting Mr. Walter to come on back in and put him on the witness stand and bring the jurors in.

He's on his way, so you can go ahead and bring them out.  Thank you.

(The jury enters the courtroom at 10:57 a.m. with all parties present.)

THE COURT:  Again, folks, thanks for your patience. The State may have redirect of this witness at this time.

MR. BUTTERS:  Yes.

REDIRECT EXAMINATION

1135

BY MR. BUTTERS:

Q   Mr. Walter, I think that you mentioned in response to Mr. Citronberg's questions that when you left Glock that was with a bad taste in your mouth?

A   Yeah.

Q   And was -- when you left Glock that was as a result of dealing with -- in other words, Mr. Jannuzzo was involved in you leaving Glock?

A   Not really.  It was Mr. Manown who gave me the ultimatum either to accept the new contract or you are terminated.

Q   Okay.  When you left Glock, were you angry at Mr. Jannuzzo?

A   No.  There was no reason.

Q   Pardon me?

A   There was no reason.

Q   Okay.  And, in fact, you went into business with the -- in the Hofer Candle company with Mr. Jannuzzo afterward

A   That is correct.

Q   And were the two of you partners in that business?

A   Yes.

Q   Were you the only partners?

A   Yes.

Q   When you ended the Hofer Candle Company, did you e up suing Mr. Jannuzzo over the Hofer Candle Company?

1136

A    No, I did not.

MR. SMITH: He's leading this witness now.

MR. BUTTERS: Okay.

THE COURT: Let him rephrase.

Q    (By Mr. Butters) Were there any lawsuits filed between the partners of Hofer Candle Company --

A    No.

Q    -- when it was ended?

A    No.

MR. BUTTERS: That's all the questions I have.

THE COURT: Any recross or may this witness be excused?

MR. CITRONBERG: Briefly, Judge.

THE COURT: Yes.

RECROSS-EXAMINATION

BY MR. CITRONBERG:

Q    One of the things you got when you were terminated from Glock was part of your agreement was 80 guns; correct?

A    No. Incorrect.

Q    How many guns?

A    None.

Q    No guns?

A    No guns. The guns that I had from Glock I either purchased. You know, I kept one as of today.

Q    How many guns did you have when you left Glock?

1137

A    Probably two or three of them.

Q    And they didn't give you any guns?

A    No.  Zero.

Q    All right.

A    Except the guns that I had for business purposes, to travel, samples.

Q    And you kept those?

A    No.  They were returned.

Q    When you were at Glock before the termination --

A    Actually, I'm sorry.  Let me correct that.  The only Glock I have still was not from Glock.  I received it from a sheriff's department as a present.

Q    All right.  Just to cover the question, were any of the 80 guns non-Glock gun?

A    I had non-Glock guns, probably about 20.

Q    Did you get those from Glock?

A    No.  None.

Q    When you left -- well, you were at Glock for a while right, before you were terminated?

A    Yes.  From 1985 until 1992.

Q    Why did Glock pay a third of its invoices to Glock Hong Kong and a third to Glock America?

A    Can you repeat this question, please?

Q    Sure.  Why did Glock, Inc., pay one third of its invoices to Glock Hong Kong and one third to Glock America?

1138

A   The way I was told is that South America and Hong Kong subsidiary did not meet their obligations.  We received a lot of the same of the products.

Q   Did you ever travel to these sister companies --

A   No.

Q   -- to discuss these invoices?

A   No.

Q   Who was Glock, Inc.'s, landlord?

THE COURT:  I don't want don't to interrupt, Mr. Citronberg, but this is going far outside the scope of the redirect from the state.  Is this a new line of questioning you wish the Court to allow you to pursue?

MR. CITRONBERG:  Yes.  Judge, just three more questions.  It is outside the scope.

THE COURT:  All right.

MR. CITRONBERG:  Thank you, Judge.

Q   (By Mr. Citronberg)  Who was Glock's landlord?

A   Highland Park.  I don't know who they were.

Q   It was Consultinvest, wasn't it?

A   Glock's landlord was Consultinvest, yes.

Q   That was the landlord; right?

A   Yes.

Q   And who owned Consultinvest?

A   It was -- I believe it was Glock.

Q   It was Unipatent, wasn't it?

1139

A    Yes.  Unipatent came very late in my career with Glock.

Q    And Glock, Inc., was owned by Unipatent and Glock GsmbH; correct?  The owner.

A    I don't know.  I cannot testify to that.

MR. BUTTERS:  Your Honor --

THE COURT:  Mr. Butters.

MR. BUTTERS:  -- I'm going to object.  I thought that he said he had a couple of more questions, and I think it's been said this is way beyond the scope.

MR. CITRONBERG:  I have three more questions, Judge.

THE COURT:  Well, it is beyond the scope, so let's try to stick to the scope of the redirect.

MR. CITRONBERG:  Can I just follow up with three more, Judge?

THE COURT:  Yes, sir.

MR. CITRONBERG:  Thank you, Judge.

Q    (By Mr. Citronberg)  So Gaston Glock had 100 percent complete control over Glock, Inc.; correct?

A    He was the president of the company.

Q    And the accountants knew that.  Did you tell the accountants that?

A    Yes.

Q    And the accountants knew that Gaston Glock owned percent and had 100 percent control of Glock, Inc.

1140

A    I don't know what the accountant's knowledge was at the time. That was quite some time ago.

Q    All right. Did Mr. Glock tell the auditors that he was the owner of Unipatent?

A    I do not know the conversations that took place between Mr. Glock and the auditors.

Q    And did you ever feel that Mr. Glock had a tax problem?

A    No, because he paid his taxes, whatever he earned over here.

Q    All right. And going back to just briefly Mr. Core, when you met with him, was that in person?

A    No. It was at the district attorney's office.

Q    And that's when Mr. Core was present with Mr. Butters?

A    Yes.

Q    And the corporate counsel, Mr. Guevara?

A    That is correct.

Q    Did Mr. Core show you documents?

A    I believe so, yes. Yes, he did.

Q    And he had them in a binder; do you remember?

A    I don't remember where they came from.

Q    Do you remember how many documents he had?

A    I only was shown one.

Q    And that was shown to you by Mr. Core; correct?

1141

A    I don't know if somebody handed it to me or Mr. Butters, Mr. Core. I don't remember.

Q    This was in the D.A.'s office; correct?

A    Yes.

Q    Back in -- your testimony earlier was back in 2003, after you supposedly had this conversation with Mr. Jannuzzo, you saw Mr. Glock; correct?

A    In 2003?

Q    Yes. Then after that you saw Mr. Glock; correct?

A    No, I did not.

Q    When did you see Mr. Glock?

A    I didn't see Mr. Glock until June, July of 2009.

Q    You didn't see him from the time that the supposed statement occurred until June 2009?

A    That is correct.

Q    And you never told him about the statement; correct?

A    No. There was no need to tell him.

Q    Isn't it true you told him about the statement, and he told you to say this is what Mr. Jannuzzo said?

A    No.

MR. CITRONBERG: Okay. That's all I have.

THE COURT: Thank you. Anything else from the Sta

MR. BUTTERS: No, Your Honor.

THE COURT: May the witness be excused?

MR. BUTTERS: Yes.

1142

THE COURT: Thank you sir. You may be excused. Mr. Butters, did you indicate that before the next witness we needed to take a break?

MR. BUTTERS: Your Honor, could we have a sidebar?

THE COURT: Yes.

(A bench conference was held off the record from 11:06 to 11:07 a.m.)

THE COURT: Ladies and gentlemen, before the next witness testifies, we need a few minutes to get a couple of things set up in the courtroom, so you can step to the jury room. I think this break will be about ten minutes.

Thank you.

(The jury exits the courtroom at 11:07 a.m.)

(Recess taken from 11:07 to 11:19 a.m.)

(Defendant and all parties present.)

THE COURT: Mr. Butters, have we had a sufficiently long break for you to --

MR. BUTTERS: You know, Your Honor, there must have been a miscommunication. They brought the easel up but they didn't bring anybody that knows how to put it together, and I've never done it, so I have sent somebo[dy] down there to do it so that we have got one that actual[ly] works. I apologize to the Court. The easel got here but --

THE COURT: But the engineer to work it --

1143

MR. SMITH: While we're waiting, Your Honor, if I could just take up a preliminary matter with this witness.

THE COURT: Sure.

MR. SMITH: The Court's probably heard enough from me of our continuing theme of not knowing what Mr. Butters is going to do, what evidence he's going to present, and not having it turned over.

THE COURT: Right.

MR. SMITH: Three weeks ago the defense presented Mr. Butters and the State the copies of the charts that it would intend to use in this trial giving the State an opportunity to review them and prepare argument and prepare an analysis so that they could respond to the charts when placed in evidence.

Mr. Butters has behind him two charts that he's waiting for an easel on. I have never seen them. They have never been produced to us. They have never been shown to us.

Up until this moment, as I'm standing here right no I have not seen what's inside of them. And so for that reason, Your Honor, we'd ask that the charts be excluded because we have not had a chance to review them.

And if the Court is not inclined to exclude them, then we'd ask Mr. Butters to make representations to th Court as an officer of this Court when those charts we

1144

prepared either in actual form or draft form and why they were not supplied to the defense so that we could review them.

THE COURT: Well, I mean, I would assume if they are demonstrative aids they are not going to be entered into evidence, so --

Is that what those are?

MR. BUTTERS: They are demonstrative aids, Your Honor.

THE COURT: Is there some authority that I have to exclude a demonstrative aid because they didn't show it to you prior to trial?

MR. SMITH: But Your Honor, if there's an analysis that's performed on these charts -- I don't know what they are.

THE COURT: Is there authority for me to exclude a demonstrative aid that's not shown to you prior to trial? I mean, I'm not familiar with a rule that requires either side to show the other side their demonstrative aids prior trial.

MR. SMITH: Well, Your Honor, if it's a demonstrative aid, that would be a picture of something or a drawing. If there's actual analysis done, that's not a demonstrative aid. It's analysis. I don't know what's the chart.

1145

We turned over at this point all the exhibits we're going to use in this trial, and we provided him with copies of the charts that our expert has put together, Mr. McGovern, who is sitting in the courtroom. We provided Mr. Butters with copies of that analysis.

I guess we could have just called it a demonstrative aid and not given it to Mr. Butters, but we did because it involved Mr. McGovern's analysis, substantive analysis.

So without seeing what the chart is and knowing, I don't know whether it's a demonstrative aid. Perhaps Mr. Butters can open up the packet now and we could see it at the same time. And if it's a picture or if it's a drawing and if it's merely demonstrative, then we wouldn't have an objection. But if it's analysis --

THE COURT: Let's suppose it has some sort of analysis by the expert on it. It's his pictorial depiction of what he intends to testify about in the case

MR. SMITH: Well, I don't know that -- I mean, I believe it would be an expert report for analysis and would fall under discovery. It wouldn't be a picture.

I mean, a demonstrative aid of a drawing -- if he performs an analysis that says this happened and that happened and then has a picture depicting it, that's fi but if it's actual analysis that's completed, we're entitled to get it. It's a report. It's not a pictur

1146

MR. BUTTERS:  Your Honor --

THE COURT:  Mr. Butters.

MR. BUTTERS:  -- I don't know if it will help, but rather than deal with this kind of in a vacuum, I would suggest the following.  I believe that Robert Balsam's spreadsheets, analysis, and all that stuff has been provided.  I believe that these charts would be made from those spreadsheets that have been provided.

I will be happy to give the -- to indulge the Court, if we could break from now until 1:30 I will leave the charts with them with their expert.

They can go through them, look at them, and then they can come back and raise any objections we can have rather than -- and I understand that it's argument, and it's in a vacuum.  And I think the Court doesn't know what they are

I have represented to the Court they are for purpose of a demonstrative.

MR. SMITH:  Do you have a copy?  Do you have a copy

MR. BUTTERS:  This is what I have.

MR. SMITH:  He only has it on the chart, Judge.  Ho can he even give us a copy of it.  Normally, you put a chart on it --

THE COURT:  Mr. Smith.  Mr. Smith.

MR. SMITH:  -- Your Honor, and --

THE COURT:  Mr. Smith.  Calm down.

1147

I'm really getting tired of your emotional outbursts. Okay? You can argue to the Court in a calm and cohesive fashion without raising your voice to me or to the other side. It's inappropriate.

Now, that being said, I will allow you to review the charts and see what they are. We will break until -- I will call the jury back in and we will break until 1:00 and that will give you time, hopefully, to get all of these things accomplished and give the defense time to look at the charts with their expert during that period of time and develop whatever examination they wish to develop with respect to the charts.

Mr. Citronberg.

MR. CITRONBERG: Yes, Judge. I know you're pushing forward, as I have indicated the other day. I was just hoping that -- may I approach? Can we approach?

THE COURT: Yes.

(A bench conference was held off the record from 11:24 to 11:28 a.m.)

MR. SMITH: If I may just put on the record that the sidebar that -- I think we already have it on the record was confirmed -- that the State has some charts that it intends to be used with its expert witness.

Those charts in any form have not previously been disclosed to the defense prior to right now. And at th

1148

point in time, 11:30, the defense still hasn't seen the substance of the chart.

I understand from Mr. Butters that he does not have the document that actually gave rise to the blow-up chart such that we could take a copy and that our expert could take the time to review it and highlight it and write on it.

So what the State is offering is that the defense receive this chart for the first time in blown-up form and that perhaps our expert could take a photograph of the chart and print that photograph and then takes notes on his photograph. To the extent he wants an actual copy, he can evaluate it.

We don't believe that's proper, Your Honor, and it certainly hinders our ability to fully and adequately prepare a defense in this case.

THE COURT: And I have indicated that it's now 11:30. We are going to break for lunch until 1:15 specifically for this purpose, because I know your expert is here. I have told him he can stay in the courtroom while this witness testified.

And so I will give you until 1:15 with the charts with the experts so that you can review them and hopefu sufficiently prepare during that period of time.

Mr. Butters has represented to me that he does no

1149

have a copy of those charts; otherwise, I would ask him to give that to you.

Mr. Butters, if you can get one of these copies, I would certainly request that you do so because it may be helpful to me as well during the trial, and I would certainly like to have one to look at, too. But at any rate, you can certainly look at those charts with your expert until 1:15.

Let's bring the jurors out, Mr. Mau, and I'll tell them what we are going to do.

(The jury enters the courtroom at 11:30 a.m. with all parties present.)

THE COURT: Don't get comfortable. Ladies and gentlemen, we have a technical issue or legal issue, I guess you would say, that we need to deal with during our lunch break, so it's going to take us a little bit longer to do that, but it's better that we try to do it during the lunch break and at least get you back here and start with this next witness as soon as we can.

So based on that and the request from the parties, have agreed that we will break from now until 1:15. It gives you a little bit longer lunch break than I would normally give you, and we are going to try to work this issue out and be ready to start at 1:15.

So what I will ask you to do, folks, is be back in

1150

the first floor jury assembly room by 1:15.  I think we can start immediately as soon as everybody gets there.

So actually -- let me ask you this, folks.  We are going to -- I want to start at 1:15.  If you can be back by 10 after that will help me, that way we can get everybody upstairs.  So if you could be back by 1:10 we will anticipate that we are starting promptly at 1:15.

Thank you, folks.  Same instructions as previous.

(The jury exits the courtroom at 11:32 a.m.)

THE COURT:  Thank you, folks.  I'll see you all at 1:15.

(Lunch recess taken from 11:32 a.m. to 1:17 p.m.)

(Defendant and all parties present.)

MR. CITRONBERG:  Well, I have something here on my baby iPod, and then with my client's permission I'm going to run out to the restroom, because I have to.

THE COURT:  As I said, that is certainly fine with me if Mr. Jannuzzo is okay with that.

MR. SMITH:  May I approach, Your Honor?

THE COURT:  Certainly.  Just hand it to the clerk there.  Thank you.

Thank you, ma'am.

MR. CITRONBERG:  Your Honor.

THE COURT:  Yes, sir.

MR. CITRONBERG:  I guess I'd ask the Court's

1151

indulgence for a little bit to ask the prosecutor what he expects. I have a witness outside, a lawyer, and if we're not going to reach him he'd like to be released.

THE COURT: Is he one of the defense's first witnesses? Is that what you are saying?

MR. CITRONBERG: No. We're going to take him out of order. If we are not going to make it to the defense case today, I'd just like to let him know.

THE COURT: Right. I would anticipate -- well, let me ask, how long with all of your witnesses do you anticipate it will take, Mr. Butters, noting that we have all been wrong before.

MR. BUTTERS: Right. I would think about two hours, but I can't speak for cross-examination.

THE COURT: I understand that. I understand.

MR. CITRONBERG: Then we have directed verdict after that, Judge.

THE COURT: Right. I understand that.

MR. CITRONBERG: And I know you have to leave early

THE COURT: And I do have to leave early. I would think it would be safe to allow that witness to go, and certainly won't penalize you if it comes to that.

All right. Now excuse me. Let me go back to whe we are here. All right. Now, Mr. Smith, you had a motion?

1152

(Defendant's Exhibit Number 12 was marked.)

MR. SMITH:  Yes, Your Honor.  Following the lunch break, at roughly 11:30 this morning, the defense and its experts and the defendant have spent roughly an hour and 40 minutes reviewing what are five charts that were provided and shown to us for the first time after the Court left the bench.

Those charts generally contain references to documents that this Court has excluded from the record. They contain references to documents that are not entered into the record.  They contain references to documents and actions that are not part of the indictment.

And after that roughly hour and 40 minutes or so with our experts taking photographs of each of the charts, we haven't, even at this point, had time to be able to even fully determine which documents are even in evidence despite our efforts.

I marked as an exhibit, Exhibit -- I believe it's 12 that I submitted to the Court, the brief that attaches photographs of each of the charts.

And the reason they are photographs is because the State is incapable of providing to us an image of these charts that contain numerous transactions in any kind of form so that we can have -- the defense can have it and the experts can review it.

1153

In addition, Your Honor, the purpose of the photograph for the record of this Court is to demonstrate the effort that the defense team made during the time that the Court gave it to try and understand it.

The Court will see in those images legal pads being held by the defendant's expert, Mr. McGovern, who is drawing pictures of the entries on the chart on legal pads in an effort to try and understand it.

I stand before this Court and represent to this Court that the defendant did not have an adequate time to evaluate these charts.

The defendant's position is that this does constitute discovery under 17-6-4(3)(A)(sic), and I do understand that Mr. Butters represented to this Court that's it's illustrative.

But, Your Honor, in the hour and 40 minutes or so, w didn't even have time to determine whether all the references relate to evidence.

Illustrative exhibits, the defendant submits, are drawings, are basic items that are used to illustrate testimony.

They are not detailed analysis that would normally considered an expert report transformed into a large picture and then told that it's not going to come into evidence, so, therefore, we didn't need to give it to

1154

So I can represent to the Court that we have not had time to adequately deal with these exhibits and we have made our best effort to do so.

Earlier this morning the Court ruled and sustained an objection with respect to the chain of custody. At that time the State was about to tender a witness to talk about the recovery of a weapon, but yet the chain of custody wasn't in the record.

Now the State has provided charts that it intends to use and intends to publish to the jury in one form or another, and those charts contain references to materials that were excluded by this Court.

There is absolutely no good-faith basis that the State can have for showing the jury a chart that references evidence that the Court has excluded. There is no good-faith basis for the State to seek to publish and show the jury a chart that contains a reference to documents that aren't in evidence.

And what has happened here, Your Honor, is that the defense throughout this case has been put to the task of submitting letter brief after letter brief making argument -- making argument after argument about the ne to have information, the need to know witnesses, the ne to see documents.

We had this discussion last Thursday. We had thi

1155

discussion on Friday.  We had the discussion on Monday.  And I have known at times the Court has grown impatient perhaps with the emotion that I have shown and perhaps at times I have crossed that line, and I apologize to the Court for that, but I can represent to the Court that we are doing our darndest to represent this client in serious charges.  We are doing the best that we can.

And a case of this size and a case of this magnitude and a case with this complexity has challenges enough, but at 11:30 in the morning in the second week of trial to receive five huge exhibits referencing detailed financial transactions based on evidence that's been excluded and evidence that's not admitted, at some point it just -- the burden becomes too much.  It's too much.

We can't prepare for this witness in an hour and a half.  We can't review these charts.  We can't keep tryin to prevent evidence that hasn't been admitted from being smuggled in at every turn.

That's what's on these charts.  The Cayman Island bank records, Your Honor, that you've excluded already.  There's no good-faith basis for that.

How could that possibly be shown to the jury?  How could a witness testify to information that he or she evaluated from documents that this Court has excluded?

And we don't want this trial delayed any more, Yo

1156

Honor. It is a burden to the defense. It's expensive to the defense.

We have taken breaks so Mr. Butters can gather witnesses, chain of custody witnesses that he should have had and should have put up, and now we took another break so our experts can get on their hands and knees and in primitive fashion make drawings of graphs, without eating lunch, to try and prepare for cross-examination. It's just not right and it's just not fair.

And we would ask, Your Honor, that the Court exclude these documents, these -- one, two, three four -- five charts under 17-6-4(sic) and 17-6-6(sic). And so the prosecution's case can continue in a timely fashion today and that this case can move forward to its natural conclusion.

I further represent to the Court that we, too, prepared charts just like this and we provided it to the prosecution at least three weeks ago, consistent with the rules we understand, which requires that there be ten days.

THE COURT: Tell me this, Mr. Smith. Which portion of 17-6-4 are you citing to the Court for the propositi that this chart to be used as -- and notwithstanding whether it contains evidence that's already been exclud by the Court, because I think that's a separate issue

1157

we'll have to deal with -- but whether the charts of the expert themselves, if used as a demonstrative aid and not introduced into evidence, tell me which statutory section I should be looking at.

MR. SMITH: Well, Your Honor, we're looking at 17-6-4(3)(A) and, we understand -- I know the Court, you know, indicated its believe with respect to whether it's or an illustrative aid prior to break. It's the defense view --

THE COURT: I just asked the State how it's going to use it because I don't -- I haven't even seen the chart yet so --

MR. SMITH: Well, it's the view of the defense that while the word "evidence" is in 17-6-4(3)(A) that the intention of the discovery statute to permit a defendant to evaluate photographs or books or papers or documents that are used against him so that he can adequately prepare for trial is covered there, and it is covered in the section that deals with evidence.

And that to permit the State to simply take an expert -- what would be equivalent of an expert report, which the Court can see has numerous entries and points with dollar signs and references to Bates numbers, and simply place that on a chart and then call it an illustrative aid and then say that there's no prejudice

1158